IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

OREGON NATURAL DESERT ASS'N,

       Plaintiff,

                                 CV 09-369-PK
                                 OPINION AND ORDER

KENNY MCDANIEL, Burn District
Manager, BLM, *et al.*,

       Defendants.

PAPAK, Judge:


       Plaintiff Oregon Natural Desert Association (ONDA) brings this action arising from the

travel management planning process for the Steens Mountain.  ONDA names as defendants the

United States Bureau of Land Management ("BLM"), Kenny McDaniel, District Manager for the

Burns District of BLM, and Joan Suther, Field Manager for the Andrews Resource Area of the


Page 1 - OPINION AND ORDER

Burns District of BLM.[1]  Specifically, ONDA alleges that either BLM's decision adopting its Travel Management Plan (TMP) or the Interior Board of Land Appeals' ("IBLA") decision approving BLM's adoption of the TMP violates the Steens Mountain Cooperative Management and Protection Act of 2000 ("Steens Act"), 16 U.S.C. § 460nnn *et seq.*, the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701–87, the Wilderness Act of 1964, 16 U.S.C. §§ 1131–36, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–61.  Now before the court is ONDA's motion for summary judgment (#52), BLM's cross-motion for summary judgment (#67), and BLM's motion to strike extra-record materials (#59).  ONDA's motion and BLM's cross-motion for summary judgment are both granted in part and denied in part as set forth below.  BLM's motion to strike extra-record materials is denied as to the declaration of Dr. Craig Miller, and denied as moot regarding any other extra-record materials.

## BACKGROUND

### I.    Steens Mountain and Steens Act

Steens Mountain is a 9,773-foot high mountain located in southeast Oregon's high desert. In 2000, Congress passed the Steens Act, which created the Cooperative Management and Protection Area (CMPA), a protected area of over 400,000 acres managed by BLM covering most of Steens Mountain.  16 U.S.C. § 460nnn-11(a).  The stated purpose of the CMPA is to "conserve, protect, and manage the long-term ecological integrity of Steens Mountain for future

---

[1] For simplicity, I refer to defendants collectively as BLM.

and present generations." 16 U.S.C. § 460nnn-12(a).[2]

## II.    Land Use Planning Requirements

As part of the Steens Act, Congress directed the BLM to develop a "comprehensive plan for the long-range protection and management of the Federal lands included in the [CMPA]" by October 30, 2004.  16 U.S.C. § 460nnn-21(b).  The Steens Act requires the plan to "include, as an integral part, a comprehensive transportation plan for the Federal lands included in the [CMPA], which shall address the maintenance, improvement, and closure of roads and trails as well as travel access." *Id.* § 460nnn-22(a).   Beyond requiring a comprehensive transportation plan, the Steens Act prohibits the use of motorized and mechanized vehicles off-road and limits their use to designated, existing roads and trails, with limited exceptions. *Id.* § 460nnn-22.  The Steens Act also prohibits construction of new roads or trails for motorized or mechanized vehicles unless necessary for public safety or protection of the environment. *Id.* § 460nnn-22(d).

## III.    BLM Oversight

The Bureau of Land Management (BLM) manages 3,275,694 acres of public land in the Burns District where Steens Mountain is located.  AR 10374.  The Burns District is divided into two Resource Areas (RAs): the Andrews RA and the Three Rivers RA. *Id.*  The two RAs are further divided into land within the boundary of the Steens Mountain CMPA, and those within the Andrews RA but outside the CMPA boundary. *Id.*  The latter is titled the Andrews Management Unit (AMU) and covers approximately 1,221,000 acres of public land. *Id.*

_____

[2] The Steens Act also created the Steens Mountain Wilderness Area, designated 29 miles of streams for wild and scenic river status, withdrew 1.1 million acres from mineral and geothermal leasing, established the Wildlands Juniper Management Area, designated a Redband trout reserve, and set aside a 97,000 acre from livestock grazing. 16 U.S.C. §§ 460nnn-61, -71, -81, -91, -72, -11(b), -23(e)(2).

Page 3 - OPINION AND ORDER

**IV.    ONDA's Participation in the Land Use Planning Process**

Starting in February, 2002, BLM began to prepare two counterpart Resource Management Plans (RMPs) for the Andrews Management Unit and the CMPA.  AR 10781.  Collectively, the plans are referred to as the Andrews Steens Resource Management Plan (RMP).  During the planning process, ONDA met with BLM staff, submitted scientific data and literature, and provided detailed written comments underscoring Steens Mountain's significant wilderness and wildlife habitat values.  *See Or. Natural Desert Ass'n v. Shuford*, No. 06-242-AA, 2007 U.S. Dist. LEXIS 42614, *5, 2007 WL 1695162 (D. Or. June 8, 2007).  Using the BLM inventory protocol established in BLM's 2001 *Wilderness Inventory Study and Procedures* handbook, ONDA conducted an independent wilderness survey documenting changes in the landscape since the 1970s, when BLM completed its last field inventory.  *See Shuford*,  2007 U.S. Dist. LEXIS 42614, *5.  The 2,000-plus page wilderness report included maps identifying areas that ONDA believed meet wilderness characteristics, annotated road and photo logs with GPS locations, thousands of photographs, and narratives documenting ONDA's analysis of wilderness characteristics not included in BLM's original wilderness review.  *See id.*; SAR 1737-3981, 3984-4073.  ONDA also provided BLM with a route inventory accompanied by photographs, maps, and narrative descriptions which documented routes that were redundant, non-existent, or impassible and recommended closing those routes to motorized use.  *Id*; SAR 4074-86.

Pursuant to NEPA requirements, BLM released a Draft RMP/Draft Environmental Impact Statement (EIS) in October 2003, and a Proposed RMP/Final EIS in August 2004.  *Shuford*, 2007 U.S. Dist. LEXIS 42614, *5.  On September 9, 2004, ONDA administratively protested the Andrews-Steens Proposed RMP and Final EIS, but on June 10, 2005, BLM denied ONDA's

protest in a letter responding to ONDA's protest issues.  *Id.*  On July 15, 2005, BLM issued a

Record of Decision (ROD) adopting the Andrews-Steens RMP.  *Id.*

## V.    July 2005 Transportation Plan

In an effort to satisfy the Steens Act requirement for a comprehensive transportation plan,

the RMP included an 8-page appendix labeled as a "Transportation Plan." AR 10707-14

(Appendix M).  The Transportation Plan (TP) included a goal ("Provide travel routes to and

through BLM-managed lands as appropriate to meet resource objectives while providing for

private and public access needs"), an objective ("Manage roads and ways within the CMPA

consistent with the Route Management Categories and Maintenance Levels"), a rationale (the

need for management and protection of natural resources as well as a route system to

accommodate public and private access needs).  AR 10707-08; *Shuford*, 2007 U.S. Dist. LEXIS

42614, *52.  The plan also included descriptions of route types, a list of management best

practices, and a glossary of terms.  AR 10708-14.  Further, the plan identified specific routes by

name, designated some as either open or closed, and provided management directions and

maintenance levels for others.  AR 10709.  Finally, the plan called for "specific field inventories

and needs determinations on all other routes within the CMPA."  AR 10707.  According to the

document, a travel plan and environmental assessment based on those inventories and

determinations would "complete the comprehensive requirements [of the Steens Act] and be

completed by December 31, 2005."  *Id.*  The plan provided that, in the interim, "the open roads

and ways shown on Map 13 in the RMP represent the routes known to be historically available

for motorized use and shall remain available for such use unless changed through the

development of the updated Travel Plan mentioned above."  *Id.*  In August 2005, BLM adopted

the final RMP, including the transportation plan contained in Appendix M.  *See* AR 10364-11051.

## VI.    Initiation of Prior Litigation

In February 2006, shortly after BLM had failed to meet its 2005 year-end deadline for adopting a comprehensive transportation plan, ONDA sued BLM in this court alleging that the RMP as adopted in August 2005 violated a number of federal environmental statutes, including the requirement of the Steens Act that the BLM develop a comprehensive transportation plan as an integral part of the CMPA RMP.  *Shuford*, 2007 U.S. Dist. LEXIS 42614, *2.  While that suit was pending before Judge Aiken, BLM announced in December 2006 that it would prepare a new "Travel Management Plan" and accompanying environmental assessment to satisfy the requirements of the Steens Act.  AR 10248, 9929.

## VII.    Travel Management Plan

### A.    Consultation with the Public and Advisory Council

In December 2006, a scoping document was distributed to gather comments and ideas from interested members of the public regarding road and travel issues to be addressed in the TMP Environmental Assessment (EA).  AR 9953.  The comments identified several key goals: (1) retain historical access; (2) protect ecological integrity by reducing motorized vehicle use; (3) close specific routes; and (4) address hiking trails and snowmobile use.  AR 9954.  BLM also consulted extensively with the Steens Mountain Advisory Council, which was established under the Steens Act to promote cooperative management of the CMPA and consists of representatives of a broad array of views and interests. 16 U.S.C. § 460nnn-51.

### B.    Release of TMP/EA

In April, 2007, BLM released a Finding of No Significant Impact (FONSI) and combined Travel Management Plan (TMP)/Environmental Assessment (EA), and called for a public comment period until May 21, 2007. AR 9913. The TMP/EA included background information about the transportation planning process, identification and grouping of motorized routes, a description of the proposed transportation plan and various alternatives, and an environmental assessment of those options.

### C. Route Inventory

In developing the Travel Management Plan (TMP), BLM stated that it completed on-the-ground route inventories for motorized travel routes. AR 9953. The TMP, however, describes those inventories only in the most general terms. In the TMP, BLM states that the inventories were conducted during the 2003 through 2006 field seasons. AR 9963. The TMP also notes that "[m]ost routes within the CMPA" were checked for general condition and degree of use by BLM staff. *Id.* Moreover, private landowners, grazing operators, County Commissioners and ONDA participated directly in conducting portions of the inventory. *Id.* The TMP also states that "[a]pproximately 70 miles of motorized routes, including 15 miles of WSA [Wildlife Study Area] ways, were found and added to the transportation network for analysis in this EA. The ways were originally identified during the wilderness inventory in the early 1980s." *Id.*

### D. Route Types and Mapping

Besides describing BLM's route inventory, the TMP/EA grouped "routes within the CMPA" into seven defined route types based on their condition and use. AR 9996-65. These types were Base Routes (those "currently open to motor vehicle travel"), Obscure Routes (those "hard to locate on-the-ground"), Historical Routes (those that "have been used to access private

lands and administer livestock grazing permits"), Private Landowner Access Routes (those "used

to access private lands within the CMPA"), Permit Routes (those "available to livestock

operators but closed to the public"), All-Terrain Vehicle Routes (those which "are no longer safe

for full-sized vehicles [because of landslides and natural erosion]"), and a Special Use Permit

Route (which "passes through Riddle Brothers Ranch and is identified in the RMP as open to the

public under Special Use Permit"). *Id.* TMP/EA also identified how many miles of some

particular route types existed within the CMPA; BLM noted 556 miles of Base Routes, 36 miles

of Obscure Routes, and eight miles of ATV Routes, but left unspecified the overall length of

routes in other route types. *Id.* Obscure Routes, however, were also counted as part of the Base

Route total. *Id.*

   The TMP also created a "Travel Management Plan Decision Map" that graphically

depicted the location and type of these routes within the CMPA. AR 803. For example, Base

Routes were represented by black lines, Obscure Routes by pink/purple lines, Historical Routes

by blue lines, etc. *Id.* Some routes were mapped using several colors simultaneously "for

analysis purposes," AR 9964, indicating that, for example, a route was both a Base Route and

Obscure Route*,* or that an Historical Route was also a Grazing Permit Route. AR 803. Not all

categorized routes were mapped; some Historical Routes were not mapped, but nonetheless

"their use and need on public lands within the CMPA is recognized." AR 9964.

