**Peter M. Lacy ("Mac") (OSB # 01322)**
Oregon Natural Desert Association
917 SW Oak Street, Suite 408
Portland, OR 97205
(503) 525-0193
lacy@onda.org

**David H. Becker (OSB # 081507)**
Law Office of David H. Becker, LLC
917 SW Oak Street, Suite 409
Portland, OR 97205
(503) 388-9160
davebeckerlaw@gmail.com

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# PORTLAND DIVISION

| | |
|---|---|
| **OREGON NATURAL DESERT ASS'N,** | Case No. 3:09-cv-369-PK |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION RE: MOTION FOR LEAVE TO FILE SUPPLEMENTAL COMPLAINT** |
| **KENNY MCDANIEL**, Burns District Manager, BLM, *et al*., | |
| Defendants. | |

# INTRODUCTION

Plaintiff Oregon Natural Desert Association ("ONDA") respectfully requests the Court to reconsider its May 31, 2012 decision (Dkt # 175) denying ONDA's motion for leave to file a supplemental complaint to challenge the Bureau of Land Management's ("BLM") decision to invoke a Categorical Exclusion ("CX") to approve mechanical maintenance and improvement of about 133 miles of the designated routes within the Steens Mountain Cooperative Management and Protection Area ("CMPA"). The Court committed clear error in ruling that BLM's CX decision is not "final agency action" reviewable pursuant to the Administrative Procedure Act ("APA"). The CX has "legal consequences" in that it represents BLM's route-specific NEPA analysis for the mechanical route maintenance action the agency intends to conduct on those 133 miles of TMP-designated routes and is BLM's only decisional document approving the specific location and character of maintenance BLM proposes to perform. A further legal consequence of BLM's decision to invoke the CX is that BLM thereby relieved itself of the obligation, under NEPA, to prepare an environmental assessment ("EA") or environmental impact statement ("EIS") for its proposed ground-disturbing action.

As the Court concluded in its April 28, 2011 summary judgment opinion (Dkt # 103), BLM did not conduct a site-specific environmental review in the EA (AR 9950–10029) for the general route maintenance authorizations contained in the Travel Management Plan ("TMP"). Thus, the CX *is* that site-specific NEPA coverage, and ONDA is entitled under the APA to challenge whether BLM's decision to rely on a categorical exclusion is valid under NEPA. For these reasons and as explained in more detail below, the Court should reconsider its May 31, 2012 decision and issue an order granting ONDA leave to file its proposed supplemental complaint (Dkt # 164).

# ARGUMENT

## I.  STANDARD OF REVIEW FOR RECONSIDERATION

A motion for reconsideration under Rule 60 must be filed within a reasonable time, but no later than one year after entry of judgment for motions brought under subsections (b)(1) through (3). Fed. R. Civ. P. 60; *see Fidelity Fed. Bank, F.S.B. v. Durga Ma Corp.*, 387 F.3d 1021, 1023 (9th Cir. 2004) (discussing Rule 60(b)). Three major grounds justify reconsideration: "if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (citation omitted). Supplementation of complaints is favored and the policy in Rule 15 is "to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quotation and citations omitted).

## II.  ONDA'S MOTION IS TIMELY AND REASONABLE

The Court resolved ONDA's motions to supplement the complaint, to modify the injunction, and to compel production of GIS data, by Opinion and Order dated May 31, 2012. Pursuant to that order, BLM lodged additional GIS data on June 14, 2012, *see* Dkt # 178, and ONDA received the CD-ROM containing the data on June 19, 2012. Dr. Craig Miller, ONDA's GIS specialist, reviewed that data and identified six routes that should be added to the currently enjoined set of routes through modification of the injunction. *See* May 31, 2012 Op. & Order at 14 (explaining that the Court will consider additional briefing on "any previously-undisclosed routes that now are known to be within the scope of the TMP"). ONDA conferred with BLM's attorneys on July 3, 2012, inquiring whether BLM will stipulate to adding the six routes to the injunction and also seeking BLM's position on this motion for reconsideration concerning

supplementation of the complaint. BLM indicated it would oppose the reconsideration motion but, to date, has not yet responded as to the injunction issue. ONDA had intended to file a single, consolidated motion for reconsideration and further modification of the injunction, but now moves for reconsideration alone and will continue to work with BLM toward a possible stipulation with respect to modification of the injunction. If BLM will not agree to such stipulation, ONDA will file the additional motion and briefing as directed by the Court. *Id*. at 14–15.

