IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON


OREGON NATURAL DESERT ASS'N,

        Plaintiff,

                              3:09-cv-00369-PK
                              OPINION AND ORDER


KENNY MCDANIEL, Burn District
Manager, BLM, *et al.*,

        Defendants.

PAPAK, Judge:

        Plaintiff Oregon Natural Desert Association ("ONDA") brought this action arising from the travel management planning process for the Steens Mountain. ONDA alleged that either BLM's decision adopting its Travel Management Plan ("TMP") or the Interior Board of Land Appeals' ("IBLA") decision approving BLM's adoption of the TMP violates the Steens Mountain Cooperative Management and Protection Act of 2000 ("Steens Act"), 16 U.S.C. § 460nnn et seq., the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.c. §§ 1701-87, the Wilderness Act of 1964, 16 U.S.C. §§ 1131-36, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-61.

OPINION AND ORDER- Page 1

Previously, this court ruled that the IBLA's decision approving BLM's TMP was inadequate to permit meaningful judicial review, vacated the IBLA decision, and remanded to the IBLA with specific instructions to address a number of issues. (#103.) Subsequently, ONDA moved for leave to supplement its complaint (#161) to challenge BLM's June 13, 2011 categorical exclusion ("CX") decision authorizing mechanical maintenance on approximately 133 miles of routes within the CMPA. This court denied ONDA's motion to supplement, reasoning that supplementing to challenge the June 12, 2011 CX decision would be futile because that decision was not a final agency action under the APA. (#175, at 8-10.)

Specifically, the court agreed with BLM that the CX decision only formally implemented activity that was already authorized by the Transportation Plan ("TP") within the CMPA Record of Decision ("ROD") and later by the TMP decision, which announced that routes would be maintained consistent with maintenance levels previously defined in the TP.[1] Thus, while the CX decision on its face purported to rely on a Department of Interior Exclusion category, 43 C.F.R. § 46.210(t), to justify maintaining the 133 miles of routes without conducting any NEPA review, in fact, BLM had already conducted an environmental assessment determining that this maintenance was permissible, obviating the need for the CX decision altogether. The court therefore concluded that the CX decision failed to satisfy the second requirement for finality, namely that it be an agency action "by which rights or obligations have been determined, or from which legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (internal quotations omitted.) ONDA now moves for reconsideration of the court's decision under either

---

[1] For simplicity I often refer to maintenance being authorized or defined by the TMP, even though the TMP technically only incorporated maintenance levels first specified in the TP.

OPINION AND ORDER- Page 2

Fed. R. Civ. P. 54(b) or under the court's inherent power to reconsider interlocutory orders. (#179.) For the reasons below, ONDA's motion for reconsideration is denied.

## DISCUSSION

Federal Rule of Civil Procedure 54(b) provides in part:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all of the parties does not end the action as to any of the claims or parties and *may be revised at any time before the entry of a judgment* adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphasis added). The major grounds for reconsidering an interlocutory order under Rule 54(b) are "an intervening change in the law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n. 5 (9th Cir. 1989). Additionally, the Ninth Circuit has observed that "[a]s long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001).

For several reasons, ONDA argues that this court should reconsider its decision because it committed clear error when it determined that no legal consequences flowed from the CX decision and therefore concluded that the CX decision was not a final agency action under the APA. First, ONDA proposes that because the Ninth Circuit has uniformly held categorical exclusion decisions to be considered final agency actions under the APA, the CX decision in this case was also final. While all of the cases ONDA cited in its original briefing on the motion to supplement and now in support of its motion for reconsideration indeed found a categorical

OPINION AND ORDER- Page 3

exclusion to be final agency action subject to judicial review, none addressed the unique issue at the heart of this motion: whether a categorical exclusion that purports to authorize the same activity without NEPA analysis that has arguably been previously authorized by the agency after conducting NEPA analysis satisfies the second requirement of the *Bennett* test for finality. ONDA does not present any binding authority, nor does this court identify any, that conclusively resolves this question.

