**Peter M. ("Mac") Lacy (OSB # 013223)**
Oregon Natural Desert Association
917 SW Oak Street, Suite 419
Portland, OR 97205
(503) 525-0193
lacy@onda.org

**Thomas C. Buchele (OSB # 081560)**
Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland OR  97219
(503) 768-6736
tbuchele@lclark.edu

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **OREGON NATURAL DESERT ASSOCIATION,** | No. 3:09-cv-369-PK |
| Plaintiff, | |
| v. | **MOTION FOR SUMMARY JUDGMENT** |
| **BRENDAN CAIN**, Burns District Manager, BLM, *et al.*, | |
| Defendants, | |
| and | |
| **HARNEY COUNTY,** | |
| Defendant-Intervenor-Cross Claimant. | |

## TABLE OF CONTENTS

GLOSSARY OF ACRONYMS ............................................................................. *viii*

KEY TO ADMINISTRATIVE RECORD CITATIONS ................................... *ix*

MOTION ............................................................................................................ *x*

INTRODUCTION ............................................................................................. 1

LEGAL BACKGROUND .................................................................................. 2

    I.   NATIONAL ENVIRONMENTAL POLICY ACT ............................... 2

    II.   STEENS ACT ...................................................................................... 3

    III.   FEDERAL LAND POLICY AND MANAGEMENT ACT ................... 3

    IV.   WILDERNESS ACT ........................................................................... 4

FACTUAL BACKGROUND .............................................................................. 5

    I.   STEENS MOUNTAIN ........................................................................ 5

    II.   BLM'S PLANS FOR STEENS MOUNTAIN ..................................... 6

ARGUMENT ..................................................................................................... 9

    I.   STANDARD OF REVIEW ................................................................. 9

    II.   BLM'S INVENTORY METHODOLOGY WAS UNRELIABLE ........ 10

        A.   The Agency's TMP Route Surveys Were "Incomplete" and "Scattershot." .......... 10

        B.   The Board Declined to Conduct a Route-by-Route Analysis. ................................ 11

        C.   The Board's Approval of BLM's Methodology Was Arbitrary and Capricious. .......................... 13

            *1.*   *BLM's surveys were incomplete.* ............................................................. 13

            *2.*   *BLM's post-decision materials do not make up for its incomplete inventory and do not support the Board's decision to reinstate Obscure Routes.* ....................... 16

            *3.*   *BLM took no ground-based photographs.* ............................................. 17

4.  *BLM used the information it did have inconsistently.* ................................ 20

5.  *BLM's method yielded inaccurate results.* ................................ 20

6.  *BLM's extrapolation from outdated findings is unreliable.* ................................ 21

D.  **BLM's Additional Route Analyses for the CRP Also Are Incomplete and Unreliable.** ................................ 23

III.  **BLM'S UNRELIABLE INVENTORY RESULTED IN PROCEDURAL VIOLATIONS OF LAW UNDER NEPA** ................................ 25

A.  **Inaccurate Baseline Information (Issue 7)** ................................ 26

B.  **Significant Environmental Impacts (Issue 9)** ................................ 27

1.  *Unique Characteristics of the Geographic Area* ................................ 28

2.  *Highly Controversial Effects* ................................ 31

3.  *Uncertainty* ................................ 33

IV.  **BLM VIOLATED SUBSTANTIVE PROVISIONS OF LAW INTENDED TO PROTECT ECOLOGICAL AND WILDERNESS VALUES ON STEENS MOUNTAIN** ................................ 34

A.  **Steens Act (Issues 2 and 3)** ................................ 34

1.  *Historical Routes* ................................ 35

2.  *"Roads" and "Trails"* ................................ 36

3.  *ATV Routes* ................................ 38

B.  **Federal Land Policy and Management Act (Issues 4 and 10)** ................................ 39

1.  *Wilderness Study Area Non-Impairment* ................................ 39

2.  *Minimization Criteria* ................................ 41

C.  **Wilderness Act (Issue 5)** ................................ 43

**CONCLUSION** ................................ 45

**APPENDIX: SUMMARY OF CLAIMS** ................................ 46

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004)..................................................... 28, 34

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229 (9th Cir. 2001)... 13, 27

*Bennett v. Spear*, 520 US 154 (1997) ........................................................................... 37

*Ctr. for Biol. Diversity v. BLM*, 746 F. Supp. 2d 1055 (N.D. Cal. 2009) .............................. 41, 42

*Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670 (D.D.C. 1997) ............................... 20

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004).......................................... 2, 26

*Earth Island Inst. v. Hogarth*, 494 F.3d 757 (9th Cir. 2007).................................... 20

*Friends of the Clearwater v. U.S. Forest Serv.*, No. 3:13–CV–00515–EJL,
    2015 WL 1119593 (D. Idaho Mar. 11, 2015)........................................................41

*Geo–Energy Partners–1983 Ltd. v. Salazar*, 613 F.3d 946 (9th Cir. 2010)................................ 10

*Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ........... 17, 25, 27, 45

*Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1992)..................................... 32

*Half Moon Bay Fishermans' Ass'n v. Carlucci*, 857 F.2d 505 (9th Cir. 1988)......................... 26

*High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004) ........................................... 5

*Idaho Conservation League v. Guzman*, 766 F. Supp. 2d 1056 (D. Idaho 2011)........................ 41

*Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549 (9th Cir. 2006)...................... 28, 32, 34

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008)............................................. 10

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005) ........................................... *xi*

*Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441 (9th Cir. 1992) ........................................ 17

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001) ..............................................3, 26, 28, 31, 32, 33, 34

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005) ......................... 28

*Or. Natural Desert Ass'n v. BLM*, 143 F. Supp. 3d 1064 (D. Or. 2015)................................ 10, 36

*Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092 (9th Cir. 2010) ... 2, 4, 18, 25, 26, 31, 39, 40, 45

*Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016) ......... 3, 6, 15, 17, 24, 26, 27, 29

*Or. Natural Desert Ass'n v. McDaniel*, No. 3:09-cv-369-PK,
2011 WL 1654265 (D. Or. Apr. 28, 2011) ........................................................................ *passim*

*Or. Natural Desert Ass'n v. Rasmussen*, 451 F. Supp. 2d 1202 (D. Or. 2006) ...................... *xi*, 15

*Or. Natural Res. Council v. Lowe*, 109 F.3d 521 (9th Cir. 1997) ................................................ 10

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ............................................ 2

*S. Utah Wilderness Alliance v. Burke*, 981 F. Supp. 2d 1099 (D. Utah 2013) ...................... 41, 42

*S.w. Ctr. for Biol. Diversity v. U.S. Forest Serv.*, 100 F.3d 1443 (9th Cir. 1996) ........................ *xi*

*Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870 (9th Cir. 2009) ...................................... 18

*W. Watersheds Proj. v. Kraayenbrink*, 538 F. Supp. 2d 1302 (D. Idaho 2008) ......................... 20

*W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) ......................................... 20

*WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920 (9th Cir. 2015) ................ 41, 42

*Wildlands CPR, Inc. v. U.S. Forest Serv.*, 872 F. Supp. 2d 1064 (D. Mont. 2012) ..................... 41

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .................................................................. 10

**STATUTES**

16 U.S.C. § 1131(a) ............................................................................................................... 4, 11

16 U.S.C. § 1133(b) ............................................................................................................... 5, 11

16 U.S.C. § 460nnn(5) ............................................................................................................ 3, 29

16 U.S.C. § 460nnn-11(a) ........................................................................................................... 3

16 U.S.C. § 460nnn-12(a) ...................................................................................................... 3, 28

16 U.S.C. § 460nnn-21(b) ........................................................................................................... 3

16 U.S.C. § 460nnn-22(a) ........................................................................................................... 3

16 U.S.C. § 460nnn-22(b) ............................................................................. 3, 11, 21, 34, 36, 38, 46

16 U.S.C. § 460nnn-22(b)(2)(A)..................................................................... 36

16 U.S.C. § 460nnn-22(b)(2)(B)..................................................................... 36

16 U.S.C. § 460nnn-22(c)............................................................................... 38

16 U.S.C. § 460nnn-22(d)................................................................... 3, 37, 46

16 U.S.C. § 460nnn-23(a)............................................................................... 38

16 U.S.C. § 460nnn-23(f)............................................................................... 38

16 U.S.C. § 460nnn-42(a)............................................................................... 38

16 U.S.C. § 460nnn-62(a)............................................................................... 43

16 U.S.C. § 460nnn-62(d)(1).......................................................................... 43

16 U.S.C. § 460nnn-64(b)............................................................................... 41

42 U.S.C. § 4332.......................................................... 3, 27, 28, 34, 47

42 U.S.C. § 4332(2)(C).......................................................... 3, 28, 34, 47

43 U.S.C. § 1711(a)................................................................................ 4, 15

43 U.S.C. § 1732(a)................................................................................ 4, 46

43 U.S.C. § 1732(b)....................................................................................... 4

43 U.S.C. § 1782(c).......................................................... 4, 11, 39, 40, 41, 43, 46

5 U.S.C. § 706(2)(A)..................................................................................... 10

Administrative Procedure Act, 5 U.S.C. §§ 701–706..................................... 9

Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701–87.............................*x*, 8

Freedom of Information Act, 5 U.S.C. §552 ................................................ 24

National Environmental Policy Act, 42 U.S.C. §§ 4321–4370m-12................................*x*

Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, 123 Stat. 991
    (codified in scattered sections of 16 U.S.C.) ...............................................28

Steens Mountain Cooperative Management and Protection Act of 2000,
16 U.S.C. § 460nnn *et seq*............................................................................................*x*

Wilderness Act of 1964, 16 U.S.C. §§ 1131–36...........................................................*x*

**OTHER AUTHORITIES**

12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocerus
urophasianus*) as Threatened or Endangered, 75 Fed. Reg. 13,910 (Mar. 23, 2010)............6, 29

Exec. Order No. 11644, 37 Fed. Reg. 2877 (1972), *as amended by* Exec. Order No. 11989,
42 Fed. Reg. 26,959 (1977) .........................................................................................4

**RULES**

Local Rule 7-1(a)(1) ......................................................................................................*x*

**REGULATIONS**

40 C.F.R. § 1500.1 ........................................................................ 3, 21, 24, 25, 26, 47

40 C.F.R. § 1500.1(b) ........................................................................ 2, 21, 24, 26, 47

40 C.F.R. § 1500.2 ........................................................................................... 25

40 C.F.R. § 1501.2 ........................................................................................... 25

40 C.F.R. § 1502.1 ........................................................................................... 25

40 C.F.R. § 1502.15 ......................................................................................... 3, 26, 47

40 C.F.R. § 1508.13 ......................................................................................... 28, 47

40 C.F.R. § 1508.27(b) .................................................................................... 28, 31, 33

40 C.F.R. § 1508.27(b)(3)................................................................................ 28

40 C.F.R. § 1508.27(b)(4)................................................................................ 28

40 C.F.R. § 1508.27(b)(5)................................................................................ 28

40 C.F.R. § 1508.9(a)........................................................................................ 28

43 C.F.R. § 8342.1 ........................................................................ 4, 39, 41, 42, 46

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| ATV | All-Terrain Vehicle |
| BLM | United States Bureau of Land Management |
| CMPA | Steens Mountain Cooperative Management and Protection Area |
| CRP | Comprehensive Recreation Plan |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FONSI | Finding of No Significant Impact |
| IBLA or "the Board" | Interior Board of Land Appeals |
| NEPA | National Environmental Policy Act of 1969 |
| ODFW | Oregon Department of Fish and Wildlife |
| ONDA | Oregon Natural Desert Association |
| RAF | Route Analysis Form |
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| TMP | Travel Management Plan |
| TP | Transportation Plan |
| USFWS | United States Fish and Wildlife Service |

## KEY TO ADMINISTRATIVE RECORD CITATIONS

The Department of the Interior has lodged the administrative record in multiple installments in this case. This table summarizes those installments and shows how documents from each are cited in ONDA's briefing.

| Title | File Date | Dkt # | Citation Format in Brief | Notes |
|-------|-----------|-------|--------------------------|-------|
| Administrative Record | 09/04/09 | 20 | "AR ___" | Bates numbers AR 01–13479. |
| Supplement to Administrative Record | 04/15/10 | 42 | "SAR ___" | Bates numbers SAR 01–5145. |
| Addition to Supplement to Administrative Record | 07/02/10 | 48 | "SAR ___" | Bates numbers SAR 5146–48. |
| GIS Data | 06/14/12 | 178 | n/a | Lodged pursuant to Court order (Dkt # 175). |
| Remand Administrative Record | 01/14/15 | 214 | "RAR ___" | Bates numbers RAR 01–22350. (Lodged following IBLA remand proceedings.) |
| Administrative Record of the Comprehensive Recreation Plan for Steens Mountain | 09/25/15 | 250 | "CRP ___" | Bates numbers CRP 01–14218.[1] |
| Supplemental Administrative Record | 01/31/17 | 284 | "SUPP ___" | Bates numbers SUPP 01–1364. (Lodged pursuant to Court order, Dkt # 283.) |
| Corrected Supplemental Administrative Record | 02/16/17 | 288 | "SUPP ___" | Bates numbers SUPP 1365–1659. |

---

[1] Note that these documents are stamped with "AR" Bates numbers. To avoid confusion and to distinguish them from the original AR, ONDA cites them as "CRP" rather than "AR."