   Additionally, the TMP/EA lays out an entirely different set of five "Route Management

Categories" which were previously defined in the TP and describe the permitted uses and types

of travel for each. AR 794. The "Route Management Categories" are Common Use Routes

("open to the public but may be closed or have seasonal restrictions during certain sensitive

Page 8 - OPINION AND ORDER

periods"), Cooperatively Managed Routes ("Routes across private, State, BLM-administered or other agency land . . . hav[ing] specified levels of public use, season of use, and type of use"), Service/Permit Use Routes ("Routes accross public and used to access private property. Motorized use allowed only for private property interest and BLM administration"), Private Property Access Routes ("Routes across public land used to access private property. Motorized use allowed only for private property interests and BLM administration"), and Private Routes ("Routes across private land not open to use by the public").  Different route types could belong to one or more "Route Management Categories."  Most contentious for the purposes of this litigation, however, was the TMP statement that "Base Routes [] would continue as Common Use Routes and, therefore, [be] available for public motorized traffic." AR 9968.

### E.    Analysis of Proposed Action and Alternatives

In reaching its decision on the Travel Management Plan, the BLM considered four alternatives: (1)"minimal change;" (2) "maximize use;" (3) "reduced use;" and (4) "proposed action."  AR 9967-9970.  Under the "proposed action," the plan ultimately adopted by BLM, the 555 miles designated as Base Routes would continue as Common Routes and thus remain available for public motorized traffic.  AR 9969.  Moreover, 36 miles designated as Obscure Routes would remain available for public motorized use, but would not be marked on the ground.  *Id.*  Further, an additional Private Property Access Route of 1.4 miles would be designated within the Bridge Creek WSA.  *Id.*  Permit Routes and Historical Routes within the WSAs and other non-wilderness public lands would be used in the same manner as allowed at the passage of the FLPMA in October 1976.  Also, Historical Routes would be used to "to the extent their character is not changed."  *Id.*  Motorized vehicle use wold be authorized for activities such as distribution

of salt and checking water reservoirs.  *Id.*  All eight miles of potential ATV routes would be

reclassified as ATV trails and nearly a quarter mile of Weston Basin Road would be gated and

closed to the public. *Id.*  BLM described the proposed action as "most like the route network

presently available in the CMPA."  *Id.*

The "minimal change" alternative would have been similar to the proposed action, but

would close Obscure Routes to public motorized travel.  AR 9967.  The "maximize use"

alternative would reclassify all routes under consideration for ATV vehicles to allow

reconstruction and maintenance by full-sized, high clearance vehicles.  Finally, the "reduced use"

alternative would have closed 250 miles of Common Use Routes and Obscure Routes to public

motorized travel.  In sum,  BLM's four alternative actions analyzed in the TMP/EA all focused on

the management of motorized travel routes.

### F.    Non-Motorized Travel in the TMP

Although BLM mainly addressed motorized travel routes in the TMP/EA, BLM also

discussed non-motorized travel in a few instances.  *See* AR 786 ("The TMP EA focuses on

motorized travel routes and discusses the continued availability of existing nonmotorized trails

for nonmotorized uses.")  For example, BLM identified and verified the existence of ten hiking

trails within the CMPA and recognized that numerous other trails existed based on information

from permit-holders and guide books.  AR 10007–08.  Nevertheless, BLM acknowledged that it

had not yet completed an inventory of non-motorized routes and trails, although it intended to do

so during later development of the Comprehensive Recreation Plan (CRP).  AR 783.  BLM

referenced maps attached to the TMP and stated that identified nonmotorized trails would retain

their status.  AR 783 ("[t]he TMP maps include known nonmotorized trails . . . these trails

remain open to nonmotorized and nonmechanized uses").  The BLM also noted that further

mapping of non-motorized routes, potential designation of additional hiking trails, and possible

closing of motorized routes would occur later as part of the Comprehensive Recreation Plan

(CRP), which would focus on recreational uses.  AR 783, 785–86, 10008.  Overall, the TMP

noted that "there has been no evidence of conflicts between motorized and nonmotorized uses

within the CMPA."  AR 785.

> ### G.    Public Comment and Final Decision

BLM received 9,872 public comments in response to the TMP/EA, in addition to

approximately 11,000 similar letters sent by members of the Wilderness Society advocating

closure of obscure routes and other routes that could adversely affect wildlife and soil erosion.

*See* AR 851-9908, 10036-10247, 10190 (example of comment letter by members of Wilderness

Society not otherwise reflected in the administrative record).  ONDA also submitted written

comments requesting BLM to close certain routes to protect the environment and plan for

motorized and non-motorized travel simultaneously.  AR 12931-45.  In addition, ONDA

submitted a 242-page updated route inventory report containing photographs, mapping, and

analysis, which documented approximately 100 routes that ONDA surveyed and found to be

overgrown, impassible, or non-existent.  AR 12946-13257.  On May 31, 2007, one week after the

end of the public comment period, BLM issued a Decision Record summarizing the public

comments and adopting the proposed action.  AR 782-803.  This Decision Record is one of the

two agency actions challenged by ONDA in the current litigation.

## VIII.   Resolution of Prior Litigation

One week later, on June 8, 2007, this court in *Shuford* affirmed most of the challenged

aspects of the RMP.   The court, however, granted summary judgment in favor of ONDA on its

challenge to the transportation plan, holding that the plan violated the Steens Act for several

reasons.  *Id.* at *56-58.  First, the plan did not include a "comprehensive management system for

travel over roads, ways, and trails."  *Id.* at *56.  Second, the plan explicitly provided for an

additional environmental assessment and travel management plan, including further field

inventories and need determinations, in order to complete the comprehensive transportation plan

mandated by the Steens Act.  *Id.* at * 57.  Finally, the plan as it existed did not "describe or

include a plan for managing different types of travel over specific areas, roads, routes or trails."

*Id.*  Thus, the plan failed to address travel on hiking trails, an unambiguous requirement of the

statute.  *Id.* at *57-58.  Several days later, on June 13, 2007, BLM rescinded its RMP decision,

expressing its intent to take into account the court's ruling in *Shuford* and reissue its decision.

AR 827.

        Over a year later, on July 8, 2008, this court remanded the TP to BLM for development of

a transportation plan that meets the requirements of the Steens Act, despite arguments from BLM

that it had already remedied the deficiencies of the TP by adopting the TMP and commencing

preparation of the Comprehensive Recreation Plan. (Def.'s Memo in Support, #68, Ex. A at 8.)

In reaching that decision, the court recognized that although the TP was "insufficient in scope,"

the court had not found that the information contained in the TP was "substantively flawed or

that such information could not be supplemented after further analysis and review of travel

routes." *Id.* at 9.  Thus, the court concluded that BLM's error with the TP was "not egregious and

can likely be remedied with further review." *Id.*

## IX.    Transportation Management Plan and the Current Litigation

On November 28, 2007, BLM issued a new TMP decision, which again adopted the proposed action unchanged from the previously rescinded TMP.  AR 783.  The new TMP decision included no additional public comments and relied upon the original environmental assessment.  AR 783-84.  On January 4, 2008, ONDA appealed from and petitioned for stay of the effect of the new TMP decision to the Department of Interior's Board of Land Appeals (IBLA), raising four main claims and a number of other concerns.  AR 619-690, 242-294.  First, ONDA asserted that the TMP decision violated the Steens Act, FLPMA and NEPA because it failed to address non-motorized travel and recreation opportunities.  AR 249-54.  Second, ONDA argued that the plan violated the Steens Act and FLPMA by designating "Obscure Routes" located in Wilderness Study Areas as open to public motorized travel. AR 255-61.  Third, ONDA contended that the decision violated the Steens Act, FLPMA and NEPA because it failed to reconsider closures on routes on Steens Mountain shown to be obsolete, redundant or causing resource damage.  AR 261-63.  Finally, ONDA asserted that the decision violated the Steens Act and FLPMA by leaving more than 500 miles of motorized vehicle routes on Steens Mountain open to motorized use.  AR 263-65.  On April 2, 2008, the IBLA granted a stay as to the part of the BLM decision to open Obscure Routes to public vehicle traffic, but denied ONDA's petition for stay as to all other challenged aspects of BLM's decision.  AR 202.  Then, on February 19, 2009, IBLA reversed BLM's decision permitting motorized traffic on the Obscure Routes within the CMPA, but affirmed BLM's TMP decision in all other respects. AR 53-57, 65.

## X.    Procedural History

Less than a month later, on April 13, 2009, ONDA originally filed this action challenging BLM's Decision Record as the final agency action.  On November 9, 2010, this court heard oral

arguments on the limited issue of which agency action – BLM's Decision Record or the IBLA

decision – was the final agency action subject to judicial review.  Subsequently, this court issued

an amended opinion and order concluding that the IBLA's February 19, 2009 decision was the

single final agency action subject to judicial review.  (#82.)   On December 9, 2010, ONDA

moved to amend its complaint to add the IBLA as a defendant and plead its claims in the

alternative, challenging both the BLM and IBLA decisions as final agency actions.  (#84.)  Since

BLM argued that ONDA's proposed amendment was futile because ONDA failed to exhaust all

of its claims before the IBLA, the court permitted the parties to submit supplemental briefing on

the question of issue exhaustion.  On January 14, 2011, this court issued a opinion and order

determining that ONDA had properly exhausted before the IBLA all nine issues raised in its

proposed amended complaint and granting ONDA's motion to amend.  (#94.)  Subsequently, the

court held a telephone conference during which it offered the parties the option to submit yet

another round of supplemental briefing focusing their summary judgment arguments specifically

on the propriety of the IBLA's decision.  (#97.)  BLM opted to file a supplemental brief, while

ONDA simply requested the court to construe its previous summary judgment briefing, which

focused on the BLM decision, to apply also to the IBLA decision.  The court permitted ONDA to

respond to BLM's supplemental brief and BLM to file a reply brief.  Consequently, the court has

the benefit of voluminous briefing on the matters for determination.

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). Where the district court reviews an administrative action

pursuant to the APA, summary judgment is an appropriate mechanism for deciding the purely

legal question of whether the agency could have reasonably reached the decision that it did.