In addition to being timely, ONDA's motion for reconsideration also is reasonable. As described in detail below, the case law was unanimous that agency decisions adopted pursuant to a NEPA CX are final agency actions subject to challenge under the APA. While ONDA cited several cases so holding, BLM made no attempt to distinguish them and cited *no* cases holding that decisions to invoke CXs are *not* final agency action. In view of the settled case law and the lenient standard for supplementation of complaints, ONDA reasonably relied on that settled law in its earlier memoranda, but here is compelled to move for reconsideration and address directly BLM's spurious argument that the CX has no legal consequences.

### III.   RECONSIDERATION IS APPROPRIATE BASED ON CLEAR ERROR

The Court denied leave to supplement the complaint based on its ruling that the CX does not have "legal consequences" because "the maintenance described in the CX is already authorized by the TMP decision." May 31, 2012 Op. & Order, at 9. That is incorrect. The CX provides the *site-specific* environmental review that is required by NEPA and under the programmatic environmental review (the TMP EA) for the travel plan; it approves the specific locations and standards for the maintenance described in the "proposed action" in the CX; and it relieves BLM from the obligation it otherwise would have under NEPA to invite public comment

and to prepare an EA or an EIS for ground-disturbing activity. For these reasons, that ruling constitutes clear error and therefore is appropriate for reconsideration under Rule 60(b). *School Dist. No. 1J*, 5 F.3d at 1263.

### A. The Nature of the Categorical Exclusion

NEPA establishes procedural requirements to ensure that federal agencies take a hard look at the environmental consequences of their actions. *See Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1099–1100 (9th Cir. 2010). For NEPA purposes, "actions" include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a). An agency must prepare a detailed EIS for "all major federal actions significantly affecting the quality of the human environment," but may prepare an EA to determine whether the environmental impact of a proposed action is significant enough to warrant an EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.9, 1508.11. And, where appropriate, an agency may decide to use a categorical exclusion for a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." 40 C.F.R. § 1508.4. Categorical exclusions are limited "to situations where there is an insignificant or minor effect on the environment." *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999).

What the CX at issue here does, and does not, say is critical to understanding its function and the legal consequences that flow from it. Exhibit A.[1] It first states that the document is a "Categorical Exclusion Environmental Review *and Approval*" of the action proposed therein. *Id.*

---

[1] In this brief, "Exhibit A" refers to the June 13, 2011 CX decision at issue, which appears in the record in two places (Dkt ## 117-1 & 165-1).

at 1 (emphasis added). It contains a "Description of Proposed Action" which states that routes "will be maintained" consistent with "assigned maintenance levels 2 and 3" on the maps in the CMPA RMP Transportation Plan ("TP") and in the TMP EA "*or* maintenance intensity 1 and 3 described in District Road Maintenance Policy Instruction Memorandum No. ORB000-2010-004" issued in June 2010. *Id*. (emphasis added).

The CX states that it is putatively in conformance with the CMPA RMP ("the applicable [Land Use Plan]"), but concedes that the proposed action "is not specifically provided for" in the land use plan. Exhibit A at 1. Thus in the CX itself, BLM recognizes that its TP (which is Appendix M of the Land Use Plan for the CMPA, AR 10707–14) does *not* specifically authorize the scope of the maintenance described in the CX. Indeed, nowhere in the CX does BLM state that the location or scope of maintenance described in the proposed action is *authorized* by the TP or TMP. Rather, as each agency specialist certifies the absence of "extraordinary circumstances," they note only that "[t]he routes are open and have been assigned maintenance classes 2 and 3. The routes exist on the landscape and are shown on the TP and TMP maps." Exhibit A at 2–3.