Second, ONDA argues that the CX did not merely re-authorize maintenance that was previously permitted by the TMP, as BLM insists. ONDA draws a distinction between the TMP, which "authorized *general categories* of maintenance on designated routes" and the CX, which "constitutes BLM's site-specific decision of where and how to conduct maintenance ...." (P.'s Br., #180, at 11, 12) (emphasis in original). Put differently, ONDA contends that the TMP was "programmatic" and failed to set forth the actual scope of maintenance to be performed, while the CX was "route-specific" and specifically defined the maintenance that was to be conducted. (P.'s Reply, #188, at 4,5.)

I disagree. Indeed, a close comparison of the TMP and the CX demonstrates that both include almost equally specific instructions regarding which types of maintenance are permitted on the routes at issue in the CX decision. The TMP incorporated definitions of maintenance level 2, which permits maintenance of drainage structures, grading to correct drainage problems, brushing, and clearing of slides that adversely affect drainage, and maintenance level 3, which permits maintenance of drainage structures, grading to provide a reasonable level of riding comfort at prudence speeds for the road conditions, brushing to improve sight distance, and removal of slides. AR 10708. For the most part, ONDA ignores these more specific

OPINION AND ORDER- Page 4

descriptions of maintenance to be performed, focusing instead on the TMP's general descriptors of each maintenance level– level 2 applies to "roads . . . . passable by high clearance vehicles" while level 3 applies to "roads . . . . [that] are natural or have an aggregate surface, but may include bituminous surface roads [and] have a defined cross section with drainage structures such as rolling dips, culverts or ditches and may normally be negotiated by passenger cars driven cautiously" – and on the fact that the maintenance levels mostly provide for maintenance "as needed." AR 10708.

Indeed, the CX gives little more concrete detail than the TMP and underlying TP concerning the types of maintenance activities that it authorizes. The CX provides:

> Roads will be maintained within the existing disturbed areas consistent with assigned maintenance levels 2 and 3 described in the CMPA RMP/ROD (M-2 & M-3) and Steens Mountain Travel Management Plan (TMP) OR-05-027-021 EA or maintenance intensity 1 and 3 described in District Road Maintenance Policy Instruction Memorandum No. ORB000-2010-004. Roads may be graded, slides removed, drainage structures maintained, culverts or rock crossings installed to prevent accelerated erosion, and roadside brushing that will be done in a way that prevents disturbance to root systems and visual intrusion.

(Ex. A, at 1) (CX). Setting aside for the moment the question of whether District Road Maintenance Policy Instruction Memorandum No. ORB000-2010-004 allows maintenance coextensive with that permitted by the TMP, it is clear that by invoking maintenance levels 2 and 3 used in the TMP, the CX reiterates the TMP's authorizations. Furthermore, the CX's statement that "[r]oads may be graded, slides removed, drainage structures maintained, . . . ." is no more specific than the TMP's description of maintenance levels 2 and 3, which similarly provides for grading, removal of slides, brushing, and maintenance of drainage structures, as needed. Finally, the CX used a map to indicate which maintenance levels– either level 2 or level 3– apply to each

OPINION AND ORDER- Page 5

route within its purview, presumably reiterating the same route-by-route designations first made by the TP and later incorporated into the TMP. (CX, #165-1, at 7.) In sum, the CX does not describe maintenance to be performed on the routes affected any more precisely than the TMP did and does not make route-specific maintenance determinations for the first time.