## MOTION

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56-1, plaintiff Oregon Natural Desert Association ("ONDA") respectfully requests that this Court grant summary judgment in ONDA's favor in the above-captioned action. The legal issues center on whether Federal defendants have violated procedural and substantive provisions of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m-12, the Steens Mountain Cooperative Management and Protection Act of 2000 ("Steens Act"), 16 U.S.C. § 460nnn *et seq.*, the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701–87, and the Wilderness Act of 1964, 16 U.S.C. §§ 1131–36, in their environmental review and final decisions for the Steens Mountain Travel Management Plan ("TMP") and Steens Mountain Comprehensive Recreation Plan ("CRP"). *See* Appendix: Summary of Claims, *infra*. Together, the TMP and CRP comprise the Bureau of Land Management's ("BLM") travel plan for the Steens Mountain Cooperative Management and Protection Area ("CMPA"). Pursuant to Local Rule 7-1(a)(1), the undersigned hereby certifies that counsel made a good faith effort to resolve the dispute between the parties, but the parties were unable to resolve the dispute.

In support of this motion, ONDA respectfully refers the court to the memorandum in support and exhibits that follow this motion, as well as the Seventh Declaration of Dr. Craig Miller, M.D., filed herewith. Dr. Miller's declaration is properly before the Court because it fits within the first and third of the Ninth Circuit's recognized exceptions (below) to the general rule that judicial review of agency action should be limited to the administrative record. This Court may consider extra-record evidence:

> (1) if admission is necessary to determine "whether the agency has considered all relevant factors and has explained its decision," (2) if "the agency has relied on documents not in the record," (3) "when supplementing the record is necessary to explain technical terms or complex subject matter," or (4) "when plaintiffs make a

showing of agency bad faith."

*Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (quoting *S.w. Ctr. for Biol. Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)); *see also, e.g.*, *Or. Natural Desert Ass'n v. Rasmussen*, 451 F. Supp. 2d 1202, 1208 (D. Or. 2006) ("Miller's testimony addresses whether BLM considered all relevant factors in its NEPA analysis, including the extent of wilderness areas in the East-West Gulch and, therefore, is an exception to the rule against considering extra-record materials on the cross-motions for summary judgment"). Dr. Miller summarizes the routes now open under BLM's travel plan, identifies which of those are of concern to ONDA, and notes a handful of photographs BLM inserted into the administrative record after close of the public comment period for the Steens Mountain CRP.

Finally, because of the number, type, and complexity of claims and issues in this case, ONDA will address the issue of remedy after the Court rules on the merits. ONDA notes that this Court's 2011/2012 preliminary injunction, as modified in 2015, remains in effect. The injunction is described in the Court's Opinion and Order dated August 25, 2011 (Dkt # 160), as modified and clarified in subsequent orders (Dkt ## 175, 197, 198, 238). Under the terms of the original injunction, BLM shall conduct "no maintenance" on 37 routes totaling approximately 26 miles, and may perform no more than "limited maintenance" on 76 routes totaling approximately 64 miles. Dkt # 160 at 3. Limited maintenance "consist[s] of repairs necessary for effective transport and safe access (but no continuous blading)." *Id*. at 3. As modified in 2015, BLM is "prohibited from authorizing, allowing, or carrying out motorized travel or mechanical maintenance on all Obscure Routes within the [CMPA], save for the limited use of 11 routes, totaling 5.78 miles . . . pending the court's decision on the merits of plaintiff's claims." Dkt # 238 at 2.

## INTRODUCTION

This case is about BLM's plan to designate as open to motorized use and subject to mechanical maintenance 521 miles of routes within a unique, congressionally-protected area on Steens Mountain in southeastern Oregon's fragile high desert. Steens Mountain rises from the sagebrush steppe in the heart of one of the last remaining strongholds for the Greater sage-grouse, an iconic bird whose survival is threatened by fragmentation and loss of its sagebrush habitat. Much of the mountain is protected by law for its wilderness values. ONDA filed this lawsuit in 2009, alleging that BLM's travel plan is unlawful because it establishes roads where none exist on the ground and where they are barred by substantive provisions of law. BLM has, in effect, approved a new and extensive motorized road network that threatens to carve up roadless areas with irreplaceable wildlife and wilderness values within this exceptional landscape whose "long-term ecological integrity" BLM must protect. ONDA also alleges that BLM failed to follow procedures required by law to ensure meaningful public participation and informed decision making.

In 2011, this Court held that the Department of the Interior's final approval of the TMP was arbitrary and capricious because BLM's route inventory methodology and results were so incomplete and convoluted that it was impossible to discern any rational basis to uphold the agency's plan. *Or. Natural Desert Ass'n v. McDaniel*, No. 3:09-cv-369-PK, 2011 WL 1654265, *21–23 (D. Or. Apr. 28, 2011) (Dkt # 103). BLM had failed to collect basic information such as photographs to document actual route conditions, and had failed to survey hundreds of miles of routes—egregious errors considering that existing, objective evidence from ONDA, provided during the NEPA process, questioned the very existence of scores of routes BLM simply assumed were there. Despite completing Court-ordered remand proceedings, and even issuing a

second plan, the CRP, BLM has now failed to cure these problems, undertaking new surveys for just a handful of the disputed routes and still failing to address the ONDA inventory. The agency's unreliable and incomplete surveys thus left it unable to establish an accurate environmental baseline necessary to providing for meaningful public participation and reaching an informed decision, and unable to comply with requirements to protect wilderness values and long-term ecological integrity on Steens Mountain.

## LEGAL BACKGROUND

### I.    NATIONAL ENVIRONMENTAL POLICY ACT

NEPA serves two purposes: (1) "it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)) (internal citations and alteration omitted); *see also* 40 C.F.R. § 1500.1(b) (requiring "high quality" information, "[a]ccurate scientific analysis" and "public scrutiny"). By requiring agencies to take a "hard look" at the choices before them and how they "affect the environment, and then to place their data and conclusions before the public . . . NEPA relies on democratic processes to ensure . . . that the most intelligent, optimally beneficial decision will ultimately be made." *Or. Natural Desert Ass'n v. BLM* ("*ONDA v. BLM*"), 625 F.3d 1092, 1099–1100 (9th Cir. 2010) (internal quotation marks and citations omitted).

"The centerpiece of environmental review under NEPA is the environmental impact statement ('EIS'), in which the responsible federal agency describes the proposed project and its

impacts, alternatives to the project, and possible mitigation for any impacts." *Or. Natural Desert Ass'n v. Jewell* ("*ONDA v. Jewell*"), 840 F.3d 562, 568 (9th Cir. 2016) (citing 40 C.F.R. §§ 1500.1, 1502.15); *see also* 42 U.S.C. § 4332(2)(C) (requiring an EIS for "major Federal actions significantly affecting the quality of the human environment"). Only if an agency can sustain its burden of providing a "convincing statement of reasons" why the impacts of a project or action will have "no" significant impact on the environment may the agency prepare an environmental assessment ("EA") instead of an EIS. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001).

## II.    STEENS ACT

In 2000, the Steens Act established the Steens Mountain CMPA, a 496,000-acre protected area managed by BLM and covering most of the mountain. 16 U.S.C. § 460nnn-11(a); AR 11158; SAR 5148 (map showing CMPA boundaries). "The purpose of the [CMPA] is to conserve, protect, and manage the long-term ecological integrity of Steens Mountain for future and present generations." 16 U.S.C. § 460nnn-12(a); *see also id.* § 460nnn(5) (defining "ecological integrity"). The Steens Act required BLM to prepare a "comprehensive transportation plan" that "shall address the maintenance, improvement, and closure of roads and trails as well as travel access." *Id.* §§ 460nnn-21(b), -22(a). The Act prohibits driving off-road and limits motorized vehicles to designated, existing roads and trails, with limited exceptions. *Id.* § 460nnn-22(b). It also prohibits construction of new roads or trails for motorized or mechanized vehicles unless the agency determines it necessary for public safety or protection of the environment. *Id.* § 460nnn-22(d).

## III.    FEDERAL LAND POLICY AND MANAGEMENT ACT

FLPMA governs BLM's management of public lands, establishing systems for

information gathering and land use planning. *See generally ONDA v. BLM*, 625 F.3d at 1098–99.

BLM must manage public lands consistent with the "principles of multiple use and sustained

yield." 43 U.S.C. § 1732(a). The multiple-use framework requires that BLM "shall . . . take any

action necessary to prevent unnecessary or undue degradation of the lands." *Id*. § 1732(b). To

ensure that BLM has adequate information to perform this task, the agency must "prepare and

maintain on a continuing basis an inventory of all public lands and their resource and other

values (including, but not limited to, outdoor recreation and scenic values), giving priority to

areas of critical environmental concern." *Id*. § 1711(a). This inventory "shall be kept current so

as to reflect changes in conditions and to identify new and emerging resource and other values."

*Id*. FLPMA also requires that BLM must, with a few exceptions not relevant here, manage

identified Wilderness Study Areas ("WSAs") "so as not to impair the suitability of such areas for

preservation as wilderness." *Id*. § 1782(c). To fulfill these FLPMA requirements and to comply

with Executive Orders intended to protect against damage from off-road vehicle use on public

lands, BLM must, when designating roads on public lands, apply regulatory criteria to

"minimize" impacts on soils, vegetation, wildlife, air, water, and cultural resources. 43 C.F.R. §

8342.1(a)–(c); *see also* Exec. Order No. 11644, 37 Fed. Reg. 2877 (1972), *as amended by* Exec.

Order No. 11989, 42 Fed. Reg. 26,959 (1977).

## IV.   WILDERNESS ACT

In 1964, Congress identified the conservation of public lands with wilderness

characteristics as a "national priority" in the Wilderness Act. *See ONDA v. BLM*, 625 F.3d at

1097. Intended to "secure for the American people of present and future generations the benefits

of an enduring resource of wilderness[,]" the Wilderness Act provides for the protection and

preservation of federal lands in their natural condition. 16 U.S.C. § 1131(a). Using unique words

found in no other natural resource protection law, Congress describes "wilderness," contrasted

with "areas where man and his own works dominate the landscape," as "an area where the earth

and its community of life are untrammeled by man, where man himself is a visitor who does not

remain." *Id*. § 1131(c). These places retain their "primeval character and influence, without

permanent improvements or human habitation." *Id*. The Act defines a "wilderness" as a roadless

area of 5,000 or more acres that appears "to have been affected primarily by the forces of nature"

and that has "outstanding opportunities for solitude or a primitive and unconfined type of

recreation." 16 U.S.C. § 1131(c); *see also* SAR 08, 13–16 (BLM *Wilderness Inventory*

*Handbook* describing these three "key factors" of wilderness). For congressionally-designated

Wilderness areas, such as the Steens Mountain Wilderness Area, the administering agency "shall

be responsible for preserving the wilderness character of the area." *Id*. § 1133(b). This is a non-

impairment requirement for Wilderness areas. *See High Sierra Hikers Ass'n v. Blackwell*, 390

F.3d 630, 648 (9th Cir. 2004) ("unimpaired for future use").

## FACTUAL BACKGROUND

This Court is familiar with the factual background and procedural posture of this action.

*See McDaniel*, 2011 WL 1654265, at \*1–8 (detailed background in decision on first round of

cross-motions for summary judgment); CRP 3454–61 (further background in ONDA comment

letter to BLM during CRP review process); RAR 22273–85 (IBLA remand decision); Joint

Notice of Completion of IBLA Remand (Dkt # 203). For the Court's convenience, ONDA

updates that background only as necessary to reset the stage here.

### I.    STEENS MOUNTAIN

Steens Mountain is situated deep in southeastern Oregon's high desert. AR 11366–67

(general description in Andrews-Steens Resource Management Plan Final EIS), 10749 & 11052

(general vicinity maps). At 60 miles long and 9,773 feet high at its peak, much of Steens

Mountain is wilderness. Within the CMPA, in addition to the congressionally-designated Steens

Mountain Wilderness Area (173,000 acres), there are seven WSAs (120,000 acres total) and

eleven citizen-proposed (but disputed by BLM) wilderness areas (81,000 acres total). *See* AR

9971, AR 9974, SAR 1737–3981, SAR 3984–4073; *see also* AR 313 (overview map of these

different types of wilderness areas in CMPA). Steens Mountain is "home to many sagebrush

communities" and "lies near the center of one of the last remaining strongholds of contiguous

sagebrush habitat essential for the long-term persistence of greater sage-grouse." *ONDA v.*

*Jewell*, 840 F.3d at 565 (internal quotes omitted). The mountain's many, large roadless areas are

important to the sage-grouse and other sagebrush "obligate" species because habitat

fragmentation and weed infestation are among the primary causes of their decline. *See* 12-Month

Findings for Petitions to List the Greater Sage-Grouse (*Centrocerus urophasianus*) as

Threatened or Endangered, 75 Fed. Reg. 13,910, 13,927, 13,935–37 (Mar. 23, 2010).