*Occidental Engineering Co. v. I.N.S.*, 753 F.2d 766, 769-70 (9th Cir. 1985). On cross-motions

for summary judgment pursuant to APA review, reviewing courts do not separately analyze each

motion as they would with ordinary cross-motions for summary judgment, presumably because

the reviewing courts address questions of law equally applicable to both motions. *Cf. Umpqua

Watersheds v. U.S.*, 725 F.Supp.2d 1232 (D. Or. 2010); *Oregon Natural Desert Ass'n v.

Rasmussen*, 451 F.Supp.2d 1202 (D. Or. 2006).

## II.     Standard of Review for Agency Decisions Generally

Where an agency has taken final action, a court may set aside that action under

§706(2)(A) of the APA if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Oregon Natural Res. Council*, 490 U.S.

360, 377 (1989). Review under the arbitrary and capricious standard is narrow, and courts give

deference to an agency's construction of a statutory provision it is charged with administering.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983);

*American Fed'n of Gov't Employees v. Fed. Labor Relations Auth.*, 204 F.3d 1272, 1274-75 (9th

Cir. 2000). The reviewing court must determine whether the agency's decision was based on a

consideration of the relevant factors or whether there has been a clear error of judgment. *Motor

Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Hells Canyon Alliance v. United States Forest Serv.*, 227

F.3d 1170, 1177 (9th Cir. 2000). For example, the court may set aside a decision if the agency

has relied on "factors which Congress has not intended it to consider, entirely failed to consider

an important aspect of the problem, offered an explanation for its decision that runs counter to

the evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Nw. Coal.*

*for Alternatives to Pesticides (NCAP) v. U.S. EPA*, 544 F.3d 1043, 1047 (9th Cir. 2008).

Thus, the reviewing court's inquiry, though narrow, must be "searching and careful."

*Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000) (quoting

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).  Further,

"[d]eference to an agency's technical expertise and experience is particularly warranted with

respect to questions involving . . . scientific matters." *United States v. Alpine Land & Reservoir*

*Co.*, 887 F.2d 207, 213 (9th Cir. 1989).  However, the "presumption of agency expertise may be

rebutted if its decisions, even though based on scientific expertise, are not reasoned." *Greenpeace*

*v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000).  Therefore,

although the scope of review is narrow, the depth of review is substantial.  *NW Coalition for*

*Alternatives to Pesticides v. EPA*, 544 F.3d 1043, 1052, n.7 (9th Cir. 2008) ("'although data

interpretation and analysis are functions that often lie within an agency's realm of expertise, it is

our duty to review those functions to ascertain whether the agency's actions were complete,

reasoned, and adequately explained. The mere fact that an agency is operating in a field of its

expertise does not excuse us from our customary review responsibilities'") (quoting *Center for*

*Auto Safety v. Peck*, 751 F.2d 1336, 1373 (D.C.Cir.1985) (Wright, J., dissenting)).

## III.    Standard of Review for IBLA Decisions

Courts apply the same standard for review of IBLA decisions as for review of agency

decisions generally.  Thus, a district court will reverse the IBLA's decision only if that decision is arbitrary, capricious, an abuse of discretion, or contrary to law.  *Gilmore v. Lujan*, 947 F.2d 1409, 1411 (9th Cir. 1991).  This standard is narrow and a reviewing court may not substitute its judgment for that of the agency.  *Geo-Energy Partners*, 613 F.3d 946, 955 (9th Cir. 2010) (citing *Mount St. Helens Mining and Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 728 (9th Cir. 2004)).  The court must determine whether the agency articulated a rational connection between the facts and the choice made and whether the agency's decision was based on a consideration of the relevant factors.  *Id.*

## IV.    Scope of Review

The APA requires a court to "review the whole record or those parts of it cited by a party" when reviewing agency action.  5 U.S.C. § 706.  The "whole record" consists of "everything that was before the agency pertaining to the merits of its decision." *Portland Audubon Soc. v. Endangered Species Committee*, 984 F.2d 1534, 1548 (9th Cir.1993).  The whole record is not just what the agency submitted as the administrative record, but also includes "all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson v. U.S. Dept. of Labor*,  885 F.2d 551, 555 (9th Cir. 1989) (internal quotations and citations omitted) (emphasis in original).

## DISCUSSION

As ONDA explained in it's initial summary judgment briefing, the gravamen of its suit is that "after more than five years of transportation planning on Steens Mountain, BLM has issued a plan that is not 'comprehensive' and at the same time designates 'roads' where none exist on the ground, according to BLM's definitions and evidence in the record . . . BLM's plan carves up

roadless areas on Steens Mountain, fragmenting core sagebrush habitat and foreclosing Congress'

ability to one day preserve these areas as Wilderness by expanding the Steens Mountain

Wilderness Area." (P.'s Br., #53, at 8-9.) ONDA now moves for summary judgment on nine

legal issues associated with four different claims for relief, all of which this court found were

properly exhausted before the IBLA. (Pl.'s Supp. Br., #86, at 5) (chart listing ONDA's four

claims and nine corresponding issues). For clarity, I reproduce a chart summarizing ONDA's

claims and associated legal issues:

| CLAIM | ISSUE | LEGAL AUTHORITY |
|---|---|---|
| **Claim 1 – Steens Act** (First Am. Compl. ¶¶ 76–82) | **Issue 1-** requirement of comprehensive travel management plan | 16 U.S.C. § 460nnn-22(a) |
| | **Issue 2-** prohibition on off-road vehicle use | 16 U.S.C. § 460nnn-22(b) |
| | **Issue 3-** prohibition on construction of new motorized roads or trails | 16 U.S.C. § 460nnn-22(d) |
| **Claim 2- FLPMA** (First Am. Compl. ¶¶ 83–91) | **Issue 4-** non-impairment requirement | 43 U.S.C. § 1782(c) |
| **Claim 3 – Wilderness Act** (First Am. Compl. ¶¶ 92–99) | **Issue 5-** non-impairment requirement | 16 U.S.C. § 1133(b) |
| **Claim 4 – NEPA** (First Am. Compl. ¶¶100–107) | **Issue 6-** range of alternatives requirement | 42 U.S.C. §§ 4332(2)(C), (E) 40 C.F.R. §§ 1500.2(e), 1508.9(b) |
| | **Issue 7-** disclosure and discussion of opposing views/ accurate environmental baseline requirement | 42 U.S.C. § 4332(2)(C) 40 C.F.R. §§ 1500.1(b), 1502.1, 1502.9(a) & (b), 1502.15, 1502.24 |
| | **Issue 8-** prohibition on segmentation of connected actions | 42 U.S.C. § 4332(2)(C) 40 C.F.R. § 1508.25 |

| | **Issue 9**- EIS and EA/FONSI requirements | 42 U.S.C. § 4332(2)(C)<br>40 C.F.R. §§ 1501.4,<br>1508.9, 1508.13, 1508.27 |
|---|---|---|

ONDA generally takes the position that since the IBLA affirmed the TMP Decision Record, it committed the same errors that BLM did in adopting the Steens Mountain TMP.  For the purposes of this motion, I analyze the IBLA's decision in light of the record before it pertaining to the merits of the issues ONDA exhausted before the IBLA. First, I find that the IBLA's decision was reasonable on the two issues before the court that it addressed directly: the Steens Act comprehensive travel plan requirement and the NEPA alternatives requirement.   I conclude, however, that the IBLA's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" concerning ONDA's other seven issues, each of which the IBLA failed to address sufficiently to create a record for judicial review.[3]  Most troubling, however, is the IBLA's complete failure to review the TMP's individual route determinations, the methodology BLM employed in conducting its route inventory, or the evidence presented by ONDA that BLM's route designations ignored the actual conditions on the ground.  Since this failure implicates most, if not all, of ONDA's legal issues, I address it in a separate section below.  Ultimately, I find that the IBLA did not rationally affirm BLM's TMP because it

---

[3]  Both ONDA and the IBLA share some responsibility for the incompleteness of the IBLA's decision on those seven issues.  ONDA did not provide unambiguous notice to the IBLA of all the legal issues it now pursues, even though it satisfied the Ninth Circuit's relatively liberal issue exhaustion requirement.  At the same time, the IBLA did not look beyond the legal formulations in ONDA's briefing or expand its analysis to BLM route designations that were implicated by ONDA's broader concerns but were not specifically challenged in ONDA's briefing.  Thus, my conclusion that the IBLA decision was arbitrary and capricious is not meant to impugn the quality of the IBLA's analysis; instead it merely follows from the limited scope of that analysis.

conducted no reasoned analysis of BLM's route inventory.  The utter lack of such an analysis is therefore the key factor in my determination that the IBLA's decision must be vacated. Accordingly, I vacate the IBLA's decision (with the exception of the IBLA's closure of Obscure Routes) and remand this action back to the IBLA for further proceedings.

## I.      Steens Act Claims

### A.      Issue 1- Requirement of Comprehensive Travel Management Plan

ONDA challenges the IBLA's approval of the BLM's decision to omit non-motorized use and trails from the TMP as a violation of the Steens Act requirement that the BLM include, as an "integral part" of its management plan, "a comprehensive transportation plan for the Federal lands . . . which shall address the maintenance, improvement, and closure of roads and trails as well as travel access." 16 U.S.C. § 460nnn-22(a).   Here, I find that the IBLA's analysis concerning the requirements of section 112 of the Steens Act was rational, based on a consideration of the relevant factors, not contrary to law, and not arbitrary or capricious.

#### 1.      *Chevron* Deference

As a threshold matter, BLM contends that the IBLA's interpretation of the Steen's Act is entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  The *Chevron* analysis proceeds in two steps.  First, *Chevron* requires courts to determine whether the statute interpreted by the agency is unambiguous; if so, the agency must follow Congress' expressed intent.  *Chevron*, 467 U.S. at 842-43.  If, however, the statute is silent or ambiguous regarding a certain issue, the court must then determine what level of deference is owed to the agency's interpretation.  *Id.* at 843; *United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001).  In that second step, courts apply *Chevron* deference only when "it

appears that Congress delegated authority to the agency generally to make rules carrying the

force of law, and that the agency interpretation claiming deference was promulgated in the

exercise of that authority." *Wilderness Watch, Inc. v. U.S. Fish and Wildlife Service*, 629 F.3d

1024, 1034 (9th Cir. 2010) (quoting *United States v. Mead Corp*., 533 U.S. 218, 226-27 (2001)).

While delegation of Congress' authority to the agency "may be shown in a variety of ways, as by

an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some

other indication of a comparable congressional intent," it most typically occurs when Congress

permits the agency to engage in notice-and-comment rulemaking or formal adjudication.  *Mead*,

533 U.S. at 227, 230.   When Congress' delegation of authority is apparent, *Chevron* deference

requires the court to give controlling weight to the agency's interpretation, so long as that

interpretation is "permissible" or "reasonable." *Chevron*, 467 U.S. at 843, 844.