The scope of maintenance approved in the CX is not defined anywhere in the TP or TMP. This also is clear from the CX's reference that the proposed maintenance is to be conducted in accordance with the 2010 "District Road Maintenance Policy" Instruction Memorandum.[2] Exhibit A at 1. That District Road Maintenance Policy *did not exist* when the TP and TMP supposedly "authorized"—at least, according to BLM in this litigation—the maintenance described in the CX. *Id*. The additional elements of the action, such as weed-free implementation and conducting maintenance only when routes are dry, Exhibit A at 1, are specifically identified

---

[2] Dkt 112-1 (Exhibit A attached to the First Declaration of Joan M. Suther).

from among the general list of "Best Management Practices" in the TP. AR 10710–11.

BLM is careful never to say in the CX that the proposed action is consistent with the "maintenance" described in the TMP or TP, but rather with the general "maintenance levels" assigned in those documents. The maintenance *levels* focus on the purpose for which routes would be maintained, describing the actual scope of maintenance to be performed only in general terms. For example, the TP describes Maintenance Level 2 as being assigned to roads open seasonally and used for various purposes. AR 10708. It describes these roads as being "passable by high clearance vehicles" and maintained "as needed." *Id*. And it provides in general terms for seasonal closures "or other restrictions" as needed, inspection and maintenance "as needed" of drainage structures, grading "as necessary" to address drainage problems, and brushing "as needed." *Id*. However, when BLM determines maintenance on a specific route is "needed" for any of these types of reasons, it prepares a route-specific decision to actually authorize specific maintenance actions to occur. *See* Exhibit A at 1, 5–7 (identifying scope of maintenance and specific routes to be maintained); District Road Maintenance Policy (Dkt # 112-1) at 7–8 (describing the route-specific approval and documentation required to undertake maintenance projects on specific routes, including that such projects are subject to NEPA review).

Finally, in the individual "Rationale" sections, the CX repeatedly parrots that "[t]he routes exist on the landscape and are shown on the TP and TMP maps." Exhibit A at 2–3. This says nothing about what scope of maintenance the TP and TMP may or may not authorize; ultimately, whether or not the routes "exist" is the subject of the current injunction as well as the future proceedings before the IBLA.

### B. Final Agency Action Under the APA

ONDA's claims in this case arise under NEPA, FLPMA, and the Steens Act. These

claims are reviewable pursuant to the APA, which provides for judicial review of "final agency action." 5 U.S.C. § 704. As the Court noted, agency action is "final" if it is (1) "the 'consummation' of the agency's decisionmaking process" and (2) an action "by which 'rights or obligations have been determined,' or from which legal consequences will flow." May 31, 2012 Op. & Order at 9–10 (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)); *see also Or. Natural Desert Ass'n v. U.S. Forest Serv.* ("*ONDA v. USFS*"), 465 F.3d 977, 982–84 (9th Cir. 2006) (discussing requirements for "final agency action"). The parties and the Court agree that the signed CX decision was the consummation of a BLM decisionmaking process. Thus the question here is whether BLM's decision to approve the proposed action based solely on a CX, rather than engaging in more robust (and public) NEPA analysis, meets the second prong of the test.

The Ninth Circuit has explained that courts "have consistently interpreted *Bennett* to provide several avenues for meeting the second finality requirement." *ONDA v. USFS*, 465 F.3d at 987. "In *Bennett*, the Court held that an agency action that consummated the agency's decisionmaking process (*Bennett's* first requirement) would be final if the action is one 'by which rights *or* obligations have been determined, *or* from which legal consequences will flow.'" *Id.* at 986 (quoting 520 U.S. at 178; emphasis added by Ninth Circuit).