ONDA also urges the court to draw guidance from *Or. Natural Desert Ass'n v. U.S. Forest Serv.* ("*ONDA v. USFS*"), 465 F.3d 977 (9th Cir. 2006), which purportedly shows that analogous agency actions constitute area-specific implementation of broader environmental directives. But analysis conducted in *ONDA v. USFS* is factually inapposite.[2] The specific

---

[2] There, the Ninth Circuit framed the issue to be decided as follows: "this appeal presents the narrow question whether the United States Forest Service's issuance of annual operating instructions ("AOIs") to permittees who graze livestock on national forest land constitutes final agency action for purposes of judicial review under the Administrative Procedure Act ("APA")." 465 F.3d at 979. By way of background, the National Forest Management Act of 1976 requires the Forest Service to develop a forest plan for each unit of the national forest system balancing many interrelated uses such as recreation, range, timber, watershed, wildlife and fish, and wilderness. *Id.* at 980 n.4. With regards to grazing, the Federal Land Policy and Management Act of 1976 authorizes and manages grazing on specific allotments within the forest by issuing a grazing permit usually valid for 10 years that sets out the number, kind, and class of livestock to be grazed in the allotment, an Allotment Management Plan (AMP) that translates the land management direction from the overarching forest plan into a directive for the specific allotment, and annual operating instructions (AOIs) that sets out yearly instructions to the permittee responsive to conditions that may not have been anticipated in the permit or the AMP. *Id.* at 980-981. However, none of the allotments at issue had current AMPs and thus, the AOIs served the role of putting the forest plan into effect. *Id.* at 984.

The Forest Service argued that an AOI "is not a final agency action because the document merely implements the Forest Service's other grazing decisions as found in the Forest Plan or grazing permit," but the Court disagreed. *Id.* at 982. The Court observed that AOIs contain specific directives that, if not followed by the permittee, triggered further agency proceedings that carried legal consequences. *Id.* at 987. For instance, several of the permittees violated terms of the AOIs, causing the Forest Service to issue notices of non-compliance, one of which resulted in a 25% reduction in the number of cattle the permittee was allowed to graze. *Id.* at 987-988. Because the AOIs were "discrete, site-specific action[s] . . . from which binding obligations flow," had a "direct and immediate effect" on the permittee, and imposed substantial and intricate legal obligations, they were considered final agency actions under *Bennett. Id.* at 990.

agency actions at issue there– annual operating instructions for individual grazing permittees – translated the generalized objectives of an environmental management plan into concrete instructions with legal consequences. By contrast, the CX at issue here recapitulated a subset of the specific route-by-route maintenance determinations previously made in the TP and TMP. Accordingly, I conclude that *ONDA v. USFS* has no application to the question now before the court.

ONDA also argues that the court has already recognized the generalized, programmatic nature of the TMP in its prior determination on summary judgment. ONDA contends that this court reviewed BLM's TMP decision and associated route inventory and found that BLM's TMP environmental assessment failed to "review the environmental impacts of [TMP maintenance level authorizations] at the route-by-route level" and thus, that BLM and the IBLA failed to conduct any "route-specific environmental review." (P.'s Br., #180, at 12). But ONDA mischaracterizes this court's finding. Rather, in reviewing the IBLA's affirmation of the TMP, this court noted that although the BLM conducted what it claimed was a route-by-route inventory justifying the TMP's route and maintenance designations, the IBLA failed to either review those designations individually or review the overall methodology employed by BLM in making them, and therefore provided inadequate explanation upon which to base judicial review. The sufficiency of the NEPA analysis supporting BLM's route inventory and corresponding TMP route designations is therefore still an open question.[3]

---

[3] Moreover, even if this court had determined– as ONDA asserts– that BLM conducted insufficient environmental analysis to support the TMP's assignment of maintenance levels to various routes, ONDA has already challenged that putative deficiency through its original complaint in this action.