## II.    BLM'S PLANS FOR STEENS MOUNTAIN

After multiple administrative appeals and one intermediate remand by this Court to the

Department of the Interior's Board of Land Appeals, this action now challenges multiple agency

decisions that approve two interconnected travel plans for the CMPA, the TMP and the CRP.[2]

*See* AR 783 (TMP Decision Record or "DR"); AR 41 (Board decision approving in part and

reversing in part the TMP DR); RAR 22268 (Board decision approving the TMP DR); CRP 1422

(CRP DR). The plans designate roads available for motorized use and set levels of maintenance

---

[2] For a detailed review of BLM's plans, starting with the agency's preparation of the underlying
land use plan and "comprehensive" transportation plan that were required by the Steens Act, and
the route and other inventory information ONDA provided to BLM during these planning
processes, *see* RAR 21880–91 (ONDA brief submitted to IBLA).

that may be undertaken in order to keep or make the designated roads drivable. The CRP also includes a handful of management decisions for hiking trails and other recreational facilities, which are not at issue in this case.

In the TMP, BLM grouped routes into categories defined by their condition and the nature of their use: Base Routes, Obscure Routes, Historical Routes, Private Landowner Access Routes, Permit Routes, All-Terrain Vehicle ("ATV") Routes, and Service/Permit Use Routes. AR 9963–65. All routes are authorized for "Level 2" maintenance unless otherwise specified. AR 9965. Maintenance Level 2 provides for routes to be mechanically graded (or "bladed"), for drainage structures to be maintained, and for roadside vegetation to be removed ("brushed"). AR 9930.[3] These route categories—in particular, the controversial Obscure, Historical, and ATV routes—are important to understanding ONDA's legal claims. *See McDaniel*, 2011 WL 1654265, at *4 (summary of the route types). In all, BLM designated as available for motorized use 555 of the 556 miles of routes identified on TMP maps. AR 793, 803.

ONDA appealed the TMP decision to the Board in 2008. AR 619–690, 242–294. In 2009, the Board affirmed in part and reversed in part BLM's TMP decision. AR 41. Central to this case—because the Steens Act prohibits off-road driving and establishment of new roads—the Board found that "there is an inherent incongruity in determining that routes are 'obscure,' or difficult or impossible to identify on the ground," yet nevertheless opening them to motorized use. AR 55. "[W]e fail to see how opening those Routes to motorized travel does not amount to permitting motorized travel 'off road.' BLM's decision to designate the Obscure Routes as open to motorized travel must be viewed as permitting off-road use by motorized vehicles." AR 57.

---

[3] In the CRP, BLM started using the term "Maintenance Intensity" instead of "Maintenance Level," but the approved types of maintenance actions are more or less the same. *See* CRP 2555–62 (a somewhat convoluted "crosswalking" between the terminologies).

For that reason, the Board reversed BLM's decision to open 36 miles of Obscure Routes within the CMPA. AR 53, 57. That 2009 decision, which served as the Department of the Interior's "final agency action" approving the TMP for purposes of judicial review before this Court,[4] reduced the TMP's final total mileage of routes authorized as open for motorized use, from 555 miles to 519 miles.

    In 2011, this Court ruled that the Board's decision approving the TMP "was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law with regard to the seven issues it did not fully address" and remanded to the Board to "issue a new decision in which it addresses the seven legal issues ONDA exhausted but that the IBLA failed to consider, and, in doing so, analyzes the completeness and accuracy of BLM's route inventory." *McDaniel*, 2011 WL 1654265, at *26 (internal quotes omitted); July 8, 2011 Op. & Order (Dkt # 118) at 6.

    Thus, the plan changed again in September 2014 when the Board issued its decision on remand, again approving BLM's TMP decision. RAR 22268–341. This time, however, the Board reinstated the Obscure Routes it had previously ruled are illegal and which, by that time, had not been a part of the TMP for more than six years, since early 2009. RAR 22341. No party had moved the Board to reconsider the legality of the Obscure Routes, and this Court had specifically left the Board's reversal of the Obscure Routes "in force." *McDaniel*, 2011 WL 1654265, at *26. Rather, the Board variously described its move as a "*sua sponte*" decision to "vacate" or "abandon" its prior ruling that BLM's designation of Obscure Routes is unlawful. *See* RAR 22268, 22272–73, 22287, 22316, 22341. That brought the total mileage of routes authorized for motorized use on Steens Mountain back up to 555 miles.

    When the case then returned to this Court, the parties could not agree on the legal status

---

[4] *See* Nov. 23, 2010 Amended Op. and Order (Dkt # 82), at 10.

of Obscure Routes or on temporary protective measures that could be instituted while this case is resolved. But before the Court could decide that question, BLM went ahead and issued the CRP on April 13, 2015—modifying the Steens Mountain route network yet again. CRP 1422, 1427, 1531. BLM states that the CRP "amended" the TMP (CRP 1427, 1430) and that any "[r]outes not shown in the [CRP DR tables, *see* CRP 1543–63] remain open as designated in the TMP." CRP 1430. The most significant change BLM made in the CRP was to move the Obscure Routes target once again. Although the CRP closed 11 of what BLM now termed "obscure ways" within WSAs and 5 other "obscure roads" elsewhere, it designated as open to at least some level of motorized use and/or mechanical maintenance at least 22 other Obscure Routes. CRP 1439–41, 1447 (Table 13 showing 10 Obscure Routes open to public use, Tables 8–10 showing Obscure Routes open to administrative use and even maintenance on one, and Table 11 showing one Obscure Route open to ATV use).

Stitching together these scattered decisions, Dr. Miller calculates that there are now 520.9 miles of routes open to motorized use and/or mechanical maintenance on Steens Mountain under the TMP-CRP. 7th Miller Decl. ¶¶ 3–4. ONDA disputes BLM's designation of 140.7 miles of those routes made available for motorized use: 125.9 miles of routes that are obscure or nonexistent according to record evidence and 14.8 miles of Historical Routes in the Wilderness Area. *See id.* ¶ 8 & Tables 1, 2, 4. ONDA disputes BLM's maintenance level designations only, for an additional 110.7 miles of routes. *See id.* ¶ 8 & Tables 1, 2, 3.

## ARGUMENT

### I.    STANDARD OF REVIEW

Judicial review of the claims at issue in this case is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. *McDaniel*, 2011 WL 1654265, at *8. Under the

APA, the Court asks whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's action must be set aside as arbitrary and capricious

> if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (citations omitted), *overruled on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The Court applies the same "arbitrary and capricious" standard whether it is reviewing a BLM decision or an IBLA decision approving that BLM decision. *Or. Natural Desert Ass'n v. BLM*, 143 F. Supp. 3d 1064, 1067 (D. Or. 2015) (citing *Geo–Energy Partners–1983 Ltd. v. Salazar*, 613 F.3d 946, 955 (9th Cir. 2010)). Under this standard, an "agency must articulate a rational connection between the facts found and the conclusions made." *See Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997).

## II.    BLM'S INVENTORY METHODOLOGY WAS UNRELIABLE.

### A.    The Agency's TMP Route Surveys Were "Incomplete" and "Scattershot."

In 2011, this Court found that BLM's inventory methodology was unreliable because its surveys were incomplete, inaccurate, and convoluted. *McDaniel*, 2011 WL 1654265, at *21–23. The Court described these problems in detail, finding that BLM had cobbled together, at best, "an incomplete and scattershot memorialization" of the agency's route inventory. *Id*. at *22. The "inventory data provided by BLM in the administrative record is incomplete, hard to understand, and made more inscrutable by the sheer number of different routes, designations, and maps." *Id*. at *22 n.13. The "paucity of BLM's route inventory documentation" made it "almost impossible for the court or any reviewing body to examine BLM's route determinations on an individual

basis." *Id*. at *22 n.14. As a result, the Board's "blanket determination" in 2009 that the TMP complied with the law "was not a reasoned decision based on facts in the record." *Id*. at * 22.

Based on these findings, the Court ordered the Board to analyze the completeness and accuracy of BLM's route inventory. The Court provided a detailed roadmap explaining that the Board could either (1) undertake a route-by-route analysis to determine whether each disputed route exists or not, or (2) review BLM's inventory methodology as a whole. *See id*. The Board declined to review each individual route (or even order additional survey information to address the gaps identified by this Court). Instead, it again approved the BLM plan based on the same paucity of evidence, but this time coupled with several incorrect or unsupported factual findings and a new legal theory that would excuse BLM's still-incomplete and unreliable inventory.

### B.  The Board Declined to Conduct a Route-by-Route Analysis.

In asking "whether BLM properly identified the status of all 555 miles of routes designated as open to motorized travel," the Board conceded that if BLM "improperly determined that *any one* of the routes was in existence" on relevant dates, "designation of the route as open to motorized travel would run afoul of" the motorized use limits and wilderness non-impairment requirements ONDA identified under the Steens Act, FLPMA, and the Wilderness Act. RAR 22288 (emphasis added; referencing 16 U.S.C. §§ 460nnn-22(b), (d), 1131(a), 1133(b), and 43 U.S.C. § 1782(c)). The Board also correctly recognized that "[i]mproperly assessing the status *of any one* of the 555 miles of routes may have impaired or prevented a proper assessment of the likely significant impacts under section 102(2)(C) of NEPA of designating the route as open to motorized travel." RAR 22288. (emphasis added).

Yet, despite characterizing the case as "fundamentally" turning "on the existence or non-existence" of each designated route, RAR 22288, the Board decided, as in 2009, not to review

each route. *See McDaniel*, 2011 WL 1654265, at * 23 (describing Board's "utter failure to seriously evaluate ONDA's contention that BLM's route inventory and the resulting TMP were flawed" and "fail[ure] to address ONDA's ground-level geo-referenced photographs" of individual routes). Instead, the Board made a series of factually incorrect statements intended to sustain its conclusion that the record shows that "all" 555 miles of TMP routes exist.

First, the Board complained that ONDA "has yet to identify with specificity the routes it claims BLM improperly designated as open to motorized travel." RAR 22289. That is simply not true and is contradicted by specific record evidence. ONDA provided to the Board a list of disputed routes, with pinpoint citations to record evidence, identifying 121.4 miles of obscure routes, 47 miles of newly-added routes, 12.8 miles of Historical Routes in the Steens Mountain Wilderness Area, 38 miles of Historical Routes within WSAs, and 8 miles of ATV routes. RAR 21766–67. ONDA explained that because BLM's inventory "was so scattered and incomplete, and because the EA/FONSI/DR are so convoluted in key respects," ONDA identified the disputed routes "on a route-by-route basis whenever possible, and also on a categorical basis when necessary." RAR 21766. Thus, ONDA also identified an "unknown number" of other obscure and pioneered routes in WSAs, RAR 21767, explaining that BLM itself did not know where some of the routes were—and therefore how could the public know? *See* RAR 21899. ONDA provided the Board with multiple maps showing the locations of the disputed routes (RAR 22173, 21863–64) and offered to provide the Board with GIS data, as it had done before for BLM. RAR 21856, n.1.

Unwilling or unable to then follow through and review the evidence for each route ONDA identified, the Board seems to have thrown up its hands, stating with breathtaking nonchalance, "Having studied ONDA's assertions regarding the disputed routes, we remain

uncertain as to their numbers and identity. For this reason, we decide this case on the basis that BLM's inventory process was sound." RAR 22289. Because it declined to undertake a route-by-route analysis to determine whether each disputed route exists or not, the Board's approval of BLM's travel plan can be upheld *only* if the Board made a non-arbitrary decision "to determine whether the inventory yielded results reliable enough to form the basis for TMP route decisions and thereby comply with the various statutes." *McDaniel*, 2011 WL 1654265, at *22. As the next section shows, it did not.

### C.  The Board's Approval of BLM's Methodology Was Arbitrary and Capricious.

Because it decided not to evaluate all the available data concerning each separate route opened to motor vehicle use, the Board instead approved the TMP on the basis that BLM's overall methodology was "sound." RAR 22289. Despite a smattering of post-decision declarations and "Route Analysis Forms" ("RAFs") BLM offered to the Board (which the agency had created for the injunction proceedings in this Court in 2011), the incompleteness, inaccuracy, and inconsistency of BLM's surveys, and both its and the Board's failure to honestly assess ONDA's survey evidence, make clear the arbitrariness of that conclusion.