     In *Shuford*, Judge Aiken addressed whether *Chevron* deference applied to BLM's

interpretation of the Steens Act requirement of a "comprehensive" transportation plan.  Judge

Aiken first doubted whether *Chevron* applied, and reasoned that, even if it did, no *Chevron*

deference was owed because the language of the Steen's Act was unambiguous.  *Shuford*, 2007

WL 1695162, at *19-20 (citing the *Oxford English Dictionary* to define Steens Act language and

determining that the Steens Act "unambiguously" requires the transportation plan to "address

travel on hiking trails").  This case is different from *Shuford* in several respects, and therefore a

different result obtains.

     First, *Shuford* found the Steens Act requirement for a "comprehensive transportation

plan. . . which shall address the maintenance, improvement, and closure of roads and trails as

well as travel access" unambiguous in the sense that it required a transportation plan containing

Page 21 - OPINION AND ORDER

at least a "minimal level of detail." *Shuford*, 2007 WL 1695162, at *19; 16 U.S.C. §
460nnn-22(a).  There, the TP completely failed to address significant components required by the
Steens Act.  Here, however, the issue is not whether the Steens Act requires BLM to address
non-motorized travel in its plan at all, but rather whether the TMP addresses roads, trails, and
travel access in *sufficient detail* to satisfy the Steens Act.  In this regard, the Steens Act language
is ambiguous, since it does not specify how thoroughly the plan must address those topics.
Therefore, this court must continue on to the second step in the *Chevron* analysis.

The parties do not dispute the IBLA's authority to implement the Steens Act. The Steens
Act specifically gives the Secretary of the Interior authority to manage the lands included in the
CMPA. 16 U.S.C. § 460nnn-21(a).  Moreover, Congress has granted the Secretary the general
authority to manage Federal lands.  *See* 43 U.S.C. §1701 *et seq.*  Finally, since the IBLA is a part
of the Department of the Interior, its decisions are within the Department's role in administering
the Steens Act.  Any party who is adversely affected by a BLM decision may appeal to the IBLA.
43 C.F.R. §4.410.

The parties do, however, dispute whether the IBLA decision here is the type of formal
administrative process to which *Chevron* deference is due.  Unlike *Shuford,* which dealt with
BLM's implicit interpretation of the Steens Act through its promulgation of a transportation plan,
this case involves the IBLA's explicit interpretation of the Steens Act in its decision on ONDA's
appeal.   The parties debate whether the IBLA decision resulted from a "formal adjudication."
The APA generally defines a formal adjudication as one "required by statute to be determined on
the record after an opportunity for an agency hearing." 5 U.S.C. § 554(a).  ONDA contends that
since no agency hearing occurred, the adjudication was informal.  BLM, however, argues that

Page 22 - OPINION AND ORDER

since ONDA had the opportunity for an agency hearing but opted not to pursue one, the decision still resulted from a formal adjudication. *See* 43 C.F.R. § 4.415(a) ("Any party may file a motion that the Board refer a case to an administrative law judge for a hearing."). I find BLM's argument persuasive. While ONDA elected not to file a motion for a hearing on an appeal involving a question of fact, such a hearing was available under 43 C.F.R. § 4.415.

Even if the adjudication was not technically "formal," my analysis would not change, since the IBLA reached its decision through procedures with enough formality that Congress likely contemplated that it would possess interpretive authority. *See Mead*, 533 U.S. at 230 ("It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force."). Whether or not a party requests a hearing on questions of fact, regulations provide for a high level of formality in IBLA decision-making. Parties may file documents with the IBLA, 43 C.F.R. § 4.22, and the IBLA must base its decision for all hearings on a record containing the testimony, exhibits, and briefing filed by the parties. 43 C.F.R. § 4.24(a)(1). Moreover, the IBLA cannot base its decision on any document not open to inspection by the parties. 43 C.F.R. § 4.24(a)(4). The IBLA may even allow oral arguments. 43 C.F.R. § 4.25.

In part because of the formality of IBLA decisions, many courts, including those in the Ninth Circuit, apply *Chevron* deference to the IBLA's interpretations of statutes administered by the Department of the Interior. *New West Materials LLC v. Interior Bd. of Land Appeals*, 398 F.Supp.2d 438, 444 & n.18 (E.D.Va. 2005) (collecting cases); *see Akootchook v. U.S*, 271 F.3d 1160, 1166-67 (9th Cir. 2001) (applying *Chevron* deference to IBLA interpretation of the Alaska

Native Claims Settlement Act); *Brandt-Erichsen v. U.S. Dept. of Interior, Bureau of Land Mgmt.*, 999 F.2d 1376, 1381 (9th Cir. 1993) (acknowledging *Chevron* and giving "substantial deference" to the IBLA's decisions interpreting the meaning of a statutory term); *Nevitt v. United States*, 828 F.2d 1405, 1406-07 (9th Cir.1987) (deferring to the IBLA's interpretation of a statutory term without directly addressing the doctrine of *Chevron* deference); *Two Bay Petroleum v. U.S. Dep't of the Interior*, No. 2:05-CV-2335-MCE-JFM, 2007 WL 2028192, at *5 (E.D. Cal. July 10, 2007) (deferring to IBLA's interpretation of the Mineral Leasing Act).[4] Similarly, in this case, the IBLA's interpretation of the Steens Act should be accorded *Chevron* deference.

### 2.    Review of IBLA Decision

I find that the IBLA's interpretation of the Steens Act "comprehensive" transportation planning requirement was permissible, especially in light of this court's construction of that requirement in *Shuford.*  The IBLA observed that the Steens Act "does not expressly dictate exactly how BLM must address the means by which the public may utilize the roads and trails across the CMPA, so long as it generally provides for route maintenance, improvement, and closure, or even exactly how the public obtains travel access through the CMPA." AR 52.  This conclusion is both permissible and consistent with *Shuford*, which found BLM's TP to be arbitrary and capricious because it failed to address non-motorized travel altogether, not because its plans for non-motorized travel were insufficiently detailed.  *See Shuford,* 2007 WL 1695162, at *19 ("I find that the Steens Act requires BLM to do more than simply describe the components

---

[4] I find no cases, and ONDA has cited none, where a court in the Ninth Circuit has explicitly declined to afford *Chevron* deference to an IBLA decision interpreting a statute administered by the Department of Interior.

Page 24 - OPINION AND ORDER

or criteria of a future plan and defer development of the transportation plan to a later planning

process.").

Moreover, the IBLA's application of the Steens Act language to BLM's TMP is also

rational.   For example, the IBLA recognized that although BLM "had not fully inventoried

nonmotorized travel routes in the CMPA at the time of issuing the TMP," it nevertheless mapped

"both motorized and nonmotorized travel routes." AR 51.  Since the Steens Act nowhere requires

BLM to fully inventory all motorized and non-motorized trails within the CMPA, the IBLA

determined that deferring future mapping of non-motorized trails was consistent with the Steens

Act.  AR 53.   In addition, the IBLA made clear that the TMP addressed travel on hiking trails as

the Steens Act required; the IBLA wrote: "by virtue of designating routes for motorized travel,

BLM effectively provided that the remaining routes . . . are for nonmotorized use only." AR 51.

This conclusion finds some support in the administrative record.  *See* AR 783 (BLM Decision

Record stating that "[t]he TMP maps include known nonmotorized trails . . . these trails remain

open to nonmotorized and nonmechanized used"); AR 791 (hiking and horseback riding off-trail

is permitted, allowing those activities to continue in entire CMPA).  Further, the IBLA observed

that the TMP "discusses existing trails designated in the Steens Mountain Wilderness and Wild

and Scenic Rivers Plan as part of the Steens Mountain wilderness trail system." AR 53; *see* AR

1007-1008 (Decision Record mentioning ten trails, referencing a map of trails, and noting that

"[u]se of both verified and unverified trails may continue to occur unless public safety or

resource protection concerns requiring corrective action are identified.").  Thus, the IBLA

reasonably found that the TMP addressed roads, trails, and travel access as required by the Steens

Act, even though it lacked an exhaustive inventory of all travel routes within the CMPA.  AR 52-

Page 25 - OPINION AND ORDER

53.

**B.      Issue 2 and Issue 3- Prohibitions on Off-road Motor Vehicle Use and**

**Construction of New Motorized Roads or Trails**

The Steens Act provides that "[t]he use of motorized or mechanized vehicles on Federal

lands included in the [CMPA]– (A) is prohibited off road; and (B) is limited to such roads and

trails as may be designated for their use as part of the management plan." 16 U.S.C. § 460nnn-

22(b)(1).  The Steens Act also states that "[n]o new road or trail for motorized or mechanized

vehicles may be constructed on Federal lands in the [CMPA] . . . ."[5] 16 U.S.C. § 460nnn-

22(d)(1).  ONDA now alleges that the IBLA's ruling violated these Steens Act provisions by

affirming BLM's TMP, which permitted motorized travel on routes "that have fallen into

obscurity on the landscape . . . ."  (Amend. Compl., #96, ¶80c.)  I previously held that ONDA

exhausted this Steens Act issue before the IBLA by generally complaining of BLM's decision to

allow motorized travel on routes which were allegedly overgrown or non-existent.  (#94.)

Nevertheless, the IBLA only addressed this issue regarding the 35 miles of Obscure Routes

specifically identified by ONDA in its appeal, in effect determining without analysis that BLM's

TMP did not violate the Steens Act by opening any other routes to motorized travel.  AR 65

(IBLA decision stating that "[t]o the extent not addressed herein, all other errors of fact or law

asserted by appellants are rejected as contrary to the facts or law, or immaterial to the disposition

of the appeal.").  Thus, I find that the IBLA's decision on these Steens Act issues is "incomplete

and inadequate to permit meaningful judicial review," and is therefore "'arbitrary, capricious, an

---

[5] The Steens Act provides exceptions to the prohibitions on off-road motor vehicles and
road construction that are apparently not at issue in this case.

Page 26 - OPINION AND ORDER

abuse of discretion or otherwise not in accordance with law.'" *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1053 (9th Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)).

Moreover, even had the IBLA extended its articulated reasoning to address other routes besides Obscure Routes, the IBLA's decision might still have been contrary to law. The IBLA determined that because of the way BLM defined Obscure Routes ("hard to locate or [] not found on-the-ground"), such routes necessarily could not also qualify as "roads" under any accepted definition of that term.[6]  AR 54, 56, 57. Therefore, the IBLA reasoned, opening Obscure Routes to motorized vehicles amounted to permitting motorized travel "off road" and violated the Steens Act.  ONDA is correct that the same logic appears to apply equally well to Historical Routes, which BLM defined in the EA as "currently hard to locate and/or were not identified during the WAS inventory process."  AR 9964.  Nevertheless, I note flaws in the general thrust of this argument embraced both by the IBLA and ONDA, since it does not consider all the relevant language of Steens Act.