The facts in *ONDA v. USFS* are instructive in resolving the question before this Court. In that case, ONDA challenged Forest Service annual decisions (called Annual Operating Instructions, or "AOIs") for livestock grazing on public lands, alleging violations under the National Forest Management Act, 16 U.S.C. §§ 1600–1614, and NEPA. 465 F.3d at 979–82 (case background). The Forest Service authorizes grazing by first allocating land for livestock grazing in "allotments" through its land use plans, and then issuing grazing permits, allotment

management plans, and AOIs to govern grazing in those areas. *ONDA v. USFS*, 465 F.3d at 979. At the broadest level, a grazing permit grants a license to graze for a 10-year period and sets the number, kind, and class of livestock, the allotment to be grazed, and the seasons of use. *Id*. at 980. An allotment management plan "relates the directives of the applicable forest plan to the individual grazing allotment." *Id*. Finally, "the AOI annually conveys these more long-term directives into instructions to the permittee for annual operations." *Id*.

Similar to BLM's argument here, the Forest Service argued an AOI was not final agency action because it "merely implements the Forest Service's other grazing decisions as found in the Forest Plan or grazing permit." *Id*. at 982. The Ninth Circuit rejected that argument, finding that AOI decisions have a "legal effect" because they set allotment-specific requirements prior to the beginning of each new annual grazing period. *Id*. at 989–89. That is similar to this case. Despite the existence of a general, activity-level *designation* of routes and maintenance categories through the TMP EA and final decision, the subsequent CX decision specifies the *scope* of the maintenance to be performed, and provides the site-specific NEPA review the agency must complete in order to actually proceed with maintenance on specified routes delineated in the CX decision. By deciding that the specific CX category applies to the proposed action, BLM also is relieved from having to seek public comment and prepare an EA or EIS under NEPA.

### C. The Ninth Circuit and its District Courts Have Uniformly Held that NEPA Decisions to Invoke Categorical Exclusion are Reviewable Under the APA

The Court states in its opinion that ONDA neglected to address BLM's "final agency action" argument. May 31, 2012 Op. & Order, at 10. Respectfully, this is incorrect. The issue of whether a decision supported by a CX is "final agency action" is settled in the case law. In making its final agency action-based "futility" argument in its response brief, BLM failed to cite a single case aside from *Bennett*. *See* BLM Resp. (Dkt # 171) at 8–11. That includes failing to

disclose, let alone discuss, the cases holding or confirming that an agency action taken pursuant to a CX is final agency action—cases ONDA cited in both its opening and reply briefs. *See* ONDA Consolidated Br. (Dkt # 165) at 8 & ONDA Consolidated Reply (Dkt # 174) at 4–5. In light of BLM's failure to cite any law to support the proposition that a CX decision is not final agency action reviewable under the APA, ONDA was justified in relying upon the cases it cited holding that a CX decision *is* a justiciable final agency action. Now, in view of the Court's adoption of BLM's novel and unsupported position, ONDA provides further discussion of the issue.

Courts in this circuit uniformly have held that a challenge to the sufficiency of an agency decision *not* to supplement a NEPA analysis, or to invoke a categorical exclusion to authorize agency action, is a cognizable claim under NEPA, reviewable pursuant to the APA. *See, e.g.*, *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 931, 937 (9th Cir. 2010) (reviewing and finding unlawful under NEPA a Forest Service "Supplemental Information Report" in which the agency "specifically discussed information that had been released after the Environmental Assessment" and determined not to supplement the EA or prepare an EIS); *Cal. v. U.S. Dep't of Agric.*, 575 F.3d 999, 1012–13 (9th Cir. 2009) (reviewing and holding unlawful an agency decision to adopt a rule via categorical exclusion pertaining to management requirements for designated roadless areas within the National Forest System); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1027 (9th Cir. 2008) (holding Forest Service categorical exclusion for fuel reduction projects was unlawful under NEPA because it failed to assess the significance of the project with respect to unique characteristics of the geographic area, controversial effects and unknown risks, establishment of future precedent for similar actions, effects on endangered species, and cumulative impacts); *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 927–29 (9th Cir. 2000)

(reviewing and holding unlawful agency CX decision for a highway interchange project); *Friedman Bros. Inv. Co. v. Lewis*, 676 F.2d 1317, 1319–20 (9th Cir. 1982) (determining that an agency decision to fund a construction project pursuant to a CX was a "final" action subject to judicial review); *Ctr. for Biol. Diversity v. Salazar*, 791 F. Supp. 2d 687, 699–703 (D. Ariz. 2011) (reviewing and holding unlawful BLM decision categorically excluding from further NEPA review a mining decision that had been subject to a prior EA). "An agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard." *Alaska Ctr. for the Envt.*, 189 F.3d at 857 (citing *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 (9th Cir.1996)).