OPINION AND ORDER- Page 7

Even though both the TMP and the CX made route-specific maintenance determinations, there are still three specific aspects of the CX that potentially exceed the scope of the BLM's previous TMP maintenance decision. First, the CX references a BLM policy that, although imprecise, could be read to permit a much more aggressive type of road maintenance than allowed by the TMP. The CX describes proposed maintenance in reference to two different standards: the "maintenance levels 2 and 3" assigned to routes in the TMP and "maintenance intensity 1 and 3" described in a 2010 BLM road maintenance policy. (CX, #165-1, at 1) ("Roads will be maintained with the existing disturbed areas consistent with the assigned maintenance levels 2 and 3 described in the CMPA RMP/ROD (M-2 &3) and the Steens Mountain Travel Management Plan (TMP) OR-05-027-021 EA or maintenance intensity 1 and 3 described in the District Road Maintenance Policy Instruction Memorandum No. ORB000-2010-004.") The 2010 policy, in turn, defines "maintenance intensity 1 and 3" by reference to the revised 9113 BLM Roads Manual and Handbook, which BLM provides for the court's review as an exhibit to its supplemental brief. (#193, Ex. A.) BLM explains that the agency endeavored at a national level to phase out the "maintenance level" terminology employed in the TMP in favor of the "maintenance intensity" terminology used in the 9113 Roads Manual in order to ensure consistency of implementation. Thus, BLM contends that maintenance intensity 1 as defined in the 9113 Roads Manual does not exceed maintenance level 2 as defined in the TMP and that maintenance intensity 3 as defined in the 9113 Roads Manual does not exceed maintenance level 3 as defined the TMP. I agree with BLM on this point.

The problem is not with the 2010 policy's reference to the 9113 Roads Manual, but with other aspects of the 2010 policy that may conflict with those 9113 Roads Manual definitions. In

OPINION AND ORDER- Page 8

particular, the 2010 policy defines "Road Maintenance" in part as "[r]epairing a road to its originally constructed condition" and states that "Road Maintenance" includes "[s]urface work (e.g. surface and/or base aggregate replacement, blading, etc.)" and "[r]establish[ing] road to its original construction/clearing limits . . . ." (2010 Policy, #112, Ex. A at 5.) Illustrating this principle, the 2010 policy provides the following among its "Road Maintenance Examples":

> A primitive road that has not been maintained for decades but has evidence of previous construction can be maintained by blading, or other maintenance activities, **within** the Construction Limits of the original footprint. **The Interdisciplinary Team (IDT) process would identify any significant disturbance that may require additional NEPA analysis.** In the case where constructed roads have evolved through lack of maintenance into two tracks, documentation with before-and-after photos will help aid in the determination of maintenance widths.

*Id.* at 5 (emphasis in original). The 2010 policy does not specifically address whether reestablishing a primitive road that has not been maintained for decades to its originally constructed condition by blading is an example of maintenance permitted under maintenance intensity 1 or maintenance intensity 3. But the policy certainly suggests that such activity would be authorized under one or both of those maintenance intensities. Primitive roads that have not been maintained for decades are unlikely to qualify for maintenance level 5, the only other maintenance level mentioned in the 2010 policy, which the policy reserves for routes with "year-round needs, high volume of traffic, or significant use" or "routes identified . . . as requiring high intensities of maintenance or to be maintained open on a year-round basis . . . ." *Id.* at 4.

If the 2010 policy were to permit blading of a disused primitive road under maintenance intensity 1 or 3, then the CX's authorization of maintenance "consistent with . . . maintenance intensity 1 and 3" described in that policy would exceed the scope of maintenance authorized by the TMP. The corresponding maintenance levels in the TMP at most authorize maintenance of

OPINION AND ORDER- Page 9

drainage structures, grading "to provide a reasonable level of riding comfort at prudent speeds for road conditions," brushing "as needed to improve sight distance," and removal of slides. AR 10708, 9930 (TMP maintenance level 3 activities). The TMP nowhere authorizes blading or reestablishing a road to its originally constructed condition among activities permitted under maintenance levels 2 or 3. In sum, the CX authorizes maintenance consistent with a 2010 BLM policy that, depending on how it is interpreted, may exceed the maintenance allowed under the TMP.