#### 1.  *BLM's surveys were incomplete.*

This Court found in 2011 that BLM's inventory methodology was flawed because its surveys were incomplete. *McDaniel*, 2011 WL 1654265, at *21–23. On remand, the Board concedes, "BLM admittedly did not survey all of the routes designated as open to motorized travel on the ground." RAR 22294.[5] In fact, the agency actually surveyed only 108 of the 555

---

[5] Elsewhere, however, the Board contradicts this, stating—incorrectly, therefore arbitrarily—that "BLM inventoried all 555 miles of routes." RAR 22292, 22299. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (agency decision arbitrary and capricious if not based on "the relevant factors" and "there has been a clear error of judgment"); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (no deference

miles of routes originally established in the TMP. *See* RAR 22125–26, ¶¶ 29–32 (explaining this to the Board). To be clear: ONDA does not contend that BLM must visit well known, established routes like the 55-mile Steens Mountain Loop Road and most of the routes identified by name in the original Transportation Plan. *See* AR 10709–10. However, BLM's decision to not visit the other routes—including over a hundred miles of specifically identified and disputed routes for which ONDA provided ground-based evidence—is a serious error in the agency's methodology. *See* RAR 21856–57, ¶¶ 7–10 (Dr. Miller describing to Board 121.4 miles of routes disputed because they are obscure on the ground).

The Board argues it was reasonable for BLM to visit fewer than 20% of the routes it decided to open because the agency used "other" reliable evidence: aerial photographs, first-hand accounts, and "other appropriate evidence." RAR 22295–96. (The Board never says what the "other" evidence is. *See* RAR 22295–96.) This argument is unconvincing and cannot make up for the lack of an actual, reliable methodology. First, the TMP EA does not contain a single reference to an aerial photograph. *See* AR 9913–10029; *see also* ONDA MSJ Reply Br. (Dkt # 75) at 13 (Sherbourne's claim that he "recall[ed] reviewing aerial images" during TMP process belied by absence of any aerial photographs in AR or SAR).[6] There is simply no evidence BLM reviewed or relied upon aerial photographs when it made its November 2007 decision.

And second, even if the narrative, non-survey accounts cited by the Board (*e.g.*, AR 13317–19) were a valid proxy inventory "methodology," none include the type of ground-based evidence, gathering using BLM's own, published survey method, like the ONDA inventory. *See*

due where agency "conclusions do not have a basis in fact"); *c.f.* RAR 22294 (switching back again stating "BLM inventoried *many* of the routes") (emphasis added).

[6] In fact, there is not a single aerial photograph in the administrative record until BLM's submission of the 2011 RAFs to the Board on July 3, 2013. RAR 2043–679.

RAR 22294 (the Board lumping ONDA's reports in with cited "input" from Harney County, grazing permittees, private landowners, and others—none of which include actual survey evidence like ONDA's). And if BLM were going to rely upon those "accounts" as part of its inventory "methodology," the agency had an obligation under NEPA to "independently evaluate the information submitted and . . . be responsible for its accuracy"—that is, to actually visit the routes to ascertain and document their existence and condition on the ground. 40 C.F.R. § 1506.5(a); *see also id*. § 1502.24 (agencies "shall identify any methodologies used").

The Board disparages ONDA's inventory as not "representative," contending that ONDA's inventory "suffers" because it "does not concern all of the challenged routes." RAR 22297. That criticism is riddled with flaws. First, under NEPA, it was BLM's job, not ONDA's, to collect adequate baseline information and to disclose that information, and the agency's analysis of it, to the public in order to make an informed decision. *See Rasmussen*, 451 F. Supp. 2d at 1212–13 ("ONDA did not have a responsibility to provide accurate information regarding [the environmental baseline] before the EA was issued. BLM did."); *see also ONDA v. Jewell*, 840 F.3d at 570 (BLM's failure to establish an accurate baseline, by failing to survey a project site and instead relying upon unsupported assumptions from off-site data, "materially impeded informed decisionmaking and public participation"). Similarly, under FLPMA, it was BLM's duty, not the public's, to "prepare and maintain on a continuing basis" a "current" inventory of public lands and resources. 43 U.S.C. § 1711(a). It is, in fact, BLM's inventory that "suffers" from being less "representative": ONDA actually visited and surveyed more than 200 miles of routes. *See* RAR 22122–23; 7th Miller Decl., Tables 2–5. BLM only visited 108 miles of routes. *See* RAR 22125–26. ONDA took ground-level photographs to document actual route existence (or not) and condition. BLM took none. *See* RAR 22122–25, ¶¶ 21–28; *see also infra* II.C.3.

**2. *BLM's post-decision materials do not make up for its incomplete inventory and do not support the Board's decision to reinstate Obscure Routes.***

To try to shore up its incomplete inventory, BLM submitted some post-decision materials to the Board. But those were just the RAFs BLM had previously submitted to this Court attached to its Field Manager's injunction declaration (Dkt # 137) on August 12, 2011, almost four years after the agency's November 28, 2007 TMP decision. RAR 1386–2038. This was the first time the agency had prepared any such route-specific analyses. Even so, the forms were not particularly relevant to the task this Court instructed the Board to undertake, and suffered from four critical problems.

First, the RAFs covered only 46.2 miles of the 121.4 miles of obscure routes identified by ONDA for purposes of the 2011 injunction proceedings. *See* RAR 21772 (citing RAR 21856–57, ¶¶ 9–10, where Dr. Miller explained to the Board what BLM did and, importantly, did not attempt to address). Second, the RAFs almost exclusively address claimed or potential *uses* of routes, continuing to assume with little or no documentation that the routes actually exist. *See, e.g.*, RAR 2657–62 (one BLM manager describing in general terms potential uses of roads as fire lines or for use during post-fire projects). Third, the RAFs rely almost entirely upon aerial imagery, not ground-based photographs. *See* RAR 21857, ¶ 11 ("on-the-ground documentation is the gold standard"). The very few ground-level photographs scattered in the RAFs confirm ONDA's far more extensive survey data illustrating that the routes are undriveable or nonexistent. *See, e.g.*, RAR 2232–34 (showing deep gullies and landslides that have obliterated one road), RAR 2275 (meadow of sagebrush and grass in which BLM claims there is a road), RAR 2332 (showing two tires tracks through grass created by BLM truck in the photograph). And fourth, not a single one of the RAFs was for an Obscure Route. *See* RAR 1386–2038.

This fourth and final flaw made the Board's "*sua sponte*" decision to reinstate the

Obscure Routes (RAR 22287) completely untethered to any basis in fact—the quintessence of arbitrary and capricious agency action. *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011); *see also Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1457 (9th Cir. 1992) (no deference given to agency "expertise" when agency has fluctuated in its position). Even if BLM's RAFs contained relevant data and helped backfill the agency's incomplete inventory, there is no real indication in the Board's decision that it actually reviewed those forms in any detail.

In short, BLM could only have verified or refuted the ONDA inventory information, and even come close to a complete and methodologically reliable route inventory, if the agency had actually surveyed those routes. *See* RAR 21862, ¶ 20. It was arbitrary of BLM not to survey the routes in light of the body of ONDA information contradicting BLM's *assumption* that the routes existed. *ONDA v. Jewell*, 840 F.3d at 569–70 (example of an instance in which contradictory data "greatly undermines the validity of the BLM's" assumption); *see also McDaniel*, 2011 WL 1654265, at *23 (finding that "[e]ven if the IBLA had attempted to review the inventory methodology, it would have likely been stymied by the inadequacy of BLM's documentation" and that BLM's "terse" statements in the EA are unverifiable despite BLM's lodging what was then a 20,000-page administrative record, as "the administrative record was simply too sparse to permit the necessary review"). Assumption or extrapolation "must be based on accurate information and defensible reasoning[,]" *ONDA v. Jewell*, 840 F.3d at 570—neither of which is present here in BLM's plan or the Board's approval of it.

### 3. *BLM took no ground-based photographs.*

The next fatal flaw in BLM's methodology was its failure to take photographs to document route existence and actual, on-the-ground conditions. *See* RAR 22114–15, 22122–25 (¶¶ 3.b, 21–

28); *McDaniel*, 2011 WL 1654265, at *23 (both explaining that BLM failed to take a single, ground-level photograph as part of its TMP route inventory process). ONDA provided thousands of photographs to BLM. SAR 1737–3981, 3984–4073, 4074–86; AR 285–94, 12946–13257, 13258–90. Yet, as this Court found, the agency ignored them: "the BLM . . . failed to address ONDA's ground-level geo-referenced photographs"—thus leaving the Board with nothing against which to measure the agency's otherwise bald designations of routes available for motorized travel and mechanical maintenance. *McDaniel*, 2011 WL 1654265, at *23. That failure was critical because, as the Court noted, the ONDA photographs are "the only visual evidence in the record of the actual condition of routes." *Id*.; *see also ONDA v. BLM*, 625 F.3d at 1121 ("We cannot defer to a void"); *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 878 (9th Cir. 2009) ("While our deference to the agency is significant, we may not defer to an agency decision that is without substantial basis in fact.") (internal quotes omitted).

Citing BLM's own handbooks, ONDA explained to the Board that photographic documentation of actual, on-the-ground conditions is a fundamental route survey technique and has been for decades. For example, in BLM's 2001 wilderness inventory handbook—which ONDA reasonably relied upon and followed in conducting its Steens Mountain route surveys beginning the following year—the agency required the public to produce photographic evidence. RAR 21930 ("for such requests from the public to be considered, they should be accompanied by . . . photographic documentation"); RAR 21965–68 (BLM's "Road/Way Analysis" and "Photo Log" template forms, which ONDA used, *see, e.g.*, SAR 3991–96); *see also* SAR 13 (1978 wilderness inventory handbook similarly requiring "[c]olor prints [and] slides"); RAR 21821–22, 21842 (2011 road inventory handbook listing "digital photos" as one of seven "basic tasks" required for a BLM road inventory, and field assessment checklist reiterating, "Remember to

take photos and GPS shots as required").

The Board repeats BLM's complaint that photographs taken at different times of year can be misleading. RAR 22297, n.34; *see also* RAR 2062, 2076 (BLM). In fact, the administrative record shows that almost every ONDA survey photograph was taken at *precisely* the time BLM says they should be taken, the end of summer or in the early fall, *see* RAR 2057, 2062, in order to capture a maximum number of existing routes once vegetation dies back at the end of the hot, dry summer.[7] And as Dr. Miller pointed out to the Board, (1) *any* photographs are better than *no* photographs, and (2) if BLM believed the ONDA photographs were misleading, the agency could have provided its own photographs. RAR 22124, ¶ 25. It did not.

The Board next complains that ONDA provides "only a few" photographs for each route and that each photograph "shows only a relatively short stretch" of the route. RAR 22297. Dr. Miller explained how that is a gross mischaracterization. ONDA typically took multiple photographs along routes—not just a single, random photograph, nor even just a single photograph at each end of the route. RAR 22123–24, ¶ 24. Often, routes start out "strong" at one end or the other, only to peter out a short way into the sagebrush. ONDA provided the Board with more than 80 separate examples of this in easy-to-follow photo-map series. AR 314–616. ONDA's methodologically sound inventory accounts for this. *See, e.g.*, SAR 1932, 1934–37 (recommending for route "PB40b" in the ONDA-identified Denio Creek roadless area that BLM "cherry-stem" the existing "road" portion of the route). But on remand, both BLM and the Board again "failed to address" the ONDA photos. *See McDaniel*, 2011 WL 1654265, at * 23.

---

[7] The photographs accompanying ONDA's September 1, 2002 and November 1, 2002 reports were taken in August of 2002 and September of 2002, respectively. *See* SAR 1737–3982, 3984–4073. The photographs accompanying ONDA's May 17, 2007 report were taken mainly between August and November of 2005, with just a handful taken in June of that year. *See* AR 12946–13257. ONDA's route inventory logs document the date every photograph was taken.

### 4.  BLM used the information it did have inconsistently.

In addition to its incomplete inventory and utter lack of ground-based photographs, BLM's inventory methodology also is unreliable because the agency used the little route survey information it *did* gather inconsistently. In many instances, Mr. Sherbourne documented routes that were obscure or impassable and recommended that they be closed or limited to permit (non-public) use only; yet, BLM disregarded its only field inventory information and the advice of its Team Lead and travel planning expert, and designated such routes as open for driving by anyone. *See* RAR 22127–34, ¶¶ 35–48. This too is evidence of arbitrary agency action: where BLM managers override the contrary advice of the agency's own experts, no judicial deference is due. *W. Watersheds Proj. v. Kraayenbrink*, 538 F. Supp. 2d 1302 (D. Idaho 2008), *aff'd* 632 F.3d 472 (9th Cir. 2011) (holding that BLM violated NEPA in promulgating revised grazing regulations that weakened ecological protections, where agency scientists warned of negative impacts to wildlife but were overridden by agency superiors); *see also Earth Island Inst. v. Hogarth*, 494 F.3d 757, 763–64 (9th Cir. 2007) (no deference due when agency does not follow its own methodology or its result is not rationally connected to the best available evidence). As one court has put it, "Although the Court must defer to an agency's expertise, it must do so only to the extent that the agency utilizes, rather than ignores, the analysis of its experts." *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 685 (D.D.C. 1997). Here, BLM's inconsistent use of the Sherbourne inventory information, sometimes disregarding it completely, is further evidence that BLM's overall inventory methodology was unreliable.