The argument relies on the notion that any route within a BLM route category defined as

---

[6] The IBLA defines a "road" as a route that has been "improved and maintained by mechanical means to insure relatively regular and continuous use . . . ." AR 56.  The IBLA borrows this definition from the September 27, 1978 *Wilderness Inventory Handbook*, which is derived from FLPMA legislative history.  SAR 7-8 (1978 handbook definitions).  The same definition was used in BLM's 2001 handbook.  (Miller Decl., #56, Attach. C, at 16-17.) Although BLM has since discontinued use of its 2001 Handbook and replaced it with a 2005 Handbook, *see Oregon Natural Desert Ass'n v. Bureau of Land Management*, 625 F.3d 1092, 1112 & n.13 (9th Cir. 2010), there is nothing in the record to indicate the operative definitions have changed.  The IBLA also acknowledged two other definitions of "road" offered by ONDA: (1) "[an] improved road that is suitable for public travel by means of four-wheeled, motorized vehicles intended primarily for highway use" (43 C.F.R. § 19.2(e); and (2) "[a] linear route declared a road by the owner, managed for use by low-clearance vehicles having four or more wheels, and maintained for regular and continuous use" (from a 2006 Roads and Trails Terminology Report).  AR 56.

hard to locate on the ground cannot be a "road" and, therefore, cannot be opened to motorized travel without impermissibly endorsing "off road" travel. The Steens Act, however, contains a strange textual ambiguity. While § 460nnn-22(b)(1)(A) prohibits motorized "off road" travel, § 460nnn-22(b)(1)(B) permits motorized travel on "roads *and trails*" designated by the transportation plan. Thus, in the same breath, the Steens Act bans motorized vehicles on anything but "roads," yet permits motorized vehicles on "trails." This inherent contradiction undercuts the IBLA's reasoning based on the definitions of Obscure Routes, and ONDA's proposed extension of that reasoning to Historical Routes. Even if a route characterized as a Historical Route is hard to locate on the ground and thus cannot be a "road," it could potentially be a "trail" which BLM can designate for motorized travel under § 460nnn-22(b)(1)(B). It is not my role to harmonize these apparently contradictory provisions of the Steens Act or to conduct a judicial review of the IBLA's determination that opening Obscure Routes violated the Steens Act. It is sufficient at this juncture, however, to observe that while the IBLA neglected to consider the degree to which permitting motorized travel on so-called Historical Routes violated the Steens Act, it does not follow that the BLM necessarily violated the Steens Act by its designation of Historical Routes. Untangling this knotty Steens Act language and applying it to the facts of this case is a matter that should be tackled first by the agency.

ONDA also challenges the TMP's designation of ATV Routes as violative of the Steens Act. ONDA now contends that since BLM defines ATV Routes as those which "are no longer safe for full-sized vehicles [because of landslides and natural erosion events]," AR 9965, these routes are necessarily nonexistent or obscure on the ground such that permitting motorized travel over them would be tantamount to "off road" use. Since the IBLA never addressed the issue

Page 28 - OPINION AND ORDER

directly, I cannot properly review its decision to affirm the BLM's designation.   Nor can I

provide post-hoc justifications for the IBLA's decision that the IBLA never advanced, as BLM

urges me to do in its briefing.  I simply observe that BLM's definition of ATV Routes appears to

focus on the safety of driving full-sized vehicles on those routes due to damage by natural forces,

rather than their existence on the landscape.  AR 9965 ("Under this classification, ATV routes

would not be recommended for use with full-sized vehicles and would be signed accordingly.").

Thus, proper resolution by the IBLA of ONDA's Steens Act issues with regard to ATV routes

should further analyze the definition of those routes, among other relevant considerations.

## II.    FLPMA Claim: Issue 4 - Non-impairment Requirement

The FLPMA "interacts with the Wilderness Act to provide the BLM with broad authority

to manage areas with wilderness characteristics contained in the federally owned land parcels the

[BLM] oversees, including by recommending these areas for permanent congressional

protection."  *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1098 (9th Cir.

2010).   Specifically, the FLPMA directs BLM to review roadless areas of five thousand acres or

more with identified wilderness characteristics and recommend that the President propose

Congress designate those areas as wilderness.  43 U.S.C. § 1782(a),(b).  These areas are known

as Wilderness Study Areas (WSAs).  *ONDA*, 625 F.3d at 1098.  In the interim period between

BLM's review of the WSAs and Congress' final preservation decision, the FLMPA requires

BLM to manage the WSAs "in a manner so as not to impair the suitability of such areas for

preservation as wilderness, subject, however, to the continuation of existing mining and grazing

uses and mineral leasing in the manner and degree in which the same was being conducted on

October 21, 1976."  43 U.S.C. § 1782(c); *see ONDA*, 625 F.3d at 1098.

Page 29 - OPINION AND ORDER

Here, ONDA alleges that the IBLA erred in affirming the BLM TMP and its "authorization of prohibited off-road vehicle use . . . on routes within WSAs that have fallen into obscurity on the landscape . . . ." (Amend. Compl., #95, ¶89a.) In briefing, ONDA continues articulating its broad challenge to all routes designated for motor vehicle use within the WSAs, regardless of how they are characterized, but particularly focuses on BLM's problematic designation of Historical Routes and "pioneered" routes within WSAs. ONDA contends that any re-establishment of motorized routes within WSAs that did not exist before passage of the FLPMA necessarily violate that statute. BLM now argues that ONDA has changed its litigation position and is judicially estopped from objecting to the TMP's designation of Historical Routes, since it originally conceded that grazing permittees could continue their motorized use of Historic Routes, but now challenges grazing permittee's motorized access to all Historical Routes that were not documented in the late 1970s.

I need not delve into these arguments now. Despite ONDA's expressed concern about BLM's designation of Historical Routes within WSAs in its IBLA briefing, *see* AR 255, the IBLA limited its analysis of the FLPMA non-impairment requirement only to Obscure Routes. By silently affirming the TMP with respect to Historical Routes and all other routes (including any pioneered since passage of the FLMPA), the IBLA failed to make a reasoned decision as to whether opening those routes to public motorized access impaired wilderness preservation within the WSAs. Without adequate administrative reasoning to review, I must find the IBLA's FLMPA determination to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. *See Locke*, 626 F.3d at 1048.

I note that the parties' discussion of the FLPMA issue gets extremely confusing, in part

because of differing perceptions about the actual effect of the TMP decision.  On the one hand,

ONDA apparently believed– and perhaps continues to believe– that the TMP grants motorized

vehicle access on Historical Routes within WSAs to the *general public*.  Consequently, ONDA

argued many times in public comments, briefing to the IBLA, and now in briefing before this

court that since there was no pre-FLPMA documentation of general public motorized use of

routes in WSAs, permitting such use now violates the FLPMA non-impairment requirement.

*See, e.g.*, AR 12931 (In public comments to BLM, ONDA objected to establishment of

motorized routes for "the public at large" within WSAs unless BLM could document the use of

those routes.)  While ONDA repeatedly objected to an extension of public motorized access, it

conceded that continued motorized use by *grazing permittees* was proper, even if that use was

not documented in BLM's late-1970's Wilderness EIS.[7]

On the other hand, BLM asserts that the TMP limits motorized travel on Historical

Routes only to grazing permittees, excluding the general public.  Therefore, BLM contends that

the TMP complies with the FLPMA by allowing only a continuation of pre-1976 grazing access,

which is explicitly permitted by statute.  *See* 43 U.S.C. § 1782(c) (agency must manage the

WSAs "in a manner so as not to impair the suitability of such areas for preservation as

wilderness, subject, however, to the continuation of existing . . . *grazing uses* . . . in the manner

and degree in which the same was being conducted on October 21, 1976") (emphasis added).

_____

[7] For example, in a meeting before the Steens Mountain Advisory Committee, ONDA
apparently had no problem with "permittee access in WSA to the extent it is on a new route
found or on an existing way or if its historical use is tied to an existing valid permit."  AR 12415
(STM001320).  Also, in its brief before the IBLA, ONDA wrote that "it will support such
historic uses as recollected by current livestock permittees, but needs proof that such use
extended to the public at large." AR 255 n.9.

I appreciate this confusion, since the TMP and EA/FONSI do not clearly delineate who has access to Historical Routes.  Supporting ONDA's position, I note that while the EA/FONSI clearly states that Permit Routes "are available to livestock operators but closed to the public," it makes no such distinction for Historical Routes.  AR 9964.  By contrast, the TMP Record of Decision supports BLM's interpretation, only discussing Historical Routes in connection with grazing permittees and thus suggesting that the general public is barred from accessing them.  AR 793 (TMP stating: "To carry out grazing permits, authorized permittees may use Permit Routes and Historical Routes within WSAs . . .  to the same manner and degree as occurring at passage of the FLPMA on October 21, 1976"); AR 794 ("Motorized vehicle use by grazing permittees is allowed on Permit Routes and Historical Routes in wilderness for activities such as distribution of large quantities of salt (200 pounds or more) and checking critical water reservoirs in allotments with very limited live water or springs.")

If indeed the TMP only allows grazing permittees to continue their pre-FLPMA access over what are now termed Historical Routes, I cannot see how those Historical Routes violate the FLPMA, especially since ONDA repeatedly conceded that "recollected" historic use by permittees would not run afoul of the FLPMA.  *See* 43 U.S.C. § 1782(c) (allowing continuation of existing grazing uses to the same manner and degree they occurred before passage of the FLPMA).  If, however, the TMP either (1) establishes Historical Routes that were not used by grazing permittees prior to the FLPMA and are now opened to grazing permittees, or (2) permits the general public to travel on Historical Routes that were previously used only by grazing permittees, ONDA's concerns remains valid.  Since ONDA's earlier statements before the agency in comments and IBLA briefing objected to such expansions of access within the WSAs

beyond routes established pre-FLMPA,  ONDA should not be estopped from repeating those

arguments now.  *See* AR 12931 (ONDA's comment: "It is critically important that BLM's

decision ensures no new routes (or ways) in any Wilderness Study Area and no new routes in

Wilderness"); AR 255 n. 9 ("Without hard documentation, BLM must abide by its Wilderness

EIS, including map boundaries and ways identified during that inventory").  Hence, the question

remains whether such expanded uses would "impair the suitability of [WSAs] for preservation as

wilderness" as required by the FLMPA.  43 U.S.C. § 1782(c); *Norton v. Southern Utah*

*Wilderness Alliance* ("SUWA"), 542 U.S. 55, 66 (2004) ("Section 1782(c) is mandatory as to the

object to be achieved, but it leaves BLM a great deal of discretion in deciding how to achieve

it.").

        ONDA also raises yet another thorny aspect of the FLPMA non-impairment issue: the

TMP's potential designation of "pioneer" routes within the WSAs that are not categorized as

Historical Routes.[8] It is not clear from ONDA's briefing, the TMP decision map, or any other

document in the record whether any route falling within a WSA was pioneered after 1976.  Mark

Sherbourne explains in an extra-record declaration that all pioneered routes were included in the

TMP route inventory before the passage of the Steens Act.  (Sherbourne Decl., #69, ¶14.)  As

ONDA points out, Sherbourne's statement is immaterial, since the crucial cut-off for FLMPA

purposes is October 21, 1976, not the passage of the Steens Act in October 2000.  Thus, the

IBLA's analysis of ONDA's FLMPA claims should include consideration of any other routes

created within WSAs after passage of the FLMPA, no matter how BLM chose to label them in

_____

        [8] Pioneered routes refer to those created by users that were not formally constructed by
BLM.