In fact, *ONDA is aware of no other court in the Ninth Circuit* that has ruled that a CX decision is *not* final agency action reviewable pursuant to 5 U.S.C. § 706(2)(A). That is because a decision purporting to "satisfy" NEPA with a CX based on a unilateral agency determination that an action does not individually, or cumulatively, have a significant effect on the environment could not more fundamentally bear upon NEPA's purposes of providing for meaningful public participation and informed agency decision making with respect to the environmental consequences of agency action. This Court's ruling would therefore appear to be the first time ever that a court has ruled an agency decision to invoke a CX rather than prepare an EA or EIS for an action is not final agency action reviewable under the APA.

### D.  The CMPA Route Maintenance CX Decision has Legal Consequences

Here, BLM decided to issue a CX for its "proposed action"—conducting route maintenance activities on 133 miles of delineated routes. *See* Exhibit A. That decision has legal consequences because it is a route-specific environmental review, authorizes a specific scope of maintenance, and relieves BLM from having to invite public comment and prepare an EA or

EIS. Put differently, the CX decision has the legal effect of providing the NEPA "analysis" BLM claims is sufficient in order to mechanically maintain those specified routes. *Id.*[3] ONDA alleges in its proposed supplemental complaint that a CX is insufficient in this situation because mechanical maintenance of these 133 miles of specified routes on Steens Mountain *will* have a significant impact on the human environment and *does not* fit within any established Department of the Interior CX category. *See* 40 C.F.R. § 1508.4.

This understanding—that the CX constitutes BLM's site-specific decision of where and how to conduct maintenance, and what level of NEPA analysis is required for this action—is consistent with the Court's earlier decision that the agency had not provided a route-by-route, *i.e.* site-specific, environmental review for any of the 519 miles of routes that the TMP designated as (1) available for motorized use and (2) subject to various, generally-described categories or levels of maintenance. *See* Apr. 28, 2011 Op. & Order at 19 (noting "the IBLA's complete failure to review the TMP's individual route determinations, the methodology BLM employed in conducting its route inventory, or the evidence presented by ONDA that BLM's route designations ignored the actual conditions on the ground"), 45 ("After reviewing the record, I am convinced that there is no way that the IBLA could have rationally determined that all of BLM's TMP route decisions were permissible under the Steens Act based on the facts before it"), 45–46 (explaining how IBLA failed to evaluate all the available route data concerning each separate route opened to motor vehicle use, characterizing it as an "utter failure to seriously evaluate

---

[3] *See also* BLM, *National Environmental Policy Act Handbook H-1790-1* (Jan. 2008), at 2 (listing EISs, EAs, and CXs as "documents used to meet NEPA requirements") & 17 (describing CXs as "categories of actions" determined not to have a significant effect on the environment, and as "a form of NEPA compliance, without the analysis that occurs in an EA or EIS") (*available at* http://www.blm.gov/pgdata/etc/medialib/blm/wo/Information_Resources_ Management/policy/blm_handbook.Par.24487.File.dat/h1790-1-2008-1.pdf) (last visited July 11, 2012).

ONDA's contention that BLM's route inventory and the resulting TMP were flawed").