Second, the CX also appears to exceed the scope of maintenance permitted by the TMP by authorizing the installation of new culverts or rock crossings. The CX states that "[r]oads may be graded, slides removed, drainage structures maintained, *culverts or rock crossings installed to prevent accelerated erosion*, and roadside brushing that will be done in a way that prevents disturbance to root systems and visual intrusions." (CX, #165-1, at 1) (emphasis added). Grading, slide removal, maintenance of drainage structures, and brushing are all explicitly authorized by the TMP under maintenance levels 2 and 3 under certain circumstances. AR 10708, 9930 (TMP maintenance level 2 allows inspection and maintenance of drainage structures, grading "as necessary to correct drainage problems," brushing "as needed," and removal of slides that adversely affect drainage; TMP maintenance level 3 allows inspection and maintenance of drainage structures, grading "to provide a reasonable level of riding comfort at prudent speeds for road conditions," brushing "as needed to improve sight distance," and removal of both slides adversely affecting drainage and other slides). But the TMP never explicitly authorized installation of culverts or rock crossings as part of maintenance levels 2 or 3.

OPINION AND ORDER- Page 10

BLM acknowledges that none of the five maintenance levels discussed in the TP and then incorporated into the TMP specifically discuss culvert or rock crossing installation, but argues that such installation is nonetheless "contemplated" under maintenance levels 2 and 3. BLM correctly notes that "drainage structures" are defined to include culverts, arches, pipes, bridges over a water way, and other similar structures. AR 10712, AR 9933. It therefore follows that routes assigned maintenance levels 2 and 3 may already contain culverts and rock crossings which require periodic maintenance. BLM also points out that several Best Management Practices listed in the TP discuss the construction or installation of culverts, suggesting that the TP emphasizes the importance of preventing erosion through culvert construction. AR 10710-10711, AR 9932. The Best Management Practices, however, are not specifically linked to any particular maintenance level, creating ambiguity about whether culvert installation is authorized as part of some or all maintenance levels under the rubric of drainage structure maintenance. On the other hand, as ONDA notes, the CMPA ROD defines "Maintenance" as "[i]n general, taking care of what already exists." AR 10713, 9934. This definition suggests that the TMP's references to maintenance of drainage structures would permit repair of existing culverts and rock crossings, but not new construction of culverts or rock crossings.[4] The CX's authorization of installation of new culverts and rock crossings is yet another example of how the CX potentially exceeds the scope of the TMP.

Third, briefing on another recent motion in this case suggests that a small number of routes for which the CX authorized maintenance may never have been previously designated for

---

[4] Of course, the modifier "in general" potentially indicates that maintenance could include new construction in some instances.

OPINION AND ORDER- Page 11

maintenance by the TMP. In support of its motion to modify this court's previous injunction (#184), ONDA submitted the declaration of Dr. Craig Miller, which stated that six routes totaling about one mile in length that do not appear on the TMP route designations map now appear to be authorized for maintenance on the CX map. (Miller Decl., #186, ¶¶ 5-13.) In conferral on that motion to modify the injunction, the parties agreed that two of those routes did not need to be added to the injunction, leaving four disputed routes. (P.'s Memo., #185, at 2.) BLM contends that two of the routes were actually designated on the TMP route map (routes 2 and 3), stipulates that one of the routes will not be maintained (route 5), and argues that another route may not even fall within the CMPA (route 1) because GIS data shows it extends into the CMPA by only 130 feet, while the CMPA boundary has a 200 foot margin of error. (D.s' Memo., #190, at 3-6.) I will resolve these disputes in the context of a later order on ONDA's motion to modify the court's injunction. However, if the CX authorized maintenance on any of these routes for the first time, the CX would exceed the scope of the TMP's maintenance authorizations.