### 5.  BLM's method yielded inaccurate results.

Based as it was on incomplete data, BLM's inventory methodology also generated plainly inaccurate results—*i.e.*, an inaccurate environmental baseline. Dr. Miller explained to the Board

how BLM's failure to visit disputed routes resulted in the agency designating routes in the TMP that do not exist or that are being naturally reclaimed due to nonuse over time. *See* RAR 22129–31, 22135–39 (¶¶ 41, 52–54). BLM in large part did not contest whether or not these routes are obscure or even exist. Rather, the agency responded by providing its 2011 RAFs to the Board, which, as described, only very generally cited claimed *uses* for about one-third of the routes. *See* RAR 2062–75; *see also* RAR 21856–57, ¶ 9.[8] Both BLM and the Board fail to recognize that assigning a particular use to a route, and doing so based on a non-public, in-office, litigation-driven analysis conducted years after it completed its NEPA review and decision, does nothing to establish, as part of an accurate baseline, whether the route in fact exists. *See* 40 C.F.R. § 1500.1(b) ("[a]ccurate scientific analysis" and "public scrutiny" "essential to implementing NEPA"). Instances abound where BLM claims there is a route, but where the evidence in the record shows there is little or nothing there. *E.g.*, AR 319, 324–25, 329–30, 338, 342–44, 353, 363, 372, 374, 378, 381, 394–95, 400, 409–10, 423, 427–28, 433, 443–44, 447, 452, 467, 480; RAR 22120–21, 22127–31, 22135–38, 22140–41 (¶¶ 16, 37, 41, 52–53, 57).

### 6.  *BLM's extrapolation from outdated findings is unreliable.*

Finally, the Board contends BLM's inventory methodology is reliable so long as BLM claims a route exists "as a matter of record"—a phrase the Board invokes repeatedly but never actually defines. *See* RAR 22288, 22296, 22309, 22311, 22316–17. Falling back on the agency's

---

[8] Even so, of the 46.2 miles of routes BLM addressed in those post-decision forms, the agency only claimed potential *public* uses for 16.8 miles of those routes. *See* RAR 21857, ¶ 10. As it has explained to BLM and the Board, with limited exceptions ONDA does not object to routes left open only for administrative or permit use. *See* RAR 21768 ("ONDA is not concerned with, and has no intention of seeking to block, *administrative* and *permittee* use of *existing* routes.") (final emphasis added); CRP 3184 (ONDA comment letter recognizing that closed routes would remain "available under limited exceptions for administrative and other specified uses" under 16 U.S.C. § 460nnn-22(b)(2)); *but see* SUPP 1387, 1389–90, 1396–1400 (ONDA comment letter disputing *nonexistent* Obscure Routes BLM was proposing to open to administrative use).

findings in its 1980s wilderness inventories, the Board suggests that the "fact that [a route] has become overgrown or otherwise has been reclaimed by natural processes" has no bearing on whether designating and allowing driving on it would violate statutory prohibitions on off-road driving, establishing new roads, or impairing wilderness values, or on whether the agency gathered adequate information to establish the *current* environmental baseline and undertook a lawful environmental review. RAR 22288, 22309, 22311. The Court already rejected this "especially concerning" notion:

> If the current route inventory failed to verify the status of all routes that it opened to vehicle traffic, then BLM effectively relied on the findings of its early 1980's wilderness inventory to fill in those gaps, thereby ignoring the likelihood that routes identified 30 years ago had since been naturally reclaimed.

*McDaniel*, 2011 WL 1654265, at *23.

Put simply, regardless of whether a route appears on a map, or even if it existed 30 years ago, if a road does not physically exist in a place today, then driving in that place is "off road" driving. *See, e.g.*, CRP 2006–07, ¶ 7 (photograph showing the supposed path of one of BLM's Obscure Routes in a place where any driving across that field would crush grasses and shrubs because there is no cleared road of any type present). And driving on or mechanically maintaining a place where there is *no road on the ground* will result in there now being a new road there—a scar that will remain in the landscape for years, destroying the ecological integrity of that area. *See* AR 10002 (on Steens Mountain, "unimproved roads or trails typically remain visible and road-like for many years even without maintenance or much traffic"). The Steens Act and BLM's long-standing definition of what is a "road" make clear that Congress intended to limit motorized travel to routes that actually existed on the ground at the time the Act passed in 2000. *See infra* IV.A. For these reasons, the Board's "as a matter of record" explanation for why BLM's inventory methodology was "sound" is arbitrary and capricious and does not make up for

the agency's otherwise incomplete and unreliable inventory.

### D.  BLM's Additional CRP Route Analyses Also Are Incomplete and Unreliable.

Finally, in the subsequent 2015 CRP EA, BLM repeated most of the same errors it committed in the TMP EA. Here, BLM had an opportunity to correct its incomplete and unreliable route inventory. For years, before and after this Court's 2011 *McDaniel* decision, the public described the CRP's many flaws through detailed letters and route survey information submitted to BLM during that plan's NEPA process, which ran roughly from early 2008 through early 2015. *See, e.g.*, SUPP 1384 (ONDA February 2015 letter and route-specific information); CRP 3454 (ONDA May 2014 letter including route-specific information and additional scientific information about impacts to sage-grouse)[9]; CRP 7504 (ONDA January 2008 letter); CRP 7289, 7322–23, 7332 (example letters from other members of the public supporting comprehensive analysis of routes for redundancy, damage to natural resources, and interference with non-motorized forms of recreation); *see also* CRP 7278 (USFWS commenting that "BLM should . . . include a comprehensive up-to-date inventory of roads and trails within the [CMPA] which may impact sensitive fish, wildlife and plant resources").

As described, the main change BLM made to the TMP route network through the CRP was to open 22 Obscure Routes that had been closed since 2009 but were reinstated by the Board in its September 30, 2014 decision. BLM's timing alone was a clear violation of NEPA.

---

[9] Note that BLM scattered this ONDA letter and its five attachments throughout the agency's administrative record document at CRP 3374–846. The attachments are at CRP 3376 (map showing enjoined routes), CRP 3377–419 (expert report discussing sage-grouse issues), CRP 3420 (map showing ODFW-identified corridors that genetically connect neighboring sage-grouse populations), CRP 3421–52 & CRP 3490–846 (detailed letter and information on routes in the "South Steens" area that includes Steens Mountain Wilderness Area, Blitzen River WSA, and Blitzen River South citizen-proposed wilderness area), and CRP 3453 (table highlighting roadless areas identified through ONDA surveys, including areas highlighted in yellow with which BLM agreed with ONDA's roadless (but not wilderness) findings).

Following the Board's decision, BLM announced on January 12, 2015 that it was proposing to now leave open most of those Obscure Routes. CRP 2384. BLM closed the public comment period on February 16, 2015. CRP 2371. Because Steens Mountain is inaccessible due to snow from November through May, the public had no opportunity to test BLM's assumption that the Obscure Routes actually exist on the ground. *See* 7th Miller Decl. ¶¶ 14–15. BLM effectively barred the "public scrutiny" that is "essential" to NEPA. 40 C.F.R. § 1500.1(b). This violates NEPA because it "materially impeded" meaningful public participation and informed agency decisionmaking. *See ONDA v. Jewell*, 840 F.3d at 570.

If anything, the existing photographs in the record should have caused BLM to assume the opposite: that the Obscure Routes, which were "hard to locate on-the-ground" in 2007 (AR 9964), well before they were closed by the Board in 2009, certainly did not exist in 2015. *See, e.g.*, *ONDA v. Jewell*, 840 F.3d at 569 ("that *some* grouse were found at [a nearby] site in mid-winter greatly undermines the validity of the BLM's assumed absence of sage grouse at the [project] site. Given that grouse do use the [nearby] site during the winter, the BLM's own extrapolation method should have resulted in assuming the birds' *presence*, not their *absence*."). As ONDA explained, the only known photographs of Obscure Routes were those ONDA itself had collected during its ground-based inventories—and those photographs showed that Obscure Routes are nonexistent. *See* CRP 2006–19, ¶¶ 7–14 (summarizing all existing administrative record evidence regarding Obscure Routes).

BLM had many opportunities over the past decade to provide photographic evidence that any of the Obscure Routes actually exists on the ground. The agency failed to do so. In fact, when ONDA asked BLM on February 11, 2015, pursuant to the Freedom of Information Act, 5 U.S.C. §552, to release *any* photographs the agency had of any of the Obscure Routes on Steens

Mountain, BLM responded that it had "no records." SUPP 901. The agency stated that all it had

was what had been included with the 39 Obscure Route RAFs posted on the agency's website.

*Id*. At that time, those forms contained not a single photograph for the public to review. *But see*

7th Miller Decl. ¶¶ 10–15 (sometime after the close of the public comment period BLM inserted

photographs into its forms for portions of five of the Obscure Routes).

Thus, the CRP did not cure the TMP's incomplete and unreliable route inventory, and

BLM's TMP-CRP travel plan decisions for Steens Mountain are arbitrary and capricious based

both on the agency's failure to conduct a route-by-route analysis to determine whether each

designated route exists or not on the ground, or to use an inventory methodology reliable enough

to support BLM's incomplete data and untested assumptions for most of the designated route

network. *Motor Vehicle Mfrs*., 463 U.S. at 43 (decision is arbitrary where agency "failed to

consider an important aspect of the problem"); *Greater Yellowstone*, 665 F.3d at 1023 (to issue a

non-arbitrary decision, agency must articulate "a rational connection between the facts found and

the choices made"); *ONDA v. BLM*, 625 F.3d at 1121 (court cannot "defer to a void").

## III.    BLM'S UNRELIABLE INVENTORY RESULTED IN PROCEDURAL VIOLATIONS OF LAW UNDER NEPA.

BLM violated NEPA's procedural requirements in two ways: by failing to establish an

accurate baseline, and by failing to prepare an EIS. The core purposes of NEPA's procedural

requirements are to ensure (1) informed decision making and (2) meaningful public participation.

*Robertson*, 490 U.S. at 348–49; *see also* 40 C.F.R. §§ 1500.1, 1500.2, 1501.2, 1502.1. BLM's

incomplete and unreliable inventory led directly to the agency's NEPA problems, leaving BLM

unable to show a rational connection between facts found and choices made and unable to

sustain its burden of providing a "convincing statement of reasons" why the impacts of its 521-

mile motorized road network will have "no" significant impact on the environment. *See Pub.*

*Citizen*, 541 U.S. at 768; *ONDA v. BLM*, 625 F.3d at 1099–1100; *Nat'l Parks*, 241 F.3d at 730.

### A. Inaccurate Baseline Information (Issue 7)

The environmental baseline is an integral part of a NEPA document. It is against this information that an agency measures and evaluates impacts. 40 C.F.R. § 1502.15. Establishing an accurate baseline "insure[s] that environmental information is available to public officials and citizens *before* decisions are made and *before* actions are taken." *ONDA v. Jewell*, 840 F.3d at 568 (citing 40 C.F.R. § 1500.1(b)). "Without establishing the baseline conditions which exist [in the action area], there is simply no way to determine what effect [the action] will have on the environment and, consequently, no way to comply with NEPA." *Half Moon Bay Fishermans' Ass'n v. Carlucci*, 857 F.2d 505, 510 (9th Cir. 1988).

Here, BLM based its decision on an incomplete, therefore inaccurate, environmental baseline. As described above, BLM only surveyed 108 miles of the 555 miles of routes it originally designated, and the record shows that 125.9 miles of the TMP-CRP routes are obscure or non-existent. There is no evidence that BLM or the Board ever seriously considered the 2,700 pages of high-quality inventory data ONDA provided to the agency during the NEPA process for the TMP. *See* AR 9967 (vague reference to "input" from ONDA); RAR 22296–97 (Board stating it "considered" ONDA's photographs, but then discounting as "limited in nature" and not "representative").