Page 33 - OPINION AND ORDER

the TMP.

### III.    Wilderness Act Claim: Issue 5- Non-impairment Requirement

Both the Steens Act and the FLMPA require BLM to comply with the Wilderness Act.

16 U.S.C. §460nnn-62(a); 83 U.S.C. §1782(c).  The Wilderness Act contains two provisions

concerning the appropriate preservation of wilderness areas.  First, the Wilderness Act requires

that wilderness areas "shall be administered for the use and enjoyment of the American people in

such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as

to provide for the protection of these areas [and] the preservation of their wilderness character...."

16 U.S.C. § 1131(a).  Additionally, the Act provides that "each agency administering any area

designated as wilderness shall be responsible for preserving the wilderness character of the area

and shall so administer such area for such other purposes for which it may have been established

as also to preserve its wilderness character."  16 U.S.C. § 1133(b).

ONDA alleges that BLM's TMP violated both of these provisions by permitting

motorized travel on naturally reclaimed routes within the Steens Mountain Wilderness Area,

which will allow those routes to be re-established and encourage users to create new pioneered

routes nearby.[9]  (Amend. Compl., #95, ¶97.)  ONDA and BLM's current briefing on ONDA's

Wilderness Act claim primarily concerns: (1) whether BLM complied with the requirements of

Congressional "Grazing Guidelines" for administration of grazing within Wilderness areas; (2)

whether five specific routes (either Historical Routes or Grazing Permit Routes) designated by

---

[9] This claim differs from ONDA's FLMPA claim in that it focuses on establishment of routes in the Steens Mountain Wilderness Area, rather than the various Wilderness Study Areas within the CMPA.

the TMP violate the Wilderness Act; (3) whether ATV Routes in the Indian Creek Road area also

violate the Wilderness Act; and (4) whether ONDA's Wilderness Act claim is barred because of

ONDA's failure to pursue a separate appeal of BLM's grazing decision.  Unfortunately, the

IBLA did not analyze whether BLM's TMP complied with the Wilderness Act or grazing

guidelines, nor whether ONDA needed to pursue a separate grazing appeal.  Thus, I cannot use

the post-hoc arguments discussed by the parties in briefing to justify or criticize the IBLA's

decision.  *See Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1048 (9th Cir. 2010) ("The

reviewing court should not attempt itself to make up for [an agency's] deficiencies: We may not

supply a reasoned basis for the agency's action that the agency itself has not given.") (internal

citations and quotations omitted).  Consequently, I find that the IBLA's decision regarding

ONDA's Wilderness Act claim is too incomplete to permit meaningful judicial review and is

therefore "'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the

law.'"  *Locke*, 626 F.3d at 1053 (quoting 5 U.S.C. § 706(2)(A)).

## IV.    NEPA Claims

Of the four NEPA issues ONDA technically exhausted before the IBLA, ONDA only

squarely complained of BLM's non-compliance with NEPA's range of alternatives requirement.

While I review the sufficiency of the IBLA's reasoning as to that issue in depth, I cannot perform

any substantive analysis regarding ONDA's other three issues because the IBLA's decision on

those issues is "inadequate to permit meaningful judicial review." *Locke*, 626 F.3d at 1053.

### A.    Issue 6- Range of Alternatives Requirement

NEPA requires agencies to "study, develop, and describe appropriate alternatives to

recommended courses of action in any proposal which involves unresolved conflicts concerning

Page 35 - OPINION AND ORDER

alternative uses of available resources." 42 U.S.C. § 4332(2)(E);  *N. Idaho Cmty. Action Network v. U.S. DOT*, 545 F.3d 1147, 1153 (9th Cir. 2008).  This "alternatives provision" applies whether an agency is preparing an environmental impact statement ("EIS") or an environmental assessment ("EA"), and requires the agency to give full and meaningful consideration to all reasonable alternatives.  *N. Idaho Cmty. Action Network* 545 F.3d at 1153, *citing Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005).  However, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS."  *Id.* (citation omitted).  *Id.* at 1246.  Whereas with an EIS an agency is required to "[r]igorously explore and objectively evaluate all reasonable alternatives," *see* 40 C.F.R. § 1502.14(a), with an EA an agency is only required to include "brief discussions of the need for the proposal, [and] of alternatives as required by section 102(2)(E) . . . ." 40 C.F.R. § 1508.9(b).  The available reasonable alternatives are dictated by the underlying purpose of the proposed action.  *See City of Carmel-by-the-Sea v. U.S. DOT*, 123 F.3d 1142, 1155 (9th Cir. 1997).  The court "reviews an agency's range of alternatives under  a 'rule of reason' standard that requires an agency to set forth only those alternatives necessary to permit a reasoned choice."  *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th Cir. 1998).

Here, ONDA alleges that, in affirming the TMP which failed to address non-motorized use and travel, the IBLA violated the NEPA requirement to study the environmental impact of the proposed action and reasonable alternatives.[10]  (Amend. Compl., #95 ¶¶101, 105a.)  ONDA

---

[10] ONDA's summary judgement briefing now also faults BLM for failing to consider an alternative providing for snowmobile use.  ONDA failed to allege as much in its Amended Complaint, and I therefore refuse to address it now.  (Amend. Compl., #95 ¶105a) (referencing only "non-motorized use and travel").  Even so, the TMP and EA did address snowmobile use,

squarely raised the issue before the IBLA and the IBLA addressed ONDA's arguments head-on, concluding that BLM's TMP did not violate NEPA's alternatives requirement for two reasons. First, the IBLA decision noted that BLM considered Alternative C, "under which an additional 250 miles of motorized travel routes would be closed to motor vehicle use." AR 64. Second, the IBLA noted that because the "purpose of the Proposed Action here was to provide routes for *motorized travel* in the CMPA, while generally leaving nonmotorized routes open to use," an alternative providing for nonmotorized travel "would not serve the intended purpose of the Proposed Action" and therefore BLM was not required to consider such an alternative. AR 65 (emphasis in original).

The IBLA's expression and ordering of these reasons creates some analytical confusion. Nevertheless, I understand the IBLA's decision on this point as offering two separate justifications for BLM's choice of alternatives: (1) the purpose of the proposed action did not require an alternative providing for nonmotorized travel; and (2) even if it did, BLM provided such an alternative. While the IBLA was unreasonable in concluding that the purpose of the TMP was limited only to addressing motorized travel, the IBLA reasonably determined that BLM considered, and ultimately rejected, an alternative addressing non-motorized attributes (Alternative C).

The IBLA noted that the "purpose of the Proposed Action here was to provide routes for *motorized travel* in the CMPA, while generally leaving nonmotorized routes open to use." AR 65 (emphasis in original). That characterization of the purpose of the TMP was unreasonably

albeit deferring planning associated with expansion of such use for the later comprehensive recreation plan. AR 785, 9954-55, 10010.

Page 37 - OPINION AND ORDER

narrow and lead to an inaccurate view of which alternatives need have been considered in the TMP. Fundamentally, the purpose of the TMP is defined by the Steens Act, which requires a "comprehensive transportation plan for the Federal lands includes in the [CMPA], which shall address the maintenance, improvement, and closure of roads and trails as well as travel access." 16 U.S.C. § 460nnn-22(a). The Steens Act thus requires a transportation plan to address all travel, both motorized or non-motorized, with at least a minimal level of specificity.

The EA confirms the comprehensive purpose of the TMP. The EA clearly states that one aspect of the TMP's purpose relates exclusively to motorized travel: to "use[] an updated route inventory to further define the motor vehicle route network within the CMPA" and "to provide guidance on maintenance, improvement, and accessibility of these routes." AR 9955. Additionally, though, the EA describes that the objectives of the TMP include "determining how best to manage travel in the CMPA while protecting resources including wilderness characteristics, providing for 'reasonable' access to private lands, providing sustainable livestock grazing, providing recreation opportunities, and otherwise meeting the RMP land management objectives." *Id.* This broad description of the TMP's task nowhere makes the distinction between motorized and non-motorized travel or suggests that the purpose of the TMP is to actively manage motorized travel while merely enforcing the status quo for non-motorized routes.

Moreover, the decision factors used by the EA in evaluating the alternatives also suggest that managing non-motorized travel alongside motorized travel was one of the purposes of the TMP. For example, the EA decision factors require analysis of how well the various alternative actions provide for "[t]ravel opportunities for primitive camping, hunting, fishing, hiking, and other recreation activities including driving for pleasure." AR 9956. Since several of these travel

opportunities, like hunting, fishing, and hiking likely involve non-motorized travel, it follows

that the TMP's purpose includes addressing non-motorized travel as well as motorized access.

ONDA made this very argument to the IBLA, AR 255-254, but the IBLA instead defined the

TMP's purpose to exclude decisions concerning non-motorized travel. *See* AR 65.  Thus, the

IBLA crucially neglected to consider the full extent of BLM's own statement of purpose and

decision factors when it held that BLM need only have reviewed alternatives dealing with

motorized travel.

Nevertheless, the IBLA's second justification for approving BLM's choice of alternatives

was reasonable.  The IBLA observed that the BLM considered Alternative C, "under which an

additional 250 miles of motorized travel routes would be closed to motor vehicle use."  AR 64.

Thus, the IBLA noted that "[t]he effect of this would be to render these routes available for

nonmotorized travel." *Id.*  The IBLA reasoned, "BLM has already considered, in effect, an

alternative which would provide a sizeable amount of nonmotorized travel routes in the CMPA."

*Id.* (citing AR 791, 10008).   Indeed, Alternative C proposed reclassifying 250 miles of Common

Use Routes– including 36 miles of Obscure Routes– as Permit Routes, which, therefore, were

"closed to public motorized travel." AR 9968.  It is reasonable to infer from the TMP and EA

that these Permit Routes would still remain open to non-motorized use by the general public for

various recreational and other activities.  *See* AR 783 (BLM Decision Record stating that "[t]he

TMP maps include known nonmotorized trails . . . these trails remain open to nonmotorized and

nonmechanized used"); AR 791 (hiking and horseback riding off-trail is permitted, allowing

those activities to continue in entire CMPA); AR 10008 ("use of both verified and unverified

trails may continue to occur unless public safety or resource protection concerns requiring

Page 39 - OPINION AND ORDER

corrective action are identified.").  Moreover, BLM specifically recognized that Alternative C

would satisfy some of the purposes of the TMP in protecting wilderness, enhancing recreation,

and balancing the needs of various users.[11]  AR 9973 (under Alternative C, "naturalness and

solitude would be enhanced to a greater degree" and 129 miles of routes within or near WSAs

would be closed to public motorized access, some of which would naturally disappear in 5-10

years).  It is not this court's role to second-guess the IBLA in matters of its expertise, such it's

determination that an alternative closing motorized routes would have the same effect as one

designating non-motorized routes.  Consequently, I do not find this aspect of the IBLA's decision

arbitrary, capricious, or contrary to law.