The Transportation Plan and Steens TMP authorized *general categories* of maintenance on designated routes. *See* AR 10760 (map showing Maintenance Levels within CMPA), AR 9930 (the TP's Appendix M, attached to the TMP EA, providing brief narrative descriptions of the general Maintenance Levels). However, the EA did not, as the Court concluded, review the environmental impacts of those general authorizations at the route-by-route level. Subsequent to the fiasco in unlawfully conducting maintenance on Burnt Car Road,[4] the Burns District BLM adopted a new District Road Maintenance Policy, which it applied for the first time in approving the maintenance of the 133 miles of routes covered under this CX. Therefore, under NEPA, BLM was not free to conduct ground-disturbing route maintenance without first preparing further, route-specific environmental review. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.4; Dkt # 112-1. ONDA disputes the level of environmental review—a categorical exclusion—that BLM decided was sufficient. ONDA is entitled to judicial review of BLM's decision to categorically exclude its approval of route-specific maintenance from further environmental review. *See* cases cited *supra*.

The absence of any route-specific environmental review, either by BLM or IBLA, is the very reason why this Court granted summary judgment for ONDA and remanded to the agency with instructions to conduct such review. *See, e.g.*, Apr. 28, 2011 Op. & Order at 19–20 ("I find that the IBLA did not rationally affirm BLM's TMP because it conducted no reasoned analysis of BLM's route inventory"), 26 (ruling that IBLA "in effect determin[ed] without analysis that BLM's TMP did not violate the Steens Act by opening any other routes to motorized travel" and that IBLA's decision therefore was "incomplete and inadequate to permit meaningful judicial

---

[4] *Or. Natural Desert Ass'n v. BLM*, No. 3:09-cv-862-PK (D. Or. filed July 28, 2009).

review"), 30 ("By silently affirming the TMP with respect to Historical Routes and all other routes (including any pioneered since passage of the FLMPA), the IBLA failed to make a reasoned decision as to whether opening those routes to public motorized access impaired wilderness preservation within the WSAs.").

Finally, that BLM decided to issue the CX decision is itself instructive. Why else would BLM have prepared a CX, if not because it was *required* to do so before actually going out and conducting ground-disturbing, mechanical route "maintenance" on specified routes? BLM's decision to issue a new and separate NEPA document for the agency's route-by-route maintenance actions belies the agency's *post hoc* litigation theory that the CX does nothing more than "implement" or re-decide something that already had been decided. That is inconsistent with how administrative agencies operate. *See generally* BLM *NEPA Handbook*, *supra* n.2.

Thus, through the CX decision document, BLM approved the proposed action to conduct route maintenance on 133 miles of specifically identified routes and determined that the action was excluded from more robust environmental review and public participation through an EA or EIS. That determination has legal consequences because it allows the route maintenance actions to occur (1) without public involvement and (2) without any site-specific environmental analysis. And that determination is final agency action subject to the arbitrary and capricious standard of judicial review under the APA. *Alaska Ctr. for the Envt.*, 189 F.3d at 857. Regardless of what BLM stated in the TP or in the TMP EA or its later briefing before this Court, by issuing the CX decision the agency recognized that it must issue *some* route-by-route, *i.e.* site-specific, NEPA documentation for the particular routes now proposed to be maintained as outlined in the June 13, 2011 CX decision.

And given the timing of the CX, issued just two months after this Court ruled that Interior

had "utterly failed" failed to engage in any route-by-route environmental analysis, the CX decision is BLM's strategic attempt to plow ahead with widespread route maintenance *before* complying with this Court's order to first evaluate the environmental impact of designation—let alone mechanical maintenance—of these routes on a route-by-route basis. That is why, as a practical matter, this Court must allow ONDA to bring the CX decision into this case by giving ONDA leave to supplement its complaint.

## CONCLUSION

For these reasons, the CX decision has the "legal consequences" of being BLM's NEPA coverage for these specific routes, relieving it of having to involve the public and prepare an EA or EIS, and approving the location and scope of maintenance described in the CX, and the Court should reconsider and revise its decision and grant ONDA leave to supplement the complaint to challenge that agency decision as unlawful under NEPA.

DATED this 12th day of July 2012.

        Respectfully Submitted,

        s/ Peter M. Lacy

        Peter M. Lacy ("Mac")
        Oregon Natural Desert Association

        Of Attorneys for Plaintiff