For the three reasons described above, I must revise my earlier conclusion that CX "does not newly authorize any maintenance not already permitted by the TP and TMP." (Opinion and Order, #175, at 8.) In fact, the June 2011 CX decision *potentially* authorizes more intensive maintenance than did the TMP, including reestablishment of primitive, unmaintained routes through blading, and new installation of culverts and rock crossings. In addition, it remains to be determined whether the CX permitted maintenance on a tiny number of routes that fall within the CMPA but were not previously designated in the TMP. In the light of these ambiguities, I can no longer conclude that no distinct legal consequences flow from the CX decision. Therefore, the CX must be considered final agency action reviewable under the APA. *See Bennett v. Spear*, 520

OPINION AND ORDER- Page 12

U.S. 154, 177-178 (1997) (agency action is final if it is: (1) "the 'consummation' of the agency's decisionmaking process"; and (2) an action "by which 'rights or obligations have been determined,' or from which legal consequences will flow").

Even if the CX is considered final agency action, BLM argues that the court should not reconsider its ultimate decision denying ONDA leave to supplement its complaint because: (1) primary jurisdiction counsels against allowing ONDA to challenge maintenance on CMPA routes while the IBLA is considering similar issues; and (2) ONDA unduly delayed moving to supplement its complaint and supplementation now would be prejudicial. Although I find the first argument unpersuasive, I agree with the second and clarify my earlier order to reflect that justification for denying ONDA's motion to supplement.

The doctrine of primary jurisdiction does not require denial of ONDA's motion to supplement its complaint. Under the doctrine of primary jurisdiction, a district court may, under narrow circumstances, elect in its discretion to refrain from exercising jurisdiction in favor of permitting a federal agency with applicable regulatory authority to decide threshold matters relevant to the dispute. *See Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 68 (1970). A court may properly invoke the doctrine where there is: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *United States v. General Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir. 1987). "The doctrine applies when protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *General Dynamics*, 828

OPINION AND ORDER- Page 13

F.2d at 1362 (internal quotation marks and citation omitted). "Thus, it is the extent to which Congress, in enacting a regulatory scheme, intends an administrative body to have the first word on issues arising in judicial proceedings that determines the scope of the primary jurisdiction doctrine." *Id.* Here, BLM has already had the "first word" on whether the CX decision exceeds the scope of the TMP. In a January 2012 letter to ONDA, the BLM district manager asserted that "[t]he Burns District BLM considers the CX to be well within the analysis and impacts analyzed in the RMP TP and the TMP" because "Maintenance Levels were set in the TP and reaffirmed in the TMP." (Sixth Karges Decl., #172, Ex. A at 2.) The doctrine of primary jurisdiction therefore does not warrant denying ONDA leave to supplement its complaint to add allegations concerning the CX decision.

However, I still must deny leave to supplement because of undue delay by ONDA in moving to supplement and the consequent prejudice to BLM. BLM notes that ONDA first brought the CX to this court's attention in the beginning of July 2011, when ONDA argued that the CX's authorization of maintenance on many non-existent routes demonstrated the urgent need for a permanent injunction against route maintenance to prevent irreparable harm to the environment. (P.'s Br., #117, at 13-14.) Yet ONDA waited until late March 2012, almost nine months later, before moving to supplement its complaint to allege the CX as a factual basis for its claims. (Mot. to Supplement, #161.) This delay is no doubt significant.

Moreover, the delay is unjustified. ONDA previously suggested it had to spend the winter of 2011 evaluating field data that it collected in the fall of 2011 concerning the routes at issue in the CX decision to determine whether the proposed maintenance of those routes would violate NEPA, FLPMA, and the Steens Act. (P.'s Reply Br., #174, at 3.) But ONDA's