As noted, this Court already has found that BLM's inventory data was "incomplete, hard to understand" and "inscrutable." *McDaniel*, 2011 WL 1654265, at *22 n.13; *see also id*. at *22 n.14 (describing "the paucity of BLM's route inventory documentation"), *23 (describing "the inadequacy of BLM's documentation"). Because of that, the Board's decision approving the TMP was "inadequate to permit meaningful judicial review" because it "did [not] even attempt

to analyze" this issue. *Id.* at *21. The Court also found "that ONDA's allegations concerning the route inventory raise serious questions about the propriety of BLM's TMP and accompanying environmental analysis." July 8, 2011 Op. & Order at 9. And, as described, the 2011 post-decision injunction RAFs BLM gave the Board on remand still covered only a fraction of the routes ONDA had already documented as being obscure on the landscape and were limited mostly to describing potential "uses" for the routes, and none of the forms was for an Obscure Route. *See* AR 314–616; RAR 1386–2038, 21856–57. The Board approved BLM's inventory methodology as "sound" despite the paucity of BLM's evidence, the agency's failure to either verify or refute the ONDA survey evidence, and the fact that the Board did not review a single piece of new evidence for the Obscure Routes. The CRP process failed to fix those problems; indeed, it created new problems as BLM slipped photographs of a few Obscure Routes into its RAFs only after the close of the public comment period. *See* 7th Miller Decl. ¶¶ 10–15.

Ultimately, BLM has little idea whether the routes it has designated for motorized use and mechanical maintenance are in fact existing roads or are new roads—and the environmental impacts of those two things are very different. On this record, BLM failed to establish an accurate environmental baseline, thus leaving its TMP-CRP with no rational basis in fact, materially impeding meaningful public participation during the NEPA process, leaving it "not possible [for BLM] to begin to assess" impacts, and therefore rendering BLM's travel plan decisions arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with NEPA, 42 U.S.C. § 4332. *ONDA v. Jewell*, 840 F.3d at 568–70; *Greater Yellowstone*, 665 F.3d at 1023; *Ariz. Cattle Growers*, 273 F.3d at 1236.

## B.  Significant Environmental Impacts (Issue 9)

BLM was required to prepare an EIS because there are substantial questions as to

whether the TMP-CRP may significantly affect the environment on Steens Mountain. 42 U.S.C.

§ 4332(2)(C); 40 C.F.R. §§ 1508.9(a), 1508.13, 1508.27(b). To prevail on this claim, ONDA

need not show that significant impacts *will* occur—only that significant impacts "may" occur.

*Nat'l Parks*, 241 F.3d at 730; *see also Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004) (EIS

required if "substantial questions" exist whether a project may have a significant effect). "This is

a low standard." *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006).

The NEPA regulations establish ten factors that help determine significance. 40 C.F.R. §

1508.27(b). The presence of even just "one of these factors may be sufficient to require

preparation of an EIS." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th

Cir. 2005). The TMP-CRP implicates three factors: unique characteristics of the geographic area,

highly controversial effects, and uncertainty. 40 C.F.R. §§ 1508.27(b)(3), (4), (5).

### 1.  *Unique Characteristics of the Geographic Area*

Steens Mountain is unique because it is an ecologically critical, half-million acre

landscape teeming with specially-protected public land designations. *See* 40 C.F.R. §

1508.27(b)(3) ("unique characteristics" include "ecologically critical areas"). Congress

recognized this when it created the CMPA "to conserve, protect, and manage the long-term

ecological integrity of Steens Mountain for future and present generations." 16 U.S.C. § 460nnn-

12(a). The Department of the Interior includes the CMPA in its National Landscape

Conservation System, the mission of which is "to conserve, protect, and restore these *nationally*

*significant* landscapes that are recognized for their outstanding cultural, ecological, and scientific

values." *See* Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, 123 Stat. 991

(codified in scattered sections of 16 U.S.C.).

The mountain "lies near the center of one of the last remaining 'strongholds of

contiguous sagebrush habitat essential for the long-term persistence of greater sage-grouse.'"
*ONDA v. Jewell*, 840 F.3d at 565 (quoting ODFW conservation strategy for sage-grouse). As
Interior has explained, "[a] small but important sage grouse population also calls this area home
and with its historic habitat in rapid decline *this population is regionally significant*." RAR
22029 (emphasis added); *see also* 16 U.S.C. § 460nnn(5)(B) ("ecological integrity" that must be
conserved, protected, and managed includes "biological diversity" and "maintenance of . . .
genetic interchange"). Almost the entire CMPA provides essential habitat for sage-grouse
breeding, nesting, brood-rearing, and overwintering. *See* AR 9984 (TMP EA describing that
"[m]ost of the CMPA has been identified as yearlong greater sage-grouse habitat" and that there
are "15 known sage-grouse leks or lek complexes within the boundary of the CMPA"). The
Board even concedes that "[w]e do not doubt that the CMPA constitutes an ecologically critical
area[.]" RAR 22334.

The record makes clear that BLM's travel plan "may" significantly affect the unique
ecology of Steens Mountain. Interior's expert wildlife agency, the U.S. Fish and Wildlife
Service, has explained that fragmentation of sagebrush habitat is the main cause of the decline of
the bird. 75 Fed. Reg. at 13,923, 13,927–28. Unpaved roads such as those on Steens Mountain
"fragment sagebrush landscapes as well as provide disturbed surfaces that facilitate spread of
invasive plant species." SAR 4404; *see also* CRP 3188–89 (citing published science refuting
BLM's contention that sage-grouse on Steens Mountain are not affected by "secondary" roads);
SAR 4128 ("Roads and other corridors promote the invasion of exotic plants"). The "expansion
of road networks contributes to exotic plant invasions" through motorized use and maintenance
activities. 75 Fed. Reg. at 13,930. On Steens Mountain, roads are "major conduits" for the
establishment and spread of weeds and a single weed "is capable of dispersing tens of thousands

of seeds" on the mountain. Gelbard Decl. (Dkt # 57) ¶¶ 11–12, 45, 51, 57–65. Weeds "are not limited to roadsides, but also encroach into surrounding habitats," 75 Fed. Reg. at 13,930, and they represent "one of the highest risk factors for sage-grouse" because they out-compete sagebrush and other native plants and cannot be effectively controlled once they become established. *Id*. at 13,935–37. For these reasons, the ODFW recommended in 2005 that BLM avoid establishing new roads "through occupied sage-grouse habitat, especially nesting and brood-rearing areas." SAR 4811.

In 2007, the TMP EA disclosed that there were 361 noxious weed sites in the CMPA. AR 10002. The record shows there had already been a 21% increase in infested acres in the CMPA in just two years, from 2005 to 2007. *Compare* AR 11197 (336 acres of weed infestations in 2005) *with* AR 10002 (404.9 acres infested by 2007). (The CRP EA fails to provide any updated numbers. *See* CRP 2372–670.) BLM conceded in the TMP EA that most infestations occur along roads or reservoirs, that roads are "the likely place for new introduction of weeds[,]" and that the presence of roads "exponentially increase[es]" sites susceptible to new weed introductions. AR 10002. And on remand, the Board conceded "the *likelihood* that opening routes would contribute to the invasion and/or spread of noxious weeds." RAR 22337 (emphasis added); *see also* SAR 4134 ("increased edge in landscapes fragmented by roads . . . and other linear features promote spread of exotic invasive species . . . and isolates wildlife populations").

Despite all of this, the TMP EA included just a single paragraph on weeds, observing that "open routes are more easily monitored for new weed infestations but they are also more apt to have weed seeds introduced." AR 10003. The Board accepted that circular reasoning (RAR 22337–38) even though Dr. Gelbard explained why it was "absurd" (Gelbard Decl. ¶ 37) and BLM admitted that the "best we can do" to try to avoid the spread of weeds by public motorists

"is to distribute educational materials emphasizing that need" (Richman Decl. ¶ 7). And eight years later, in the CRP EA, BLM included no additional analysis on weeds. In response to public concern about weeds, CRP 2644, BLM simply noted that it planned to clean its equipment before entering the CMPA and to monitor project sites for weeds. CRP 1582, 2403.

In short, the special designations and uncontroverted ecological significance of Steens Mountain fit squarely into NEPA's "unique characteristics" factor, 40 C.F.R. § 1508.27(b)(3), and BLM has not met its burden of providing a "convincing statement of reasons" to support its findings of "no significant impact" to these characteristics, thus rendering the FONSIs arbitrary and capricious *Nat'l Parks*, 241 F.3d at 730; *see also ONDA v. BLM*, 625 F.3d at 1121 ("We cannot defer to a void.").

### 2. Highly Controversial Effects

BLM's travel plan also is "highly controversial." 40 C.F.R. § 1508.27(b)(4). Effects are controversial "when substantial questions are raised as to whether a project may cause a significant degradation of some human environmental factor or there is a substantial dispute about the *size, nature,* or *effect* of the major federal action." *Nat'l Parks*, 241 F.3d at 736 (internal citation, ellipsis, brackets and quotation marks omitted; emphasis added). "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI, casts serious doubt upon the reasonableness of an agency's conclusions." *Id.* (internal citation omitted).

The record shows there were "substantial questions," based upon evidence (2,700 pages of ground-based survey data) ONDA provided to BLM during the NEPA process, that casts doubt upon BLM's and the Board's conclusions that all 521 miles of the agency's designated routes actually exist on the ground. On top of that, the record also shows that of nearly 20,000 public comments BLM received at the outset of this long travel planning process, more than 99%

disputed BLM's baseline assumptions and proposal, and asked for meaningful road closures on

Steens Mountain. AR 784, 10028; RAR 22139–40; *see also McDaniel*, 2011 WL 1654265, at *6

(observing same). BLM did not include that information in either EA and later dismissed the

public's concerns as "brainless and identical." CRP 6995. And BLM failed to include at all in the

administrative record 11,000 public comment letters favoring significant road closures. *See* AR

10190 and BLM's "Document Description" for it in the AR Index.

The Board decided BLM was "not unaware" that some routes "are overgrown or

otherwise naturally reclaimed"—and that this, apparently, was enough to remove any questions

about the size, nature, or effect of the 521-mile travel plan. RAR 22239–40. That is inconsistent

with controlling precedent in *National Parks*. In that case, the Park Service received 450

comments on its Vessel Management Plan for Glacier Bay National Park, "approximately 85%

of which opposed" the agency's alternative (to increase ship entries) and favored an alternative

to instead decrease entries. 241 F.3d at 736. The court explained that "[t]his volume of negative

comment is more than sufficient to meet the 'outpouring of public protest' discussed" in prior

cases, and noted the importance of that public protest occurring during the NEPA process. *Id*. at

736 & n.16 (citing *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1334 (9th Cir. 1992)). "Most

important," explained the court, "to the extent the comments urged that the EA's analysis was

incomplete . . . they cast substantial doubt on the adequacy of the Parks Service's methodology

and data." *Id*.; *cf. McDaniel*, 2011 WL 1654265, at *23 (BLM "failed to address ONDA's

ground-level geo-referenced photographs").

The facts here surpass the low threshold of "uncertainty" that the Ninth Circuit found

compelling in *National Parks*. *See also Klamath Siskiyou*, 468 F.3d at 562 (showing significant

impacts "may" occur is a "low standard"). This goes far beyond a situation where a plaintiff is

"simply opposed" to BLM's decision. RAR 2099–2100 (BLM's argument to the Board). Scores of data and analyses undermine BLM's conclusory statements and the Board's blanket approvals in 2009 and 2014. When ONDA provided (and the public pointed to) information questioning BLM's baseline assumptions regarding whether each of the designated routes actually exists, "NEPA then places the burden on the agency to come forward with a well-reasoned explanation demonstrating why those responses disputing the EA's conclusions do not suffice to create a public controversy based on potential environmental consequences." *Nat'l Parks*, 241 F.3d at 736 (citations and quotation marks omitted). BLM failed to do so.

### 3. *Uncertainty*

Finally, the "possible effects" of BLM's travel plan "are highly uncertain." 40 C.F.R. § 1508.27(b)(5). "Preparation of an EIS *is mandated* where uncertainty may be resolved by further collection of data . . . or where the collection of such data may prevent speculation on potential . . . effects." *Nat'l Parks*, 241 F.3d at 732 (citations and internal quotations omitted; emphasis added). "The purpose of an EIS is to obviate the need for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action." *Id.*

Here, BLM's inventory and methodology were so inadequate that they prevented the Board, and then this Court, from undertaking any meaningful review of the TMP. *See McDaniel*, 2011 WL 1654265, at *22 ("After reviewing the record, I am convinced that there is no way that the IBLA could have rationally determined that all of BLM's TMP route decisions were permissible under the Steens Act based on the facts before it."); *23 ("the proliferation of extra-record materials endeavoring to explain either the gaps in the inventory (Dr. Miller) or the sufficiency of the inventory (Mark Sherbourne) further highlights that [BLM's] administrative record was simply too sparse to permit the necessary review").