> **B.**      **Issue 7- Disclosure and Discussion of Opposing Views/ Accurate**
>
>            **Environmental Baseline Requirement**

ONDA next argues that the IBLA erred by upholding the TMP despite BLM's failures to

disclose and discuss opposing views in its NEPA analysis and to ensure that it studied an

accurate environmental baseline.  I previously held that ONDA administratively exhausted these

issues before the IBLA through several general comments, even though it did not raise them

directly.  Although ONDA does not specifically plead these legal theories under its NEPA claim

in its Amended Complaint, this technical deficiency does not prevent ONDA from challenging

the IBLA's decision on these grounds, especially since ONDA alleged facts suggesting that BLM

ignored ONDA's extensive route inventory data and BLM has received notice of ONDA's intent

---

[11] ONDA advocated strongly for Alternative C before BLM, asserting that it was the only option that would have significant beneficial effects on Wilderness Areas, Wilderness Study Areas, wildlife, noxious weed control, biological soil crusts as well as the only option that answered the public's expressed desires for enhanced ecological protection.  AR 12943-44.

to pursue these theories in the round of supplemental briefing focused on exhaustion.  *See*

*Fontana v. Haskin*, 262 F.3d 871, 877 (9th Cir. 2001) (because of liberal federal notice pleading

standards, specific legal theory need not be pleaded as long as factual allegations show plaintiff

entitled to relief); *Green Country Food Mkt., Inc. v. Bottling Group, LLC*, 371 F.3d 1275, 1279

(10th Cir. 2004) ("plaintiff should not be prevented from pursuing a claim simply because of a

failure to set forth in the complaint a theory on which the plaintiff could recover, provided that a

late shift in the thrust of the case will not prejudice the other party in maintaining its defense.")

    The parties briefing again debates the merits of this issue, particularly whether an EA

must also comply with the regulations that require an EIS to discuss opposing views, and if so,

whether the EA sufficiently responded to ONDA's concerns.  This court, however, is reviewing

the IBLA's decision, not BLM's TMP, and thus it would be inappropriate to resolve the merits of

an issue the IBLA did not even address.  *UOP v. United States*, 99 F.3d 344, 351 (9th Cir. 1996)

("on its review of the administrative decision the district court lacked the authority to decide

issues that the administrative agency had arbitrarily and capriciously eschewed deciding.").

Since the IBLA did even attempt to analyze whether the EA violated NEPA in the manners

described above, the IBLA's decision is simply "inadequate to permit meaningful judicial

review," and is therefore arbitrary and capricious under the APA.  *Locke*, 626 F.3d 1040, 1053.

**C.    Issue 8- Prohibition on Segmentation of Connected Actions**

    ONDA alleges that BLM "improperly segment[ed] its environmental analysis by

preparing or proposing to prepare three separate NEPA documents involving the TP and TMP for

motorized travel and a subsequent CRP for non-motorized travel."  (Amend. Compl., #95,

¶105b.)   Again, since there is no IBLA reasoning on this issue to review, the IBLA's decision

Page 41 - OPINION AND ORDER

upholding the TMP is arbitrary and capricious.  *See Locke*, 626 F.3d 1040, 1053.

### D.    Issue 9- EIS and EA/FONSI Requirements

The same result also obtains for ONDA's final NEPA issue: the TMP violated NEPA by

failing to recognize the significant environmental impact that would result and, consequently,

whether BLM improperly failed to prepare an EIS.  (Amend. Comp., #95, ¶105(d).)  Since the

IBLA did not even analyze the propriety of BLM's FONSI, I must conclude that the IBLA's

decision was arbitrary and capricious.

### E.    Analysis of BLM Route Inventory

My separate analysis of the IBLA's reasoning– or lack thereof– on each of ONDA's

exhausted legal issues does not get to core of one of ONDA's major concerns with the TMP.

ONDA generally complained that BLM's route inventory was inaccurate and incomplete, causing

BLM to open routes to motorized travel that ONDA's own route inventory found were

overgrown or non-existent on the landscape.  This concern permeates ONDA's Steens Act

claims, its FLMPA claim, its Wilderness Act claim, and some of its NEPA claims.  Thus, it is

extremely troubling that the IBLA completely failed to analyze that topic in its decision.[12]

To determine whether the IBLA's failure to address the alleged deficiencies of BLM's

inventory rendered its decision arbitrary or capricious, I must examine: (1) whether the IBLA

rationally approved BLM's TMP designations based on the facts in the record; and (2) whether

---

[12] I can understand why the IBLA might have found it easier to take up ONDA's
contentions about broad route categories, such as Obscure Routes, instead of delving into the
overwhelming detail of individual route descriptions or the methodology of the route inventory.
Nevertheless, the agency, with its expertise in this area, is the adjudicative body most well-
equipped to conduct a thorough review of BLM's route inventory and associated route
classification to determine whether they violated any applicable statutory scheme.

the IBLA considered all the factors that are relevant to determining that BLM's TMP did not

violate any relevant statutes.  *See Geo-Energy Partners*, 613 F.3d at 955.  This, in turn, requires a

discussion of both the facts in the record before the IBLA and the range of relevant factors that

the IBLA should have taken into consideration.

The IBLA was presented with a variety of information in the administrative record

concerning BLM's route inventory, all of which amounted to an incomplete and scattershot

memorialization of that inventory.[13]  First, the IBLA had BLM Natural Resource Specialist Mark

Sherbourne's TMP Field Notes, dated August 11, 2003 to November 10, 2005, which consist of

heavily redacted comments on 160 routes, each associated with a map reference number and a

date.[14]  *Id.*; AR 10288-97; (Pl's. Supp. Brief on Issue Exhaustion, #85, Ex. 1 at 35) (Index of

administrative record before the IBLA including Sherbourne's field notes).  Sherbourne

explained that he created these notes over time "to provide baseline information for the TMPA

EA" and "highlight specific irregular findings during the inventory and to help the BLM

remember to address potential changes to specific route designations."  (Sherbourne Decl., #69,

¶¶6,9.)  According to Sherbourne, the field notes did not comprise a complete record of

---

[13] At this juncture, I find that I must rely on extra-record evidence, in the form of Dr. Miller's and Mr. Sherbourne's declarations, to provide background details and technical assistance in interpreting the administrative record.  The inventory data provided by BLM in the administrative record is incomplete, hard to understand, and made more inscrutable by the sheer number of different routes, designations, and maps.

[14] Incidentally, the BLM map which acts as a kind of key to these comments by placing the route reference numbers on their geographical location on the map is not reproduced in a manner that can be read, much less used to match up Sherbourne's field notes with any particular route on the map. AR 10288. Thus, the paucity of BLM's route inventory documentation provided in the record makes it almost impossible for the court or any reviewing body to examine BLM's route determinations on an individual basis.

Sherbourne's inventory: "Routes not specifically addressed in the inventory table were inventoried, but did not require inclusion in the table." *Id.* at ¶9.

Second, the record also contains approximately 30 field maps of route inventories with handwritten notations. AR 10299-10328. Shelbourne explains that BLM staff provided those individual route maps, which he "marked up with route notes and other observations and options." (Sherbourne Decl., #69, ¶6.) Third, the record includes four field inventory maps that Sherbourne also used in the field. AR 10329- 10332. Fourth, the record provides a single model transportation inventory form that BLM staff used to create an electronic geographic information system (GIS) record and categorize specific routes. AR 10298; (Sherbourne Decl., #69, ¶6.) Fifth, the record includes various maps presented by Harney County, grazing permittees, and land owners showing what Sherbourne describes as "known,"or "used," routes as well as historic grazing routes. AR 10360-10363, 13473-13479; (Sherbourne Decl., #69, ¶5.) Sixth, the record contains maps from the RMP EIS process conducted between 2001 and 2004, which documented then-existing condition of routes within the CMPA. AR 10759-61. These maps, particularly Map 13 (AR 10761) reflected BLM's determination of the known routes already available for motorized use within the CMPA. AR 9929.

Finally, the record before the IBLA also included two documents produced by ONDA which provide detailed route information, maps, geo-referenced photographs, and recommendations for closing many routes that were overgrown, impassible, or nonexistent. AR 12946-13257 ("Steens Transportation Plan Recommendations," May 17, 2007); AR 13258- 13290("CMPA Transportation Plan Recommendations," December 7, 2005). The May 2007 Transportation plan spans well over 300 pages.

Page 44 - OPINION AND ORDER

After reviewing the record, I am convinced that there is no way that the IBLA could have rationally determined that all of BLM's TMP route decisions were permissible under the Steens Act based on the facts before it. Aside from analyzing BLM's route category definitions– which it only did for Obscure Routes– I can imagine only two other ways for the IBLA to determine if the remaining routes complied with various relevant statutes. First, the IBLA could have evaluated all the available data concerning each separate route opened to motor vehicle use, comparing Sherbourne's field notes, hand-written map notations, and any other inventory data with ONDA's geo-referenced ground-level photographs and other evidence. Then, the IBLA could have decided whether opening the particular route to motorized travel would be the equivalent of permitting off-road travel (Steens Act violation), constructing a new road or trail (Steens Act violation), or impairing the suitability of Wilderness Study Areas and Wilderness Areas for preservation as wilderness (FLMPA and Wilderness Act violations). The second method would be to scrutinize the route inventory methodology as a whole – including BLM's treatment of ONDA's survey evidence– to determine whether the inventory yielded results reliable enough to form the basis for TMP route decisions and thereby comply with the various statutes. The record suggests that the IBLA did not engage in either of these inquiries. Thus, even aside from the IBLA's failure to address ONDA's separate legal issues described above, I conclude that the IBLA's blanket determination that the TMP complied with the Steens Act for all routes besides those labeled as Obscure Routes was not a reasoned decision based on facts in the record.

Examining several of the numerous relevant factors that the IBLA did not consider demonstrates IBLA's utter failure to seriously evaluate ONDA's contention that BLM's route

inventory and the resulting TMP were flawed.  First, the IBLA, and indeed the BLM before it,
failed to address ONDA's ground-level geo-referenced photographs purportedly showing that
individual routes designated as open to motor vehicles were, in fact, nonexistent or overgrown.[15]
Sherbourne now disputes the utility of ground-level photographs for inventory purposes,
explaining his preference for aerial photography and ground verification.  (Sherbourne Decl.,
#69, ¶10.)  The propriety of various inventory methods is not an appropriate inquiry for the court
at this stage, although it is an issue that the agency should address in the course of further
proceedings.  In short, the IBLA's failure to analyze the only visual evidence in the record of the
actual condition of routes demonstrates that the IBLA's decision was arbitrary and capricious.