OPINION AND ORDER- Page 14

positions here on reconsideration and previously in support of its motion to supplement indicate that ONDA was, or should have been, aware of the basis for its CX-related claims soon after the CX was issued. For example, ONDA makes a definitional argument about the impact of the CX, explaining that because the CX authorizes mechanical maintenance including potential continuous blading of over 133 miles of primitive routes within the CMPA, its effects cannot be "limited" in its context and intensity, and therefore BLM's use of the Department of Interior categorical exclusion was improper. (P.'s Br., #165, at 9-10.) Indeed, ONDA stated that it intends to prove its CX-related claims in part by presenting the same evidence it previously offered during summary judgment briefing, evidence which existed even before the CX was issued. *Id.* at 10 ("ONDA will demonstrate the absurdity of that claim [that the CX maintenance has limited context and intensity], for the reasons stated in ONDA's earlier summary judgment papers and also based on the new evidence ONDA now presents to the Court.") ONDA repeats essentially the same definitional argument now in its supplemental brief on reconsideration. ONDA posits that because the CX authorizes reestablishing roads to their originally constructed state through blading and other surface work, it both exceeds the maintenance authorizations in the TMP and threatens to "dramatically alter the ecological integrity and primitive character of the Steens Mountain," necessitating a public NEPA process rather than a categorical exclusion. (P.'s Suppl. Br., #194, at 5.) While ONDA's more recent analysis of photographic evidence may show the currently primitive nature of individual routes that could be maintained under the CX, it appears that ONDA did not need that evidence to articulate its CX claims.

I also find that allowing supplementation now would significantly prejudice BLM. If ONDA had moved to supplement in July 2011 when it originally brought the CX to the court's

OPINION AND ORDER- Page 15

attention, this litigation might have proceeded very differently. At that point, the court had not yet issued its modified order remanding this case to the IBLA or fashioned a preliminary injunction. Both of these decisions might have been delayed to first allow adjudication of CX-related claims. However, supplementation now would force BLM to simultaneously litigate ONDA's CX claims in this court and the remand proceedings before the IBLA, both of which implicate many of the same routes.[5] These claims are duplicative in the sense that if the IBLA finds merit in any of ONDA's arguments the court ordered the IBLA to address on remand, some or all of the TMP's route designations and maintenance level assignments may be invalidated and the current maintenance scheme altered. Such a result would at the very least change the nature of the litigation before this court on the CX claims, if not moot those claims altogether. Litigating dispositive motions on the CX-based claims would unfairly prejudice BLM by forcing it to incur substantial additional legal expenses for potentially duplicative litigation. *See Owens v. Kaiser Foundation Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (additional litigation expenses caused by a proposed amendment may be prejudicial). Because granting ONDA's leave to supplement would prejudice BLM, I decline to modify my previous ruling denying ONDA's motion to supplement.

However, in light of the considerable ambiguity in the CX and the distinct possibility that the CX could be interpreted to permit more intensive road maintenance than authorized by the TMP, it is necessary to clarify the terms of the court's preliminary injunction concerning maintenance. I previously limiting mechanical maintenance activities in the CMPA in accord

---

[5] ONDA has already expressed its intention to move for summary judgment separately on claims based on the CX, should the court grant leave to supplement. (#165, at 8-9 n. 3)

OPINION AND ORDER- Page 16

with BLM's proposed maintenance injunction. (Opinion and Order, #160.) I now emphasize that for routes where the court restricted BLM to "limited maintenance" only as necessary to ensure effective transportation and access and not to include continuous blading, BLM may not now conduct continuous blading merely because such blading may be independently authorized by the CX decision. Similarly, on those "limited maintenance" routes, BLM may not now install new culverts or rock crossings under the authority of the CX decision. However, I adhere to my prior ruling on ONDA's motion to modify and I decline to expand the scope of this court's injunction to cover additional routes within the scope of the CX decision, because ONDA already had the opportunity to challenge maintenance of these routes earlier in this litigation.

Nevertheless, given that the CX could easily be interpreted to permit reestablishment of disused primitive routes through blading, and given that such activities clearly exceed the scope of the maintenance authorized by the TMP, I caution BLM against relying on the CX as authority to conduct maintenance in this manner on routes within the CMPA that are not currently subject to this court's injunction.

## CONCLUSION

For the foregoing reasons, ONDA's motion for reconsideration (#179) is denied.

Dated this 28th day of September, 2012.

Honorable Paul Papak
United States Magistrate Judge