The Court gave BLM a chance to correct this uncertainty. Rather than complete its "scattershot" and "inscrutable" inventory, BLM supplied only a smattering of information that still fell short of the detailed inventory provided to the agency by ONDA. In turn, the Board declined to undertake a route-by-route review and instead found BLM's inventory methodology relying on incomplete, irrelevant, and outdated information, establishing that routes exist "as a matter of record," to be "sound." Nothing BLM or the Board did on remand addressed the uncertainty of designating and maintaining these 521 miles of roads on Steens Mountain. And despite yet another chance to correct these data and analytical gaps through the CRP—and allow the public an opportunity to review a complete and accurate baseline and BLM's analysis of that baseline—BLM again failed to do so. *See supra* II.C.2 (discussing the still-incomplete RAFs).

In sum, BLM has failed to sustain its burden to produce a "convincing statement of reasons" to support its findings of "no significant impact" for the TMP (AR 789) and the CRP (CRP 1521). This case surpasses the "low standard" of there being "substantial questions" whether establishing these 521 miles of motorized routes, subject to mechanical maintenance, "may" have a significant impact on the environment within the congressionally-protected CMPA. *Klamath Siskiyou*, 468 F.3d at 562; *Anderson*, 371 F.3d at 488; *Nat'l Parks*, 241 F.3d at 730. That leaves BLM's TMP-CRP decisions arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with NEPA, 42 U.S.C. § 4332(2)(C).

## IV.    BLM VIOLATED SUBSTANTIVE PROVISIONS OF LAW PROTECTING ECOLOGICAL AND WILDERNESS VALUES ON STEENS MOUNTAIN.

### A.    Steens Act (Issues 2 and 3)

The Steens Act prohibits off-road motorized vehicle use and new road construction. 16 U.S.C. §§ 460nnn-22(b)(1)(A), -22(d)(1). BLM's plan violates these requirements because, of the 521 miles of routes the TMP-CRP designates as open to motorized travel and available for

mechanical maintenance on Steens Mountain, 125.9 miles are obscure or nonexistent on the landscape. They are little more than lines on a map. By allowing visitors to drive on (*i.e.*, search for) these routes, and by allowing mechanical maintenance including blading, BLM has violated the Steens Act's prohibitions of off-road driving and establishment of new roads.

In 2009, the Board determined that there is an "inherent incongruity in determining that routes are 'obscure,' or difficult or impossible to identify on the ground, and concluding that opening them to motorized use is consistent with the Steens Act." AR 55. BLM's decision would have allowed the new creation or establishment of roads that have been naturally reclaimed due to nonuse over time. AR 57; *see also McDaniel*, 2011 WL 1654265, at *14 n.6 (noting long-standing definition of a "road"). Historical and ATV Routes are unlawful for the same reason, as are other Base Routes that are "obscure" on the landscape and therefore cannot be legally designated under the Steens Act. Of the 521 miles of routes open to motorized use, the record shows there are almost 270 miles of routes (*see* 7th Miller Decl., Table 1) that BLM has authorized for motorized use (125.9 miles) and mechanical maintenance (110.7 miles) in violation of the Steens Act. 16 U.S.C. §§ 460nnn-12(a), -22(b)(1), -22(d)(1). As described, this is borne out by (1) BLM's own descriptions of the routes in the TMP EA and (2) evidence in the administrative record of actual route conditions.

### 1.   *Historical Routes*

The Court agreed with ONDA that "the same logic [as applied to Obscure Routes] appears to apply equally well to Historical Routes, which BLM defined in the EA as 'currently hard to locate and/or were not identified during the [WSA] inventory process.'" *McDaniel*, 2011 WL 1654265, at *14 (quoting AR 9964). On remand, BLM confirmed that, although not clear from its definition in the EA (*see* AR 9964), Historical Routes are available only to grazing

permittees. *Cf.* AR 786 (TMP DR stating that Historical Routes are available only to permittees, in lands subject to FLPMA's "same manner and degree" limitation, *i.e.*, WSAs). With that clarification, ONDA conceded that Historical Routes are lawful in the CMPA *outside* of WSAs and Wilderness. *See* RAR 21860–61 (¶ 18). The Steens Act's exceptions in § 112, however, compel a different result for Historical Routes in WSAs.

Section 112 prohibits off-road travel. 16 U.S.C. § 460nnn-22(b)(1). Then it provides two exceptions: one for administrative purposes or responding to an emergency, and a second for building or maintaining agricultural facilities, for fish and wildlife management, or for ecological restoration projects. *Id*. § 460nnn-22(b)(2)(A), (B). But then there is an exception to the second exception: off-road travel is *not* allowed for those activities in WSAs or Wilderness. *Id*. § 460nnn- 22(b)(2)(B). This Court has held that the exception-to-the-exception means off-road use is prohibited in WSAs, full-stop. *ONDA v. BLM*, 143 F. Supp. 3d at 1069–71. Thus, BLM's designation of Historical Routes in WSAs is arbitrary based on the plain language of the Steens Act. There is no way to square the Board's "as a matter of record" theory (*see* RAR 22305–11) with the Steens Act's clear and unambiguous prohibition against "off-road motorized travel" in WSAs. 16 U.S.C. § 460nnn-22(b). Accordingly, the TMP's designation of 38 miles of Historical Routes in WSAs is unlawful.

### 2. *"Roads" and "Trails"*

The Court directed the Board to consider a potential "contradiction" in the Steens Act: while § 112(b)(1)(A) prohibits motorized "off road" travel, § 112(b)(1)(B) permits motorized travel on designated "roads and trails." *See* 2011 WL 1654265, at *14. The Court asked whether a route that is hard to locate on the ground (and thus cannot be designated as a "road") could still be lawfully designated as available for motorized travel as a "trail" under the Steens Act. *Id*.

The answer to that question is no. The only way there could be a contradiction is if § 112(b)(1)(B) allows BLM to designate "roads and trails" that do not exist. That would be inconsistent with the clear and unambiguous *off road* prohibition in § 112(b)(1)(A) and also with the prohibition on *new construction* in § 112(d). Such reading would be inconsistent with the "cardinal principle of statutory construction" that courts must "give effect, if possible, to every clause and word of a statute . . . rather than to emasculate an entire section." *Bennett v. Spear*, 520 US 154, 173 (1997) (internal quotes omitted). It also would be inconsistent with the Act's provision that the Secretary *may* construct or maintain "trails"—but only for "nonmotorized or nonmechanized use." 16 U.S.C. § 460nnn-22(d)(2). In the Steens Act, the word "trail" refers to routes available for nonmotorized or nonmechanized use.

On remand, the Board recognized that since the Act "clearly meant to allow BLM to designate roads and trails as open to motorized travel, the prohibition against motorized off-road travel logically can only mean that motorized travel that *does not occur on either a road or a trail* is prohibited." RAR 22307. In other words, § 112(b)(1) prohibits *cross-country* driving.[10] The Board erred, however, in concluding that this clear statutory language allows driving on routes "that exist only as a matter of record." RAR 22296. Authorizing driving and mechanical maintenance on a route that exists on paper but not on the ground is the antithesis of the Steens Act's prohibition against driving "off road" and its ban on establishing new motorized routes. This is amplified throughout the Act's "important protections" that strive, in essence, to keep Steens Mountain as it is—*i.e.*, "in its current, relatively undeveloped condition." RAR 22028

---

[10] Elsewhere, BLM has defined a "trail" as just a narrower version of a road: a "route managed for human-powered, stock, or off-highway vehicle forms of transportation or for historical or heritage values. Trails are not generally managed for use by four-wheel drive or high-clearance vehicles." SAR 5052 (2006 *Roads and Trails Terminology Report*).

(Interior's statement to Congress leading up to passage of Steens Act); *see* 16 U.S.C. §§ 460nnn-22(c) (process for closing "existing" roads), -23(a) (BLM "shall only allow such uses" as will further the CMPA purpose of protecting long-term ecological integrity), -23(f) (prohibiting construction of "new facilities" with limited exceptions), -42(a) (development on any land within CMPA "which is different from the current character and uses of the lands is inconsistent with the purposes of this subchapter").

### 3. *ATV Routes*

BLM's designation of ATV Routes (AR 9965; CRP 1433, 1441) also violates the Steens Act. The agency and the Board defend these routes by focusing on the safety of driving full-sized vehicles on them, rather than their existence on the landscape (RAR 2086, 22311)—a problem already identified by this Court. *McDaniel*, 2011 WL 1654265, at *14. But these routes have "fallen into obscurity" and "have become almost entirely . . . obliterated" by natural processes. AR 57. In the TMP EA, BLM did not even attempt to establish that the routes were present on the landscape. *See* RAR 22119–27 (¶¶ 15, 21–28, 29–33). Allowing driving by any type of vehicle on these 9.4 miles (8 miles under TMP and 1.42 miles under CRP) of obscure or nonexistent ATV routes is impermissible under the Steens Act, 16 U.S.C. § 460nnn-22(b)(1), because that constitutes off-road driving. *See* AR 55.

For these reasons, BLM's travel plan decisions to open to motorized use 125.9 miles of routes that do not actually exist on the ground, and to allow mechanical maintenance on 110.7 miles of routes that would essentially reestablish or create new roads because of those routes' primitive to nonexistent nature, is arbitrary, capricious, an abuse of discretion, and otherwise note in accordance with the Steens Act, 16 U.S.C. §§ 460nnn-22(b)(1)(A), -22(d)(1).

### B.  Federal Land Policy and Management Act (Issues 4 and 10)

BLM violated FLPMA in two ways. First, BLM designated routes that do not exist, within Wilderness Study Areas, in violation the non-impairment requirement. 43 U.S.C. §1782(c). And second, BLM failed to apply regulatory criteria to minimize impacts to soils, vegetation, wildlife, air, water, and cultural resources. 43 C.F.R. § 8342.1(a)–(c).

#### *1.  Wilderness Study Area Non-Impairment*

BLM must manage WSAs "so as not to impair the suitability of such areas for preservation as wilderness." 43 U.S.C. § 1782(c). A route within a WSA may only be used "in the same manner and degree in which the same was being conducted on October 21, 1976." *Id*.; *see also ONDA v. BLM*, 625 F.3d at 1098–99 (discussing WSA non-impairment requirement). However, if that route has since become overgrown—in effect, "closed" by nature—then BLM cannot now designate it as open in the Steens Mountain travel plan. That is because where wilderness characteristics have "improved" since 1976, BLM's binding WSA management manual forbids "actions that would cause the regression of the WSA to its 1976 . . . condition." CRP 5152–53.

In 2011, this Court found that the Board had only addressed this issue as to Obscure Routes. *McDaniel*, 2011 WL 1654265, at *15. "By silently affirming the TMP with respect to Historical Routes and all other routes (including any pioneered since passage of the FLPMA), the IBLA failed to make a reasoned decision as to whether opening these routes to public motorized access impaired wilderness preservation within the WSAs." *Id*. In remanding to the Board, the Court noted that if the TMP "either (1) establishes Historical Routes that were not used . . . prior to the FLPMA and are now opened to grazing permittees, or (2) permits the general public" to drive on them, then "ONDA's concerns [are] valid." *Id*. at *16. The Court also recognized that for "pioneered" routes the "crucial cut-off for FLPMA purposes is October 21,

1976, not [as BLM had argued] the passage of the Steens Act in [2000]." *Id*. at *17.

As discussed, there is no way to square the Board's "as a matter of record" theory with the Steens Act's off-road driving prohibition for Historical Routes in WSAs. The same is true with regard to FLPMA's non-impairment requirement. *See* RAR 22312–15 (Board approving BLM designation of routes that exist only "as a matter of record" in 1976); RAR 22288 (ignoring the non-impairment "regression" prohibition). ONDA showed the Board why BLM's blanket designation of routes in WSAs is not reliable: illustrating that of eleven routes BLM designated in the Bridge Creek WSA, five did not exist at the time BLM designated the WSA, one was extended in length in the TMP and the extended portion is therefore unlawful, only three existed at the time the WSA was established and therefore are lawful, and two BLM never inventoried at all. *See* RAR 21802–04. Yet, the Board approved the blanket designation of routes in WSAs based on BLM's bald assertion that its original WSA inventory map "did not disclose all of the routes." RAR 22319. In the face of contrary evidence showing that at least half of BLM's designations in just one example were unlawful, this Court cannot defer to the type of evidentiary "void" the Board offers. *See ONDA v BLM*, 625 F.3d at 1121. Because its methodology for designating routes in WSAs is demonstrably unreliable, and therefore arbitrary and capricious, BLM's designation of 38 miles of Historical Routes and an unknown number (*see* RAR 21767) of other "pioneered" routes in WSAs, violates FLPMA. 43 U.S.C. § 1782(c).

In the CRP, BLM committed the additional error of designating twenty Obscure Routes as available for motorized use in WSAs. CRP 1439, 1441, 1447 (Table 8 showing nine "Obscure Way[s]" totaling 5.01 miles within WSAs; Table 11 showing OR-28, a 1.09-mile "ATV Use" WSA way; Table 13 showing ten Obscure Routes, six of which—OR-4, OR-6, OR-10, OR-11, OR-12, and OR-29—are, according to the DR maps, in WSAs, but providing no mileage for the

routes); *see also* AR 9964 (TMP EA noting that 27 of the 36 miles of TMP-designated Obscure Routes are within WSAs); 7th Miller Decl. ¶¶ 8, 10–15, Tables 2, 4.

Even if any of these Obscure Routes existed in WSAs in 1976, the fact that they have since been naturally reclaimed means BLM cannot take any "actions that would cause the regression of the WSA" to its 1976 condition. CRP 5153; *see also* 16 U.S.C. § 460nnn-64(b) (WSAs within CMPA "shall continue to be managed under" the FLPMA non-impairment requirement). The record demonstrates these Obscure Routes do not exist on the ground. *See* SUPP 1387–99, 1403–56; *see also* 7th Miller Decl., Tables 2, 4 & Map 3. Accordingly, BLM's designation of Historical Routes, Obscure Routes, and pioneered routes in WSAs is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with FLPMA, 43 U.S.C. § 1782(c).

### 2. *Minimization Criteria*

BLM regulations require that the agency "minimize" impacts on soils, vegetation, wildlife, air, water, and cultural resources. 43 C.F.R. § 8342.1(a)–(c). BLM must apply these minimization criteria when designating routes and must discuss the basis for the conclusion that each route designation at issue minimizes impacts in accordance with the regulation. *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920 (9th Cir. 2015); *see also S. Utah Wilderness Alliance v. Burke*, 981 F. Supp. 2d 1099 (D. Utah 2013); *Ctr. for Biol. Diversity v. BLM*, 746 F. Supp. 2d 1055, 1080 (N.D. Cal. 2009).[11]

---

[11] The Forest Service also has minimization criteria adopted pursuant to Executive Orders 11644 and 11989, and the courts have likewise required that agency to apply the criteria when designating routes on national forests. *Wildlands CPR, Inc. v. U.S. Forest Serv.*, 872 F. Supp. 2d 1064 (D. Mont. 2012); *Idaho Conservation League v. Guzman*, 766 F. Supp. 2d 1056, 1068 (D. Idaho 2011); *Friends of the Clearwater v. U.S. Forest Serv.*, No. 3:13–CV–00515–EJL, 2015 WL 1119593 (D. Idaho Mar. 11, 2015).

Importantly, BLM cannot assess routes in a general sense—as it claims to have done here—but, rather, must analyze each on a "route specific level" in order to "assess the effects of route designations." *S. Utah Wilderness Alliance*, 981 F. Supp. 2d at 1104–06; *see also WildEarth*, 790 F.3d at 930–31 (agencies "must provide a more granular minimization analysis" and must "apply the minimization criteria to *each area* . . . designated") (emphasis in original). Even a detailed survey and inventory of routes (which is absent here) is still inadequate if "there is nothing in the record to show that the minimization criteria *were in fact applied* when . . . routes were designated." *Ctr. for Biol. Diversity*, 746 F. Supp. 2d at 1079 (emphasis added).

Here, the EAs for both the TMP and the CRP contain no route-specific discussion in any of their sections addressing soils, vegetation, wildlife, air, water, or cultural resources. *See* AR 9950–10029 (TMP EA); CRP 2372–542 (CRP EA). During the CRP process, BLM did finally prepare a series of RAFs for the 36 miles of Obscure Routes the Board had reinstated. CRP 2715–892. But even those forms contain no evidence that BLM applied the minimization criteria. They are bare-bones to say the least: almost all of them lack ground-based photographs and more often than not they provide cursory Yes/No answers to irrelevant questions. *See id.* The questions on the forms ask BLM to describe the general setting where the route is located, the route's purpose, and whether the route could be useful for firefighting or other emergencies. *See, e.g.*, CRP 2718–19. Often, BLM fails even to answer all the questions posed on the form. The forms contain nothing about soils, vegetation, wildlife, air, water, or cultural resources. There is not a single reference to the minimization criteria or regulation in the TMP EA or the CRP EA. Accordingly, BLM's failure to apply the minimization criteria for any of the 521 miles of routes it designated in the TMP-CRP renders its decisions arbitrary capricious, an abuse of discretion, and otherwise not in accordance with FLPMA, 43 C.F.R. § 8342.1(a)–(c).

## C.  Wilderness Act (Issue 5)

BLM violated the Wilderness Act's non-impairment requirement by establishing 14.8 miles[12] of Historical Routes within the Steens Mountain Wilderness Area. 16 U.S.C. § 1133(b); *see also id.* § 460nnn-62(a); 43 U.S.C. § 1782(c) (Steens Act and FLPMA requiring BLM to adhere to Wilderness Act). The Steens Act provides that livestock grazing within the Wilderness Area shall be administered in accordance with the "Grazing Guidelines." 16 U.S.C. § 460nnn-62(d)(1); *see also McDaniel*, 2011 WL 1654265, at * 17 (describing same). The Guidelines govern BLM's administration of grandfathered (preexisting) grazing in Wilderness Areas. AR 715–16. Relevant here, the Guidelines provide that motorized use in Wilderness (for maintaining facilities such as fences or reservoirs) is permitted only "in those portions of a wilderness area where they had occurred prior to the area's designation as wilderness[.]" AR 716. The Guidelines expressly do not "reestablish uses where such uses have been discontinued." *Id*.

The 14.8 miles of Historical Routes BLM designated in the Steens Mountain Wilderness Area are unlawful because the record proves they were not in existence on October 21, 1976. That is the operative date for this analysis because the Wilderness Area was WSA prior to the Steens Act—meaning FLPMA's non-impairment requirement applied to the area at that time. Thus, if BLM did not identify these routes during its WSA inventory, then FLPMA, 43 U.S.C. § 1782(c), barred BLM from later designating the routes.

There are 21 Historical Routes in the Wilderness Area. *See* SAR 5146. During the TMP process, BLM inventoried and assigned numbers to just eight of them: 4, 7B, 135, 141, 142, 143, 144, 157. BLM described routes 4, 141, 142, 143, and 144 with terms like "not found" and

---

[12] BLM's figures are sketchy. *See* RAR 21860–61 (Dr. Miller pointing out that the TMP Decision Map appeared to show 14.6 miles, not 12.8 miles, in Wilderness Area).

"faint." AR 10289–97; *see also* RAR 22163, 22171 (Dr. Miller's chart comparing versions of Sherbourne inventory). BLM's inventory sheet suggests that routes 7B, 135, and 157either do not exist or had been closed at some point, but were "requested" by grazing permittees to be reopened and designated through the TMP. *See* AR 10289, 10295, 10297 ("SPUR" or "Service Use Permit Route" requests for an "existing closed road," for "ATV use along a fenceline for maintenance," and for an "[e]xisting but unmapped rt"). The EA defines Historical Routes as "currently hard to locate and/or *were not identified during the WSA inventory process*" (emphasis added), and, despite only inventorying 8 of the routes, opened all 21 of them. AR 9916, 9964, 9969–70.

In 2011, this Court concluded that "the IBLA did not analyze whether BLM's TMP complied with the Wilderness Act or grazing guidelines" and its decision, therefore, was "too incomplete to permit meaningful judicial review." *McDaniel*, 2011 WL 1654265, at * 17. It remanded to give BLM another chance to identify (and the Board to review) any evidence that any of the Historical Routes existed on October 21, 1976. BLM told the Board there was "specific record evidence" for Historical Routes 4, 141, 142, 143, and 144. RAR 2090. The maps and notes BLM cited are mostly irrelevant. As ONDA pointed out, BLM's maps for the Home Creek and Blitzen River WSAs in the agency's Oregon Wilderness EIS (SAR 794, 838) show *no roads* where these routes appear on the TMP inventory map (SAR 5146). And again: the FLPMA non-impairment requirement prevented any of the five routes from being designated or established after publication of the Wilderness EIS. Because the Historic Routes did not exist (and could not legally have existed) at the time Congress created the Steens Mountain Wilderness Area in 2000, establishing them through the TMP-CRP violates the Wilderness Act's non-impairment requirement. 16 U.S.C. § 1133(b).

For the other 13 Historical Routes within the Wilderness Area, BLM provided the Board with no evidence whatsoever. *See* RAR 2088–93 (failing to address those routes). Those other Historical Routes are unlawful because they are, by definition, obscure on the landscape and will reestablish motorized use within the Wilderness Area. *See McDaniel*, 2011 WL 1654265, at *14 ("the same logic [as applied to Obscure Routes] appears to apply equally well to Historical Routes") (citing AR 9964).

Ignoring this evidentiary gap, the Board decided that even though those routes are "hard to locate" on the ground, "this does not mean the Routes do not exist" and "BLM has demonstrated that all of the Historical Routes, including Route 4 and 141 through 144, existed when the [Wilderness Area] was created on October 30, 2000, and on October 21, 1976." RAR 22324. Because the Board failed to articulate "a rational connection between the facts found and the choices made," *Greater Yellowstone*, 665 F.3d at 1023, and improperly rested its decision on a "void" of evidence, *ONDA v. BLM*, 625 F.3d at 1121, its approval of Historical Routes within the Wilderness Area established in the TMP was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the Wilderness Act. 16 U.S.C. § 1133(b).

<u>**CONCLUSION**</u>

For these reasons, the Court should grant summary judgment in ONDA's favor.

DATED this 12th day of April, 2017.                Respectfully submitted,

s/ Peter M. Lacy

_____

Peter M. Lacy
Oregon Natural Desert Association

Of Attorneys for Plaintiff

## APPENDIX: SUMMARY OF CLAIMS

For the convenience of the Court, ONDA provides the following summary of the claims at issue. The Court provided a similar chart at pages 18–19 of its April 28, 2011 Opinion and Order (Dkt # 103). For consistency, this chart retains the Court's numbering of the original issues, and labels BLM's failure to apply the FLPMA minimization criteria as Issue 10.

| CLAIM | ISSUE | LEGAL AUTHORITY |
|---|---|---|
| **Claim 1 – Steens Act** (Dkt # 244, ¶¶ 98–105) | Issue 1:  comprehensive travel management plan<br><br>[2009 IBLA Decision Ruled Valid] | 16 U.S.C. § 460nnn-22(a) |
| | **Issue 2:**  Did BLM violate the Steens Act's **prohibition against off-road vehicle use**, by designating as available for motorized travel routes that do not actually exist on the ground? | 16 U.S.C. § 460nnn-22(b) |
| | **Issue 3:**  Did BLM violate the Steens Act's **prohibition on construction of new motorized roads or trails**, by approving for mechanical maintenance routes that do not actually exist on the ground? | 16 U.S.C. § 460nnn-22(d) |
| **Claim 2 – FLPMA** (Dkt # 244, ¶¶ 106–115) | **Issue 4:**  Did BLM violate FLPMA's **non-impairment requirement for Wilderness Study Areas** ("WSAs"), by designating as available for motorized travel Obscure Routes, Historical Routes, and other routes that either do not actually exist on the ground or that were created after the time the WSAs were established? | 43 U.S.C. § 1782(c) |
| | **Issue 10:**  Did BLM violate FLPMA's requirement to apply the **minimization criteria** to each route designated? | 43 U.S.C. §§ 1732(a), (c)<br>43 C.F.R. § 8342.1(a)–(c) |

| | | |
|---|---|---|
| **Claim 3 – Wilderness Act** (Dkt # 244, ¶¶ 116–123) | **Issue 5:** Did BLM violate the Wilderness Act's **non-impairment requirement for the Steens Mountain Wilderness Area**, by designating as available for motorized travel Historical Routes and other routes that either do not actually exist on the ground or that were created illegally after the time the original WSAs were established? | 16 U.S.C. § 1133(b) |
| **Claim 4 – NEPA** (Dkt # 244, ¶¶ 124–131) | Issue 6:  range of alternatives<br><br>[2009 IBLA Decision Ruled Valid] | 42 U.S.C. §§ 4332(2)(C), (E)<br>40 C.F.R. §§ 1500.2(e), 1508.9(b) |
| | **Issue 7:** Did BLM violate NEPA's requirement to use **accurate environmental baseline information**? | 42 U.S.C. § 4332(2)(C)<br>40 C.F.R. §§ 1500.1(b), 1502.1, 1502.15, 1502.24 |
| | Issue 8:  connected actions<br><br>[ONDA waives this issue.] | 42 U.S.C. § 4332(2)(C);<br>40 C.F.R. § 1508.25 |
| | **Issue 9:** Did BLM violate NEPA by failing to provide a convincing statement of reasons to support its **Findings of No Significant Impact** and failing to prepare an **EIS** for this major federal action that may have a significant impact on the human environment? | 42 U.S.C. § 4332(2)(C)<br>40 C.F.R. §§ 1501.4, 1508.9, 1508.13, 1508.27 |