Second, and perhaps more crucially, the IBLA failed to consider BLM's overall inventory
methodology and, thus, failed to provide a reasoned explanation for accepting BLM's route
designations *en masse*.  For example, the IBLA made no attempt to ascertain the level of
completeness of BLM's route inventory or the accuracy with which the inventory results were
translated into TMP route designations.  These oversights are especially concerning.  If the
current route inventory failed to verify the status of all routes that it opened to vehicle traffic,
then BLM effectively relied on the findings of its early 1980's wilderness inventory to fill in
those gaps, thereby ignoring the likelihood that routes identified 30 years ago had since been

---

[15] Dr. Miller identified at least 40 miles of routes included in Sherbourne's inventory and
opened to vehicle traffic under the TMP that ONDA purportedly documented to be obscure or
nonexistent, and another 9 miles of routes that Sherbourne field notes purportedly admitted were
nonexistent, faint, or obscure, but that were nevertheless opened to motor vehicles under the
TMP.  (Miller Decl., #56, ¶¶33,34.)  I refer to Dr. Miller's extra-record tabulations not to prove
that BLM necessarily erred in opening these routes under the TMP, but merely to demonstrate
the potential relevance of ONDA's independent route inventory data to BLM's TMP decision
and the IBLA's affirmation of that decision.

naturally reclaimed.

Even if the IBLA had attempted to review the inventory methodology, it would have likely been stymied by the inadequacy of BLM's documentation. The EA tersely notes that "most routes within the CMPA were checked for general condition and degree of use by BLM staff," AR 9963, but the record before the IBLA does not easily verify that statement. As explained above, Sherbourne's field notes, maps, and other documentation hardly provide a complete overview of the inventory process. Moreover, the proliferation of extra-record materials endeavoring to explain either the gaps in the inventory (Dr. Miller) or the sufficiency of the inventory (Mark Sherbourne) further highlights that the administrative record was simply too sparse to permit the necessary review.[16] In further proceedings, the IBLA should ensure that the record is robust enough to permit reasoned analysis of BLM's route inventory, including, if necessary, requiring BLM to either provide additional support for its route designations or reassess those designations. In sum, the fact that the IBLA conducted no analysis of the BLM's route inventory methodology, despite ONDA's persistent argument that the inventory was incomplete and flawed, provides yet another basis for concluding that the IBLA's decision was arbitrary and capricious. This deficiency is also the main factor in my ultimate decision to vacate

---

[16] Dr. Miller estimates that BLM failed to inventory over 400 of the 555 miles of routes designated as open to motor vehicles by the TMP. (Miller Decl., #54, ¶¶25-26.) Sherbourne admits that BLM saved time and resources by choosing not to inventory "well-known" or "undisputed" routes in favor of focusing on "lesser-known or newly-identified" routes, presumably because BLM had already examined many of the motorized routes within the CMPA at some point in the past and BLM's TMP left all those routes open. (Sherbourne Decl., #69, ¶7); AR 793 (TMP stating that "[r]oads specified in the RMP as remaining open to motorized vehicles will remain so."). Nevertheless, Sherbourne also suggests that the scope of the route inventory went beyond just the routes identified and commented upon in his field notes. (Sherbourne Decl., #69, ¶9.)

the IBLA's decision pending further proceedings instead of remanding without vacatur.

## V.    Remedy

ONDA argues that this court must vacate the BLM's decision adopting the TMP as well as the IBLA's decision for the most part affirming the TMP, and remand this case back to BLM for preparation of an EIS.  ONDA also proposes the court enjoin all route maintenance within the CMPA, motorized use of Obscure Routes which the IBLA previously held violated the Steens Act, and motorized use of other routes that the TMP prohibited.  By contrast, BLM argues if the court finds fault with the IBLA decision, it should remand the action back to the agency– it does not specify whether it means BLM or the IBLA– without vacating the IBLA's decision or the underlying TMP.  BLM contends that setting aside the IBLA's decision would be confusing to the public because doing so would effectively open Obscure Routes to motorized use that were closed by virtue of the IBLA's decision.  BLM also resists ONDA's proposed injunction because ONDA has neither moved for injunctive relief nor carried its burden to demonstrate that an injunction is warranted.

First, it is clear that vacating the underlying TMP decision cannot be the appropriate remedy in this case.  Under the APA, a district court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).  Here, I have reviewed the IBLA decision as the final agency action, finding it to be arbitrary and capricious in several respects.  Since I did not review BLM's Decision Record as the final agency action, I did not determine whether it was arbitrary, capricious, an abuse of discretion or contrary to law and thus I cannot set it aside.  By contrast, setting aside the IBLA decision is appropriate, since I found

that the IBLA unreasonably failed to consider either the particular designations or overall

methodology of BLM's route inventory and additionally failed to provide sufficient reasoning to

enable judicial review on seven of nine issues that ONDA exhausted.

Where a reviewing court finds an agency decision to be arbitrary, capricious, an abuse of

discretion, or contrary to law because the agency failed to consider all relevant factors or because

the agency failed to provide reasoning that could be reviewed, the court should remand the action

back to the agency for additional proceedings. *Florida Power & Light Co. v. Lorion*, 470 U.S.

729, 744 (1985) ("if the reviewing court simply cannot evaluate the challenged agency action on

the basis of the record before it, the proper course, except in rare circumstances, is to remand to

the agency for additional investigation or explanation"); *see UOP v. U.S.*, 99 F.3d 344, 351 (9th

Cir. 1996) (after finding that the IBLA arbitrarily and capriciously neglected to decide whether

reservation of mineral rights was void, district court erred by not remanding case back to the

IBLA to investigate, compile a record, and make a determination).   Here, the IBLA both failed

to grapple with the relevant details of BLM's route inventory and failed to address issues raised

in various degrees of specificity by ONDA's briefing.[17] Accordingly, the IBLA must remedy

these deficiencies through further proceedings.

The only remaining question is whether it is proper to vacate the IBLA's decision or leave

it in place during those additional proceedings.  While vacating is usually the proper approach, in

rare cases a reviewing court will remand back to the agency without vacating the agency's

---

[17] As stated previously, both ONDA and the IBLA share some responsibility for the
incompleteness of the IBLA's decision.  ONDA did not clearly provide notice to the IBLA of all
the legal issues it now pursues and the IBLA did look beyond the legal formulations in ONDA's
briefing and address ONDA's substantive concerns.

decision "when we deem it advisable that the agency action remain in force until the action can

be reconsidered or replaced." *Locke*, 626 F.3d at 1053 n. 7 (citing *Heartland Reg'l Med. Ctr. v.*

*Sebelius*, 566 F.3d 193, 198 (D.C.Cir. 2009); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392,

1405-06 (9th Cir.1995)).  Typically, this occurs when an agency fails to adhere to APA

procedural requirements when promulgating a regulation and equity demands that the regulation

be left in place while the agency follows proper procedures.  *See Idaho Farm Bureau Federation*

*v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (concerns about the potential extinction of an

animal species justified leaving Endangered Species Act listing in place) (citing *Western Oil and*

*Gas v. EPA*, 633 F.2d 803, 813 (9th Cir.1980)).

  Vacating the IBLA's decision appears to be the appropriate course of action, especially

because that decision approved BLM's route designations without providing any reasoned

analysis of the route inventory upon which those designations were based.   Moreover, the

circumstances described above militating against vacatur are not present in this case, where

ONDA challenges an appeals board decision, not promulgation of a regulation.   Nevertheless,

there are equitable concerns that counsel in favor of leaving in place at least part of the IBLA's

decision.  That decision reversed the TMP only as to its designation of Obscure Routes as open

to public motorized access.  Both parties seem to agree that this aspect of the IBLA's decision

should not be disturbed, lest the public become confused and now attempt to travel on Obscure

Routes with motorized vehicles.  Accordingly, I vacate the IBLA's decision to the extent that it

affirms BLM's TMP Record of Decision, but leave that decision in place to the extent that it

reverses BLM's designation of Obscure Routes as open to public motorized use.

  Finally, I decline to act upon ONDA's suggestion in briefing that the court enjoin route

Page 50 - OPINION AND ORDER

maintenance activities within the CMPA. I have not found that BLM violated the Steens Act,

FLPMA, Wilderness Act, or NEPA. Moreover, ONDA has not yet formally moved for any

injunctive relief, and consequently, BLM has not been accorded an opportunity to respond.

Thus, issuing an injunction now would be premature. This decision makes no changes to the

permissibility of route maintenance on all routes open to motorized access. Nevertheless, it

seems that ONDA has ample justification to seek an injunction against route maintenance before

the IBLA while further proceedings occur there consistent with this decision, especially because

neither the BLM TMP Record of Decision nor the IBLA decision give much reassurance that all

the routes which BLM has a right to "maintain" still, in fact, exist on the ground.

## VI.    BLM's Motion to Strike Extra-Record Materials

Generally, judicial review of agency action is limited to review of the administrative

record. *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988). The Ninth Circuit,

however, has recognized four exceptions to this rule, allowing extra-record materials: (1) if

necessary to determine whether the agency has considered all relevant factors and has explained

its decision, (2) when the agency has relied on documents not in the record, (3) when

supplementing the record is necessary to explain technical terms or complex subject matter, or

(4) when plaintiffs make a showing of agency bad faith. *Ctr. for Biological Diversity v. U.S.*

*Fish & Wildlife Serv.*, 450 F.3d 930, 943 (9th Cir. 2006). Parties may not use post-decision

information either to justify or attack an agency's decision. *Id.*

Here, ONDA presents several declarations and exhibits that it contends fit within the first

and third exceptions. BLM responds that the declarations and exhibits should be stricken

because they are post-decisional rationalizations attacking BLM's analysis and that none of the

exceptions for review of extra-record materials apply.[18]  The nature and scope of this court's

review makes most of ONDA's extra-record submissions irrelevant.  I did, however, consider the

declarations of Dr. Miller in analyzing whether the IBLA considered the relevant factors in

affirming the TMP in all respects except for designation of Obscure Routes.  Thus, I deny BLM's

motion regarding Dr. Miller's declaration, which falls within the exceptions articulated by the

Ninth Circuit.  Further, I deny as moot BLM's motion regarding all of ONDA's other extra-

record evidence.

//

//

//

//

//

//

//

//

//

//

//

//

//

---

[18] BLM also offers extra-record materials in response to ONDA's extra-record offerings,
although ONDA has not formally objected to those materials.

Page 52 - OPINION AND ORDER

## CONCLUSION

For the foregoing reasons, ONDA's motion for summary judgment (#52) is granted in part and denied in part and BLM's cross-motion for summary judgment (#67) is granted in part and denied in part. The IBLA's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" with regard to the seven issues it did not fully address. *See* 5 U.S.C. § 706(2)(A). The decision was valid as to the Steens Act comprehensive transportation plan requirement issue and the NEPA range of alternatives requirement issue. Thus, the IBLA's February 19, 2009 decision is vacated, except for the portion that reversed BLM's TMP Decision Record permitting motorized access on Obscure Routes, which remains in force. This action is remanded to the IBLA for further proceedings consistent with today's opinion. BLM's motion to strike ONDA's extra-record materials (#59) is denied as to the declaration of Dr. Craig Miller, and denied as moot regarding any other extra-record materials.

Dated this 28th day of April, 2011.

/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge