**Peter M. ("Mac") Lacy (OSB # 013223)**
Oregon Natural Desert Association
917 SW Oak Street, Suite 419
Portland, OR 97205
(503) 525-0193
lacy@onda.org

**Thomas C. Buchele (OSB # 081560)**
Earthrise Law Center
10015 SW Terwilliger Blvd.
Portland OR  97219
(503) 768-6736
tbuchele@lclark.edu

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **OREGON NATURAL DESERT ASSOCIATION,** | No. 3:09-cv-369-PK |
| Plaintiff, | **REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **JEFF ROSE**, Burns District Manager, BLM, *et al*., | |
| Defendants, | |
| and | |
| **HARNEY COUNTY,** | |
| Defendant-Intervenor-Cross Claimant. | |

## TABLE OF CONTENTS

GLOSSARY OF ACRONYMS ................................................................................. *vii*

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

I.    BLM'S INVENTORY METHODOLOGY WAS UNRELIABLE ................................. 2

    A.    BLM Concedes that its TMP Route Surveys Were Incomplete and that the Board
        Declined to Conduct a Route-by-Route Analysis. ................................................ 2

    B.    The Board's Approval of BLM's Methodology was Arbitrary and Capricious. ........ 4

        *1. Incomplete Surveys* ......................................................................................4

        *2. Still-Incomplete, Post-Decision, non-NEPA Materials* ................................6

        *3. Lack of Ground-Based Photographs* ...........................................................8

        *4. Inconsistent Use of Information* ................................................................11

        *5. Inaccurate Results* ....................................................................................12

        *6. Unreliable Extrapolation* ..........................................................................13

    C.    BLM's Additional CRP Route Analyses Also Are Incomplete and Unreliable. ....... 14

II.    PROCEDURAL VIOLATIONS UNDER NEPA ................................................... 16

    A.    Inaccurate Baseline Information (Issue 7) ..................................................... 16

    B.    Significant Environmental Impacts (Issue 9) ................................................. 17

        *1. Designation of 521 miles of roads on Steens Mountain "may" result in*
        *significant environmental effects* ..................................................................17

        *2. The NEPA significance factors require an EIS.* ..........................................20

III.    VIOLATIONS OF SUBSTANTIVE PROVISIONS OF LAW .................................. 25

    A.    Steens Act (Issues 2 and 3) ......................................................................... 26

    B.    Federal Land Policy and Management Act (Issues 4 and 10) ........................... 29

*1. Wilderness Study Area Non-Impairment.* ..................................................**29**

*2. Minimization Criteria.* ...........................................................................**32**

**C.    Wilderness Act (Issue 5)**................................................................ **36**

**CONCLUSION** ........................................................................................... **39**

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004)..........................................................21

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229 (9th Cir. 2001) .........10

*Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912 (9th Cir. 2001)................................13

*Atchison v. Wichita Bd. of Trade*, 412 U.S. 800 (1973) .................................................................5

*Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000)...............................................................13

*Chevron U.S.A., Inc. v. Natural Resources Def. Council*, 467 U.S. 837 (1984) ...................26, 27

*City of Sausalito v. O'Neill*, 211 F. Supp. 2d 1175 (N.D. Cal. 2002)...........................................33

*Ctr. For Biol. Diversity v. U.S. Forest Serv.*, 349 F.3d 1157 (9th Cir. 2003)...............................15

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004).................................................................34

*Ecology Ctr. v. Castaneda*, 574 F.3d 652 (9th Cir. 2009) ............................................................30

*Great Basin Res. Watch v. BLM*, 844 F.3d 1095 (9th Cir. 2016) ..................................................15

*Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ..............................11

*Helping Hand Tools v. EPA*, 848 F.3d 1185 (9th Cir. 2016)..........................................................10

*Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002)............................................33

*Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549 (9th Cir. 2006)......................18, 20, 21

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ............................................................30

*Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988 (9th Cir. 2013)...............................................16

*Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722 (9th Cir. 2001)..................20, 21, 24

*Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058 (9th Cir. 2010)..................................33

*New Mex. ex rel. Richardson v. BLM*, 565 F.3d 683 (10th Cir. 2009) .........................................18

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005) ..........................20

*Or. Natural Desert Ass'n v. Jewell*, 840 F.3d 562 (9th Cir. 2016).................................4, 5, 12, 16

*Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092 (9th Cir. 2010) ......................................... passim

*Or. Natural Desert Ass's v. McDaniel*, 751 F. Supp. 2d 1151 (D. Or. 2011) ............................ 33

*Or. Natural Desert Ass'n v. McDaniel*, No. 3:09-cv-369-PK,
2011 WL 1654265 (D. Or. Apr. 28, 2011) ........................................................................ passim

*Or. Natural Desert Ass'n v. Rasmussen*, 451 F. Supp. 2d 1202 (D. Or. 2006) ...................... 8, 10

*Or. Natural Desert Ass'n v. Zinke*, -- F. Supp. 3d -- , 2017 WL 2129910 (Apr. 18, 2017).......... 17

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ........................................... 15

*S. Utah Wilderness Alliance v. Burke*, 981 F. Supp. 2d 1099 (D. Utah 2013) ............................. 34

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ........................................................................ 27

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ................................................................. 8, 27

*Vt. Yankee Nuclear Pwr. Corp. v. Natural Res. Def. Council*, 435 U.S. 519 (1978)................24

*W. Watersheds Proj. v. Salazar*, No. 4:08-cv-516-BLW,
2011 WL 4526746 (D. Idaho Sept. 28, 2011)............................................................................5

*WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920 (9th Cir. 2015) ...................... 34

**STATUTES**

16 U.S.C. § 1133(b) ................................................................................................... 36, 38, 39

16 U.S.C. § 460nnn-12(a) ................................................................................................ 2, 20

16 U.S.C. § 460nnn-21(b) ................................................................................................ 4, 23

16 U.S.C. § 460nnn-22(a) ............................................................................................ 4, 23, 26

16 U.S.C. § 460nnn-22(b) ............................................................................................ 7, 23, 24

16 U.S.C. § 460nnn-22(b)(1) .................................................................................................. 27

16 U.S.C. § 460nnn-22(c) ........................................................................................................ 27

16 U.S.C. § 460nnn-22(d)(1) ................................................................................................... 27

16 U.S.C. §§ 460nnn-22(d)......................................................................................................  7, 29

42 U.S.C. § 4332 ................................................................................................ 7, 17, 25

43 U.S.C. § 1732(b) .................................................................................................... 35

43 U.S.C. § 1782(c)……………………………………………………………………...29, 31, 32

**OTHER AUTHORITIES**

12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocerus urophasianus*) as Threatened or Endangered, 75 Fed. Reg. 13,910 (Mar. 23, 2010)...............23

BLM Manual 1626 – Travel and Transportation Management, *available at* https://www.blm.gov/media/blm-policy/manuals (last visited Sept. 22, 2017) ...................... 34

CEQ, "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 Fed. Reg. 18,026 (1981)................................................................. 11

Exec. Order 11644, 37 Fed. Reg. 2877 (1972), *as amended by* Exec. Order No. 11989, 42 Fed. Reg. 26,959 (1977) ..............................................................................34

Merriam-Webster Dictionary (2017), *available at* https://www.merriam-webster.com/ (last visited Sept. 29, 2017) ..................................................................................... 35

**REGULATIONS**

40 C.F.R. § 1502.15 .............................................................................................. 7, 17

40 C.F.R. § 1508.27(b) ...................................................................................... 20, 23, 25

40 C.F.R. § 1508.27(b)(4).......................................................................................... 23

40 C.F.R. § 1508.27(b)(5).......................................................................................... 25

43 C.F.R. § 8342.1 ........................................................................................ 32, 33, 34, 35

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record[1] |
| ATV | All-Terrain Vehicle |
| BLM | United States Bureau of Land Management |
| CMPA | Steens Mountain Cooperative Management and Protection Area |
| CRP | Comprehensive Recreation Plan |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act of 1976 |
| FONSI | Finding of No Significant Impact |
| IBLA or "the Board" | Interior Board of Land Appeals |
| NEPA | National Environmental Policy Act of 1969 |
| ODFW | Oregon Department of Fish and Wildlife |
| ONDA | Oregon Natural Desert Association |
| RAF | Route Analysis Form |
| ROD | Record of Decision |
| TMP | Travel Management Plan |
| TP | Transportation Plan |
| USFWS | United States Fish and Wildlife Service |

---

[1] For this and other citations to the administrative record, ONDA follows the same format it set out in its "Key to Administrative Record Citations" in its opening brief. ONDA MSJ at *ix*.

## INTRODUCTION

After nearly a decade of litigation, the Department of the Interior has failed—despite multiple opportunities to get it right—to sustain its statutory duties to protect irreplaceable ecological values on Steens Mountain, and to follow procedures required by law to ensure meaningful public participation and informed agency decisions. ONDA has shown that the Bureau of Land Management ("BLM") and the Department's Board of Land Appeals ("IBLA" or "the Board") violated the National Environmental Policy Act, the Steens Act, the Federal Land Policy and Management Act, and the Wilderness Act, in approving the Travel Management Plan and Comprehensive Recreation Plan that together establish BLM's motorized travel and mechanical maintenance plan for the half-million acre Steens Mountain Cooperative Management and Protection Area ("CMPA").

Of the 520.9 miles of routes now open to motorized use and/or mechanical maintenance on Steens Mountain under the TMP-CRP, ONDA disputes BLM's designation of 140.7 miles of those routes made available for motorized use. *See* 7th Miller Decl. ¶ 8 & Attachments A, B (tables, maps, and record citations). Evidence in the record demonstrates that anyone attempting to follow these routes will wind up creating new roads on Steens Mountain, either by driving around unpassable or naturally reclaimed sections, or by driving cross-country as they search for routes shown on BLM maps but where there is little or no trace to follow on the ground. ONDA also disputes BLM's maintenance level designations only, for an additional 110.7 miles of routes. *See* 7th Miller Decl. ¶ 8 & Attachments A, B. Mechanically maintaining these obscure and primitive tracks that pass through areas important for their wilderness values and essential sage-grouse habitat will upgrade them into constructed roads. These things will result in prohibited off-road motorized use and *de facto* establishment of new roads on Steens Mountain,

leaving these places vulnerable to weed infestations and habitat fragmentation that will destroy the "long-term ecological integrity" BLM is charged with protecting above all else on Steens Mountain. 16 U.S.C. § 460nnn-12(a).

Despite being given an opportunity to complete its "scattershot and incomplete" route inventory, BLM declined to do so. On remand, the Board rejected this most obvious method for ensuring BLM had made a factually supported and legally defensible decision. Instead, it came up with a new label, now contending that routes need only exist "as a matter of record." That label does nothing to correct the real problem here: by persisting with its incomplete and unreliable inventory, BLM has failed to establish the accurate environmental baseline that NEPA requires, thereby impeding meaningful public participation and informed decisionmaking. And this fictional environmental baseline led BLM to designate a vast route network that failed to account for and protect wilderness and ecological values on Steens Mountain, as was required under the Steens Act, FLPMA, and the Wilderness Act.

## ARGUMENT

### I. BLM'S INVENTORY METHODOLOGY WAS UNRELIABLE

#### A. BLM Concedes that its TMP Route Surveys Were Incomplete and that the Board Declined to Conduct a Route-by-Route Analysis.

For literally years, ONDA pointed out to BLM that the agency's route survey information for Steens Mountain was inaccurate and incomplete, and used an unreliable methodology that led to flawed assumptions. *See* CRP 3454–61 (relevant history of ONDA's extensive participation in BLM's travel planning processes for Steens Mountain, beginning after the passage of the Steens Act in 2000). When BLM ignored extensive, ground-based data collected by ONDA following BLM's own route survey protocol, and provided to BLM during multiple agency planning processes, ONDA filed this lawsuit in 2009. And in 2011, this Court agreed with ONDA that

BLM's inventory was so "incomplete and scattershot" that it rendered the Department of the Interior's approval of the TMP arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with procedural and substantive requirements under NEPA, the Steens Act, FLPMA, and the Wilderness Act. *Or. Natural Desert Ass'n v. McDaniel*, No. 3:09-cv-369-PK, 2011 WL 1654265, *21–23 (D. Or. Apr. 28, 2011). So holding, the Court gave BLM and the Board a chance to correct these serious flaws. Instead of collecting new data, or ground truthing ONDA's route-specific inventory information, or preparing a route-by-route analysis for public review of the roads at issue, BLM simply asked two Interior department lawyers serving as administrative judges to rubber-stamp the agency's still-incomplete decision. Which they did, doubling down by simply giving a new label—"as a matter of record"—to an indefensible methodology. RAR 22268.

In response, BLM does not deny that its TMP route surveys were incomplete (ONDA MSJ at 10–11), and concedes that the Board declined to conduct a route-by-route analysis of BLM's route and maintenance designations (ONDA MSJ at 11–13). *See* BLM MSJ at 11, 17. Although BLM talks about a smattering of specific routes in its brief (BLM MSJ at 18–22), by and large it is left to defend the Board's "as a matter of record" approval of BLM's unreliable methodology, and the fact that BLM failed to use the CRP, which amended the TMP, to fix those errors. ONDA explained in its opening brief why that "blanket" approval of BLM's methodology and route designations, even as amended by the CRP, was arbitrary and capricious for six overarching reasons. ONDA MSJ at 13–23. None of the agency's defenses rescue its travel plan from its core flaw of being incomplete and demonstrably inaccurate—and therefore suffering from no rational connection between facts found and choices made.

**B. The Board's Approval of BLM's Methodology was Arbitrary and Capricious.**

   *1. Incomplete Surveys*

It is undisputed that BLM conducted ground-based surveys for only 108 miles of the 555 miles of routes it designated in the first iteration of the TMP. BLM MSJ at 17; RAR 22125–26. BLM has no answer to the fact that, beyond those 108 miles of routes surveyed by its travel planning Team Lead, Mark Sherbourne, it simply never visited other routes for which ONDA, during the NEPA process, provided ground-based survey information that questioned BLM's baseline assumptions—that those routes existed on the ground, were drivable, and were not causing resource damage, and that mechanical maintenance would not work to upgrade or establish new routes. This is like *ONDA v. Jewell*, where the Ninth Circuit held that this same BLM district office's failure to establish an accurate environmental baseline with regard to Greater sage-grouse habitat on Steens Mountain, by failing to survey the project site and instead relying upon unsupported "extrapolation" from a different site, "materially impeded informed decisionmaking and public participation." 840 F.3d 562, 570 (9th Cir. 2016).

As in *Jewell*, BLM incorrectly insists it was reasonable to extrapolate from incomplete and inapposite surveys because of limited "time and resources." BLM MSJ at 18. That is not convincing. Congress passed the Steens Act 17 years ago, directing BLM to complete a "comprehensive transportation plan" within four years, no later than October 30, 2004. 16 U.S.C. §§ 460nnn-21(b), -22(a). In the meantime, ONDA, a non-profit organization based nearly 200 miles away from Steens Mountain, and with just six employees at the time, followed BLM's own route inventory protocol, surveyed more than twice as many miles of routes as the agency managed, and provided that information to BLM during the NEPA process in easy-to-follow reports, which ONDA organized using BLM's own template forms and reporting requirements.

*See* Miller Decl. (Dkt # 56) ¶¶ 7–8 (ONDA followed BLM's published inventory and reporting methodology); SAR 1737–3981, SAR 3984–4073, SAR 4074–4086, AR 12946–13257, AR 13258–90 (ONDA's main inventory reports). Just as it was unreasonable for BLM to fail to assess "the actual baseline conditions" at the site of the proposed energy facility at issue in *Jewell*, 840 F.3d at 569—"because impacts to sage grouse were by far the most significant concern during environmental review"—thus was it unreasonable here for BLM to fail to assess "the actual baseline conditions" of routes being authorized for motorized use and mechanical maintenance, which was by far the most significant concern during this NEPA process. AR 784, 10028; RAR 22139–40 (¶ 55); RAR 21880–91 (overview of public process).

It is significant that, unlike ONDA, BLM *did not* follow its own route survey protocol for the 108 miles of routes that Mr. Sherbourne visited. *See* RAR 22152–72 (Sherbourne's inventory chart). As the Court has described, Mr. Sherbourne's "TMP Field Notes" consist of "heavily redacted comments on 160 routes, each associated with a map reference number and a date." *McDaniel*, 2011 WL 1654265 at * 22. The accompanying BLM map (AR 10288) "which acts as a kind of key to these comments" is inscrutable. *Id*. at *22 n.14. Other field maps with hand-written comments scrawled on them are similarly haphazard and unhelpful. *See id*. at *22 (referencing AR 10299–332); *see also W. Watersheds Proj. v. Salazar*, No. 4:08-cv-516-BLW, 2011 WL 4526746, at *15, *17 (D. Idaho Sept. 28, 2011) (BLM violated NEPA and FLPMA by "completely disregarding its own policies . . . without discussion or analysis") (citing *Atchison v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (where agency modifies or overrides its longstanding precedents or policies, it "has the duty to explain its departure from prior norms").

///      ///      ///

///      ///      ///

### 2. *Still-Incomplete, Post-Decision, non-NEPA Materials*

ONDA explained why the post-decision declarations and Route Analysis Forms

("RAFs") BLM filed with its brief to the Board on remand (RAR 1386–2038) failed to cure the

agency's incomplete route inventory. ONDA MSJ at 16–17. BLM had generated those RAFs in

2011 for purposes of this Court's injunction proceedings, years after the public process that led

to the 2007 TMP Decision Record. The RAFs were not particularly relevant to the Board's

assigned task on remand: (1) they covered only 46.2 miles of the 121.4 miles of routes ONDA

had identified as being of concern for purposes of ONDA's motion for preliminary injunction

(Dkt # 105); (2) they focused almost entirely on potential *uses* of the routes, rather than whether

the routes exist on the ground in the first place; (3) they included almost no ground-based

photographs; and (4) not a single RAF was for an Obscure Route. *See* ONDA MSJ at 16–17.

Now, BLM talks about a few specific routes in its brief, but again focuses largely on what

the routes might be used for and on satellite photographs taken from space, rather than ground-

based photographs. *See* BLM MSJ at 18–19; *compare* RAR 22140–41 (Dr. Miller walking Board

through discussion and ground-based photos of some of these same routes); CRP 340–43 (a

BLM RAF claiming route "AFF" is "partially visible on" a satellite image, but providing no

ground-based photo); *but see* RAR 1827–36 (a rare instance where the BLM RAF included

photos—but in which the photos confirm little more than the fact that a vehicle drove across and

crushed vegetation in an eroded drainage).

Later, BLM claims it prepared RAFs addressing "all" of the routes "that Plaintiff alleged

were nonexistent." BLM MSJ at 61 (citing n.70 in Board decision, RAR 22329–30, where Board

repeats BLM's false statement that ONDA failed to identify the disputed routes).[2] That is just not true. Two months after the parties had completed briefing before the Board, BLM, without conferring with ONDA and without leave of the Board, gave the Board additional RAFs (mixed into RAR 0014–1325). The Board failed to provide ONDA an opportunity to respond to the new materials, which in any event were incomplete and unreliable like the first batch. *See* RAR 21725–27 (ONDA objecting to untimely submission of "chaotic hotchpotch" of materials, none of which had been disclosed to the public during the NEPA process). In any event, most of the BLM filing consisted of materials that were already in the record, including BLM's litigation-generated 2011 declarations and RAFs for purposes of injunctive relief, and they included only a smattering of mostly unhelpful photographs. *See* RAR 014–1325.

Importantly, BLM does not deny that not a single RAF was for an Obscure Route. Thus, absent a shred of new evidence to consider regarding Obscure Routes, the Board's "*sua sponte*" reinstatement of those routes was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with NEPA and the Steens Act—the former because the Board failed to based its decision on an accurate environmental baseline, thus failing to draw a rational connection between any facts found and the choice made; and the latter because designating Obscure Routes in the absence of any evidence they actually exist on the ground violates the Steens Act's prohibitions against driving cross country and against establishing new roads in the CMPA. 42 U.S.C. § 4332; 40 C.F.R. § 1502.15; 16 U.S.C. §§ 460nnn-22(b), (d).

---

[2] *See* ONDA MSJ at 12 (explaining that, in its opening brief on remand, ONDA provided to the Board a list [RAR 21766–67] of disputed routes, with pinpoint citations to record evidence, identifying 121.4 miles of obscure routes, 47 miles of newly-added routes, 12.8 miles of Historical Routes in the Steens Mountain Wilderness Area, 38 miles of Historical Routes within WSAs, and 8 miles of ATV routes).

### 3. *Lack of Ground-Based Photographs*

ONDA explained why BLM's failure to take ground-based photographs was a major flaw in the agency's methodology. Ground-based photography is the gold standard of route inventory, and BLM has recognized this in its handbooks and manuals for decades. *See* ONDA MSJ at 18 (and citations therein to BLM's 1978 and 2001 wilderness inventory handbooks, and 2011 road inventory handbook). It was unreasonable for BLM to ignore its own, decades-long position. *See, e.g.*, *Or. Natural Desert Ass'n v. BLM* ("*ONDA v. BLM*"), 625 F.3d 1092, 1115–16 (9th Cir. 2010) ("The views the BLM expresses in its guidance documents 'claim the merit of ... [a] thoroughness, logic, ... [and] fit with prior interpretations' of the relevant statutes, [*United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)], as its brief does not."). Even if BLM could reasonably ignore its own guidance, the agency still had an obligation to address the thousands of ground-based photographs that ONDA provided to the agency during the NEPA process. *See, e.g.*, *Or. Natural Desert Ass'n v. Rasmussen*, 451 F. Supp. 2d 1202, 1212–13 (D. Or. 2006) (BLM's responsibility, not ONDA's, to collect and evaluate accurate baseline information).

BLM responds that, although it never took a single photograph to support its TMP decision, the Board on remand from this Court "specifically reviewed photos"—pointing to the Board's incorrect assertion that "only a handful" of ONDA's photographs showed routes that were nonexistent on the ground. BLM MSJ at 22 (citing RAR 22302). In fact, ONDA gave the Board an easy-to-follow document that highlighted more than 80 examples, complete with maps and ground-based photographs, drawn from the more than 2,700 pages in ONDA's 2002–2007 route survey information (also in the record), of routes that are partly or entirely nonexistent. *See* AR 307–618; *see also* RAR 21775–76 (describing this photo-map series to Board). There is no

evidence the Board examined that critical exhibit; the Board does not cite it even once in its remand decision. *See* RAR 22268–341.

Confusingly, at RAR 22302 (n.39), the Board does seem to concede that at least some ONDA photographs *do* document where at least 14 different routes do not exist on the ground. The issue before the Board was whether BLM's individual route designations were supported by evidence in the record, or, alternatively, whether the evidence supported BLM's methodology. *McDaniel*, 2011 WL 1654265, at *26; July 8, 2011 Op. & Order (Dkt # 118) at 6. The Board's inconsistency undermines its blanket approval of all routes.

Here, BLM and the Board fail to respond to the "cherry-stem" issue. As ONDA explained, sometimes a route starts strong—for example, when it leaves a major road—but then peters out after some distance—for example, after it reaches some destination, such as a reservoir or a wilderness boundary (*e.g.*, AR 400, AR 590–93), or because it simply leads to nothing in particular, or the route has disappeared because there are better ways to get from "point A" to "point B" in the area, and therefore it has not been driven in decades or longer (*e.g.*, AR 342, AR 359–75). The Board partly grasped this idea, observing that at least some routes the Board agreed are "nonexistent" for part of their length "were shown to exist at other locations along the route." RAR 22302. But neither the Board nor BLM then explain why it was not arbitrary to nevertheless designate routes like these beyond the cherry-stem segment. And under NEPA, BLM's representation that these entire routes exist, when the record shows otherwise, is further proof of the agency's demonstrably inaccurate baseline.

BLM rehashes its "time of year" argument—the same argument the Board bought on remand. BLM MSJ at 23; RAR 22297 n.34. But BLM again fails to address the fact that ONDA took nearly every one of its survey photographs at exactly the time of year the agency said the

photographs should be taken: the end of summer or early fall. The Board contends that in

ONDA's photographs, "[p]lainly, the vegetation was still vigorous, indicating that the

photographs should have been taken in the late fall/winter, in order to more accurately represent

ground conditions." RAR 22302 n.40. This Court owes no deference to that "finding." There is

no indication in the record that Mr. Roberts or Ms. Kalavritinos, the administrative judges who

penned the IBLA remand decision from their offices in Arlington, Virginia, have ever visited

Steens Mountain—let alone that they are expert botanists or that they have ever performed a

route survey. Under these circumstances, the Court does "not simply review whether it was

arbitrary or capricious for the Board to reject" ONDA's "claims that [Interior] clearly erred";

rather, the Court must "conduct a deferential review of the entire agency action, including

whether approval of the [permit] is based on a *clearly erroneous* finding of fact or conclusion of

law." *Helping Hand Tools v. EPA*, 848 F.3d 1185, 1194 (9th Cir. 2016) (emphasis added;

internal quotation marks and citation omitted); *see also Ariz. Cattle Growers' Ass'n v. U.S. Fish

& Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir. 2001) (agency not entitled to deference where its

"conclusions [] do not have a basis in fact"). And again: if BLM or the Board thought ONDA's

photographs were misrepresentative, then the agency could—no, *should*—have taken its own

photographs to show why ONDA's were unrepresentative. *See Rasmussen*, 451 F. Supp. 2d at

1212–13. BLM and the Board fail to identify a single photograph in the record where the agency

went out and re-shot an ONDA photo-point in order to attempt refute the ONDA photograph. In

other words, they failed to complete BLM's incomplete inventory.

Next, BLM argues that a 2012 handbook requires ground-based photographs only for

"human health and safety issues." BLM MSJ at 23. But the cited page (RAR 1349) shows that

BLM defines "health and safety" issues to include "washouts, damaged rails, falling rocks and

collapsed drainage." Even if BLM could reasonably ignore its other handbooks that have long required ground-based photographs (RAR 21821–22, 21842), ONDA documented many, many instances where BLM failed to photograph such "health and safety" issues.[3]

Finally, BLM argues that an EA is to be a "concise" document and the NEPA regulations "do[] not require photographs of each and every route." BLM MSJ at 61 (citing 40 C.F.R. § 1508.9). That is true; however, an agency must point to *somewhere* in the administrative record where it has established a rational connection between *facts found* and choices made in order to support a non-arbitrary decision. *Greater Yellowstone Coal., Inc. v. Serrheen*, 665 F.3d 1015, 1023 (9th Cir. 2011).[4] BLM's near-total failure to take ground-based photographs leaves a major hole in TMP-CRP decisions here.

### 4. Inconsistent Use of Information

ONDA explained how BLM used the information it *did* gather inconsistently. ONDA MSJ at 20. In response, BLM tries to downplay Mr. Sherbourne as merely a "staffer" whose "recommendations" apparently should not be given too much weight. BLM MSJ at 21 n.4. That

---

[3] For example, just in the photo-map series ONDA provided to the Board, there is evidence of washouts and collapsed drainages (AR 385, 399, 402, 411, 412, 413, 414, 436, 438, 442–44, 456–57, 493, 499, 503, 531, 559, 586, 598, 601–03), fallen rocks (AR 427, 491–93, 501, 524–26, 544, 592–93), and even fallen trees blocking a route (AR 394). *Cf.* RAR 1352 (photograph in the 2012 BLM handbook showing what BLM itself describes as "severe rutting" that would require ground-based photographic documentation); RAR 2231–34 (four BLM photographs, produced during the 2011 injunction proceedings, of severe water erosion, gullying, and landslides that have destroyed a road open to all motorized vehicles, and also depicting "apparent efforts by vehicles to maneuver around rutted areas"—which, of course, is prohibited off-road driving (RAR 2228)).

[4] *See also* 46 Fed. Reg. 18,026, 18,037 (1981) (Council for Environmental Quality, stating that "[w]hile the [NEPA] regulations do not contain page limits for EA's [sic], the Council has generally advised agencies to keep the length of EAs to not more than approximately 10–15 pages . . . . In most cases . . . a lengthy EA indicates that an EIS is needed."). The TMP EA (AR 9950) is 77 pages long and the CRP EA (CRP 2372) is 271 pages long.

argument might be more convincing if BLM could point to any actual, systematic, field- and protocol-based route survey information beyond Mr. Sherbourne's partial notes and hand-annotated maps. The fact is: these things are the best BLM has; the agency never undertook an analysis of each route ONDA specifically inventoried and drew BLM's attention to during the NEPA process and again during two rounds of IBLA reviews. There is nothing in the record that reflects the "closer scrutiny" BLM claims was applied to the Sherbourne field inventory. *See* BLM MSJ at 21 n.4. In making that "finding," the Board merely quoted *this Court's paraphrasing* of Mr. Sherbourne's statement that he intended for his inventory "to provide baseline information for the TMP." *See* RAR 22301 (quoting *McDaniel*, 2011 WL 1654265, at *22). Neither BLM nor the Board ever cites any document in the record that actually reflects "closer scrutiny" of Sherbourne's (or ONDA's) route-specific inventory information.

### 5. *Inaccurate Results*

ONDA explained how BLM's incomplete and largely office-based inventory yielded inaccurate results. *See* ONDA MSJ at 20–21. Put into NEPA terms, BLM's unreliable work resulted in the agency failing to establish an accurate environmental baseline. *See ONDA v. Jewell*, 840 F.3d at 568–70 (failure to survey to see whether sage-grouse use project area during winter, relying instead on inapposite off-site surveys, rendered agency's project decision unlawful because it was not based on an accurate baseline). Other than stating claimed or potential uses of routes, BLM fails to address the scores of instances where the agency claimed there was a route but ONDA pointed to evidence in the record showing there is little or nothing there on the ground. *See* ONDA MSJ at 21 (long string of pint-point administrative record citations); BLM MSJ at 18–21 (focused on uses and satellite images, not ground-based photos).

### 6.  *Unreliable Extrapolation*

Finally, ONDA explained why the Board's new extrapolative theory—that a route can "exist" "as a matter of record" even if it cannot be found on the ground—is not convincing: it does not fix BLM's incomplete and unreliable inventory, but rather is just a new label for it. *See* ONDA MSJ at 21–23 (describing Board's repeated invocation of this phrase it coined but never actually defines). In response, BLM only briefly addresses the Board theory in its Steens Act and FLPMA sections (BLM MSJ at 28–29, 37), which ONDA addresses below. *See infra* at III.A. & III.B.

The agency fails to respond to ONDA's showing that the "as a matter of record" theory runs afoul of *NEPA* because driving on or mechanically maintaining a route that exists only "as a matter of record" on paper, but which does not exist on the ground, will have dramatically different environmental impacts compared to driving on or maintaining a road that actually exists on the ground. *See* ONDA MSJ at 22. BLM also fails to address this Court's rejection of this same idea in 2011. *See id.* (citing *McDaniel*, 2011 WL 1654265, at *23, describing BLM's "especially concerning" reliance on wilderness inventory findings from the 1980s, "thereby ignoring the likelihood that routes identified 30 years ago had since been naturally reclaimed"). BLM thus waives, and therefore concedes, the issue of whether the Board's "as a matter of record" theory resulted in a violation of NEPA's requirements to ensure an accurate environmental baseline and to prepare an EIS for actions that may significantly impact the environment. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) ("issues which are not specifically and distinctly argued and raised in a party's opening brief are waived" and "a bare assertion does not preserve" a claim) (quotations omitted) (citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1110, n.1 (9th Cir. 2000)).

Finally, here and throughout BLM's brief, the agency never addresses the issue of *maintenance*. As a result, neither the Board nor BLM disputes that where a road does not currently and actually exist *on the ground*, mechanically maintaining that supposed path will result in a road now existing in that place. *See* ONDA MSJ at 22. That a road exists "as a matter of record" on paper in a historic document is irrelevant to whether maintaining that spot on the ground will change the environment. Indeed, whether or not designating for driving and maintenance a road that exists only on paper is a violation of substantive provisions under the Steens Act or FLPMA, it is indisputable that allowing driving and maintenance on such routes will, by definition, alter the landscape. And this is an environmental impact that BLM and the Board simply do not examine because of their flawed premise that designating an "existing" road will have "no significant impact" on the environment.

### C.  BLM's Additional CRP Route Analyses Also Are Incomplete and Unreliable.

ONDA explained how, in the 2015 CRP, BLM repeated most of the same errors it had committed in the TMP EA: failing to cure its incomplete route inventory, failing to refute the ONDA inventory information, and exacerbating these errors by reinstating the long-defunct Obscure Routes in the absence of a valid public process based on an accurate environmental baseline evaluated in an EIS. *See* ONDA MSJ at 23–25.

BLM responds that in the CRP EA, it "expressly considered" what it terms "Plaintiff's alternative." BLM MSJ at 25. But the cited page (CRP 2421) actually suggests that all BLM did was look at the 2011 injunction materials. ONDA already has explained why that exercise fell short: because BLM's RAFs addressed only about one-third of the routes identified by ONDA for purposes of the injunction proceedings, and focused on potential uses instead of actual

existence, lacked ground-based photographs, and failed to deal at all with Obscure Routes. *See* ONDA MSJ at 16–19.

ONDA explained how BLM apparently misrepresented on February 11, 2015 that it had "no records" of photographs of Obscure Routes. *See* ONDA MSJ at 24–25; SUPP 901. Regardless of when BLM finally took the handful of photographs it eventually placed on its website after the close of the public comment period, the fact remains: during the 30-day wintertime window BLM provided for review and comment, no member of the public could access any of the Obscure Routes BLM was now proposing to open on Steens Mountain. 7th Miller Decl. ¶¶ 10–15.

This is similar to *Great Basin Resource Watch v. BLM*, 844 F.3d 1095 (9th Cir. 2016). In that case, *after* issuance of its final EIS for a mine project, BLM conducted a "double-check" analysis of its baseline air quality estimates, later arguing to the court that its post-decision analysis cured any defects in the baseline it represented in the EIS that was available to the public. *Id*. at 1104. The Ninth Circuit rejected that approach, holding that "a post-EIS analysis—conducted without any input from the public—cannot cure deficiencies in an EIS." *Id*. (citing *Ctr. For Biol. Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1169 (9th Cir. 2003)). As here, "[t]he public never had an opportunity to comment on the 'double check' analysis, frustrating NEPA's goal of allowing the public an opportunity to 'play a role in . . . the decisionmaking process.'" *Id*. (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)); *see also ONDA v. BLM*, 625 F.3d at 1121 n.24 (agency obligation to obtain and disclose information about environmental impacts during the public review process is central to NEPA's principle of "democratic decisionmaking").

///       ///       ///

## II.    PROCEDURAL VIOLATIONS UNDER NEPA

Above and in its opening brief, ONDA explained why BLM's unreliable inventory resulted in procedural violations of law under NEPA: the agency's failure to establish an accurate environmental baseline and failure to prepare an EIS. *See* ONDA MSJ at 25–34. Given its mandate to protect Steens Mountain's "long-term ecological integrity" by, among other things, barring cross-country driving and establishment of new roads, and other requirements like FLPMA's requirement to minimize impacts on a route-specific basis, it was arbitrary of BLM not to carefully establish and assess an accurate, route-by-route environmental baseline. *See Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1002 (9th Cir. 2013) ("a NEPA analysis should be informed by the laws driving the federal action being reviewed") (citing *ONDA v. BLM*, 625 F.3d at 1109).

### A.  Inaccurate Baseline Information (Issue 7)

As Section I of this brief makes clear, the issue of whether BLM evaluated and disclosed an accurate environmental baseline is at the very heart of this case. The paramount import of establishing an accurate baseline cannot be understated in the NEPA context. As the Ninth Circuit explained in the Steens Mountain energy facility case, BLM's inaccurate assumption that no sage-grouse used the project site in the winter was "not harmless" under NEPA. *ONDA v. Jewell*, 840 F.3d at 570. Rather, it misled the public and the Secretary of the Interior to believe the Project's habitat disturbance was mitigatable—in other words, providing "inaccurate information and unsupported assumption [that] materially impeded informed decisionmaking and public participation." *Id*. Applying that analysis, this Court on remand held that BLM's error was serious as a matter of NEPA law because the public was never provided with or allowed to comment on accurate information about whether the project site might provide winter habitat for

sage-grouse. *Or. Natural Desert Ass'n v. Zinke*, -- F. Supp. 3d -- , 2017 WL 2129910, at *1 (Apr.

18, 2017) (vacating Record of Decision approving project because "the Secretary's ROD relied

on a faulty baseline analysis" and was therefore "ill-informed" and because BLM's failure to

establish baseline conditions meant "the public was not able to comment on either the results of

the baseline findings or the methodology used in reaching those results").

The same thing happened here: BLM's inaccurate assumptions misled the public, and

then the Board, to believe the TMP-CRP was merely formalizing "an existing network" of roads

that were already there, not approving motorized use and mechanical maintenance that would, in

fact, as ONDA warned during the NEPA process, result in new disturbance tantamount to cross-

country driving and creation of new roads. AR 788 ("This decision designates existing routes

that can continue to be used by the public."); RAR 2101 (BLM representing to the Board that

"[t]he route network that BLM designated already exists"). But ONDA has proven that that

baseline was demonstrably false based on BLM's incomplete route inventory, its lack of ground-

based photographs and refusal to re-take any ONDA photo points it disputed, its inconsistent use

of the scattershot information it *did* have, and the plainly inaccurate results of its office-based

inventory—all of which led BLM and the Board to base their blanket route and maintenance

level approvals on deeply flawed assumptions. *See supra* Section I. Accordingly, BLM's

incomplete inventory and unreliable methodology resulted in the agency's failure to establish an

accurate environmental baseline, in violation of NEPA. 42 U.S.C. § 4332; 40 C.F.R. 1502.15.

## B.  Significant Environmental Impacts (Issue 9)

### 1.  Designation of 521 miles of roads on Steens Mountain "may" result in significant environmental effects.

BLM's unreliable inventory also played into the agency's failure to recognize that, as

ONDA has shown, the TMP and CRP "may" have significant effects on the environment on

Steens Mountain. ONDA MSJ at 27–34. This is because evidence in the administrative record disputes whether 140.7 miles of BLM's routes even exist, suggests how dramatically mechanical maintenance on another 110.7 miles of routes would alter the mountain, and highlights the scientifically-established adverse environmental effects of roads and road networks. BLM defends based on the notion that it has merely designated an "existing" network of routes. But the issue is whether ONDA has surpassed the "low standard" of showing there are "substantial questions" as to whether the TMP "may" have a significant environmental effect. *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006). Even if it were true that every last one of the 521 miles of designated routes actually exists on the ground, the likely environmental impacts of that vast motorized network are significant.

The record is replete with "substantial questions" about the effects of the TMP-CRP. The ONDA reports document routes that have been naturally reclaimed on the landscape and therefore no longer exist, *e.g.* AR 342–43, 611–613, and routes that are causing resource damage, such as crossing streams or creating erosion problems. *E.g.*, AR 385, 436, 442–44, 531. Whether those routes "exist" or not on prior BLM maps or in incomplete agency inventories, more than 2,700 pages of data dispute BLM's baseline assumption that not altering the "status quo" means BLM can ignore documented ongoing and likely new damage to the environment. *See*, *e.g.*, *New Mex. ex rel. Richardson v. BLM*, 565 F.3d 683, 715 (10th Cir. 2009) (where the evidence "points uniformly in the opposite direction from the agency's determination, we cannot defer to that determination") (quoting *ONDA*, 625 F.3d at 1121 ("We cannot defer to a void.")).

From the start, ONDA and the public expressed concern about potential damage to Steens Mountain's fragile "ecological integrity" from expanding weed infestations if BLM pressed forward with its full-motorized-use alternative. Even if BLM were only designating an "existing

network" of roads, the public warned, and BLM knew, that weeds are a major threat on Steens

Mountain and that motorized recreation on our public lands is rapidly growing. *See*, *e.g.*, AR

9890, 10138, 12939–41 (comment letter examples); SAR 1688 (BLM "increasingly concerned"

in 2001 about the impact of "motorized OHV use on" public lands).

ONDA highlighted the link between the presence of roads and the spread of weeds as one

of the most significant potential impacts that may result from BLM's TMP decision. RAR

21911–12; *see also* AR 12937 & 12939–41 (ONDA comment letter raising this issue and citing

leading scientific studies); Gelbard Decl. ¶¶ 27–81, 82 (describing instances where BLM did not

consider relevant factors or adequately explain its decision, and concluding that "BLM failed to

consider important science-based prevention strategies for minimizing the impacts of these roads

on the spread of invasive weeds" and that BLM's finding of "no" significant impact "is not

scientifically defensible"). BLM responds (BLM Br. at 57) that the *single paragraph* at page 51

of the EA (AR 10003), shows that the agency adequately determined that allowing driving and

maintenance of 521 miles of roads would have "no" significant impact with regard to weeds.

However, consider what BLM conceded on the previous page of the EA: that there are 361

noxious weed sites in the CMPA, that most of those occur along roads or livestock reservoirs,

that roads are "the likely place for new introductions of weeds," and that the presence of roads

"exponentially increas[es]" sites susceptible to new weed introductions. AR 10002.

With these threats in mind, and the body of scientific literature documenting the

pernicious threat posed by weeds taking over native ecosystems, the single sentence in the

Environmental Consequences section on the following page of the EA, generically observing

(and in circular fashion) that "open routes are more easily monitored for new weed infestations

but they are also more apt to have weed seeds introduced," AR 10003, cannot survive as a

"convincing statement of reasons" to support BLM's finding of "no significant impact." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001); *see also* Gelbard Decl. ¶ 37 ("This attempt to justify keeping roads open so they can be used for weed monitoring and control purposes is absurd. BLM can conduct these activities by using roads that are closed to the public to minimize the risk that they will act as a conduit for invasions."); Richman Decl. ¶ 7 (BLM weed program coordinator conceding that although BLM follows several "Best Management Practices" when it conducts agency business on Steens Mountain, "[t]here are no such [protective] provisions for general visitors").

It follows that a decision establishing 521 miles of routes as open to motorized use "may" result in significant environmental effects. That failure is particularly acute bearing in mind Congress's directive that BLM shall, above all else, protect the "long-term ecological integrity" of Steens Mountain "for present and future generations." 16 U.S.C. § 460nnn-12(a). Accordingly, the EA fails on its face to satisfy the "convincing statement of reasons" standard. *Nat'l Parks*, 241 F.3d at 730.

### 2. The NEPA significance factors require an EIS.

ONDA explained how the presence of three of the regulatory "significance factors"— unique characteristics of the geographic area, highly controversial effects, and uncertainty— trigger the requirement for BLM to prepare an EIS, rather than an abbreviated EA/FONSI. ONDA MSJ at 27–34; 40 C.F.R. § 1508.27(b). Again, the presence of *any one* of these factors can be sufficient to surpass the "low standard" for requiring an EIS. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005); *Nat'l Parks*, 241 F.3d at 730; *Klamath Siskiyou*, 468 F.3d at 562 ("low standard"). BLM in response fails to refute that the effects of designating a 521-mile road network "may" affect these important factors on Steens Mountain.

*Unique Geographic Characteristics.*  The Steens Mountain CMPA, created by Congress in 2000, is part of the Department of the Interior's National Landscape Conservation System, and it contains scores of specially recognized areas of wilderness and ecological significance—not least of which is the mountain's significance as essential habitat for the Greater sage-grouse. *See* ONDA MSJ at 28–29. Interior concedes these "unique characteristics of" Steens Mountain, but says it "took them into account" when it prepared the TMP EA. BLM MSJ at 51. But the standard is not whether BLM merely took "into account" or acknowledged these things. It is whether BLM provided a "convincing statement of reasons" to support its finding of "no" significant impact, *Nat'l Parks*, 241 F.3d at 730, or whether, instead, the facts here surpass the "low standard" of showing there are "substantial questions" whether designating a 521-mile road network on Steens Mountain "may" have a significant impact. *Id.*; *Klamath Siskiyou*, 468 F.3d at 562; *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004).

BLM notes (BLM MSJ at 51) that the ODFW did not "express[] or identif[y] concerns with the current transportation network." AR 9989. But that single page in the EA only talks about "wildlife" generally; it does not mention sage-grouse. AR 9989. BLM does not acknowledge—let alone evaluate each of its route designations against—ODFW's recommendation that BLM avoid establishing new roads "through occupied sage-grouse habitat, especially nesting and brood-rearing areas." SAR 4811. Next, BLM reprises that it "accounted for potential weed spread from vehicle use" (BLM MSJ at 52), but still fails to reconcile its circular argument about opening roads to weed invasions so it can monitor for weed invasions. *See supra* at II.B.1.

BLM repeats its argument that closing roads will concentrate vehicle use and "potentially" increase impacts to sage-grouse. BLM MSJ at 52. BLM misunderstands: it is *roads*,

not *vehicles*, that *fragment* habitat. *See* CRP 3188–89 (citing scientific studies linking secondary roads to habitat fragmentation, and explaining that USFWS found the study BLM relied upon failed to consider important factors and used inaccurate road data sets). *Fragmentation* of sagebrush habitat (not collisions with vehicles) is the main cause of the decline of the sage-grouse. CRP 3190 (ONDA letter to BLM citing USFWS findings). BLM claims the Steens Act created "large core unroaded habitat areas." BLM MSJ at 52. While creation of the Wilderness Area was a good start, the record shows that BLM's travel plan left almost no areas more than three miles away from a BLM-designated road on Steens Mountain. AR 10119 (spatial analysis map provided to BLM by ONDA, asking agency to "analyze and discuss road-related impacts on wildlife" [AR 10117]).

BLM claims the "major sources of some [weed] infestations are riparian corridors, not routes." BLM MSJ at 53. Only the agency's use of the vague word "some" saves this from being an outright misrepresentation: BLM simply cherry-picked a statement that one of the 17 types of weeds known to be present on Steens Mountain, *see* AR 10002, "tends to spread via waterways." RAR 2202 (Richman Decl. ¶ 12). More pertinent is BLM's statement in the EA that "[r]oads and travel corridors are typically the likely place for new introductions of weeds." AR 10002; *see also* ONDA MSJ at 29–31 (discussing roads as "major conduit" for weed infestations and citing Board's concession as to the "likelihood that opening routes *would contribute* to the invasion and/or spread of noxious weeds") (emphasis added).

Finally, BLM notes that there are "several [other] unique characteristics" even beyond those ONDA has discussed, citing Congress's designation of the Steens Mountain Wilderness Area in 2000. BLM MSJ at 53. ONDA agrees: Congress's creation of the Wilderness Area and its No Livestock Grazing Area, both closed to public motorize travel, coupled with its directives

to BLM to protect the "long-term ecological integrity" of Steens Mountain, and to prepare a comprehensive travel plan that includes evaluation of *further route closures* and prohibits establishing new roads, all support ONDA's showing that designation of 521 miles of routes available for driving and mechanical maintenance "may" significantly affect this unique and ecologically significant landscape. *See* 16 U.S.C. §§ 460nnn-12(a), -21(b), -22(a), -22(b) (relevant Steens Act provisions).

Finally, BLM claims ONDA "points to no biologists or agencies indicating that the TMP decision is based on poor science." BLM MSJ at 55. That is wrong. For years, ONDA provided BLM with extensive written comments referencing and describing relevant scientific studies, *see, e.g.*, AR 12931–45, CRP 3444–47 & 3451–52, CRP 3454–89, declarations from experts, *see, e.g.*, RAR 22033–110 (Dr. Gelbard addressing weeds issues), RAR 22113–73 (Dr. Miller addressing problems with BLM's inventory methodology), and federal agency science that undermined BLM's flawed assumptions—for example, USFWS findings that weeds "are not limited to roadsides, but also encroach into surrounding habitats" and represent "one of the highest risk factors for sage-grouse" because they out-compete sagebrush and other native plants and cannot be effectively controlled once they become established.[5] Through these and other materials, ONDA did more than enough to surpass the "low" threshold of showing BLM's proposed 521-mile road network "may" have significant environmental impacts.

***Highly Controversial Effects.*** ONDA explained why BLM's motorized travel and maintenance plan for Steens Mountain is "highly controversial" under 40 C.F.R. § 1508.27(b)(4) and the cases interpreting that regulation. ONDA MSJ at 31–33. ONDA highlighted the Ninth

---

[5] 12-Month Findings for Petitions to List the Greater Sage-Grouse (*Centrocerus urophasianus*) as Threatened or Endangered, 75 Fed. Reg. 13,910, 13,927, 13,930, 13,935–37 (Mar. 23, 2010).

Circuit's decision in *National Parks*: where 85% opposition out of 450 commenters on a Vessel Management Plan for Glacier Bay National Park was "more than sufficient" to trigger this factor. 241 F.3d at 736. BLM says that case is different because the Park Service admitted it did not know the effects of its proposed increase in cruise ships. BLM MSJ at 57. By contrast, says BLM, it "knows" the effects of the TMP-CRP because they are "not a major change from the status quo." *Id*. Even ignoring for a moment the thousands of pages of ONDA inventory information that undermine that assertion and the unreliable methods BLM used to reach it, BLM ignores the fact that even a decision *not* to adjust the "status quo" *is* highly controversial.

Because NEPA requires agencies "to consider every significant aspect of the environmental impact of a proposed action," *Vt. Yankee Nuclear Pwr. Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553 (1978), the "considerations made relevant by the substantive statute driving the proposed action" are what must inform the agency's environmental review. *ONDA v. BLM*, 625 F.3d at 1109. Here, in order to protect the "long-term ecological integrity" of Steens Mountain, the Steens Act prohibits off-road driving and establishment of new roads. 16 U.S.C. §§ 460nnn-22(a), -22(b). Because the presence or absence of roads, and the environmental impacts of those roads (whether existing or new) was, in essence, the whole ball game, nothing could be more "highly controversial" than BLM's assumption of 556 miles of "existing" roads, when contrasted with the ONDA inventories and the comments of 20,000 citizens who urged BLM to consider that information and to *reduce motorized use* on Steens Mountain. Far from mere "form-letter comments" (BLM MSJ at 55) that were "brainless and identical" (CRP 6995), the outpouring of public protest evident in this record created a clear "public controversy" that necessitated an EIS. *Nat'l Parks*, 241 F.3d at 736.

***Uncertainty.***  ONDA explained why the "possible effects" of BLM's travel plan "are highly uncertain" because BLM's inventory and methodology were so unreliable that they prevented this Court and the Board (twice) from undertaking any meaningful review of BLM's individual route designations. ONDA MSJ at 33–34 (quoting 40 C.F.R. § 1508.27(b)(5)). BLM fails to address this factor other than repeating its complaint that the TMP did nothing more than adopt the "status quo" and the CRP merely "addressed a modest array of already-existing . . . routes." BLM MSJ at 54–59. This Court rejected that flawed assumption in the first phase of this case, *McDaniel*, 2011 WL 1654265 at *22–23, and gave BLM and the Board a chance to correct this uncertainty—which the agency failed to do, not least of which through the unsupported reinstatement of Obscure Routes that had not been driven in at least five years. *See supra* Section I.B.2. (BLM does not deny none of the RAFs submitted to the Board was for an Obscure Route). For these reasons, BLM's TMP-CRP decisions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with NEPA's requirement, 42 U.S.C. § 4332(2)(C), to prepare an EIS for any action that "may" have a significant impact on the environment.

## III.    VIOLATIONS OF SUBSTANTIVE PROVISIONS OF LAW

BLM's incomplete inventory and unreliable methodology, which resulted in its failure to abide by NEPA's core procedural requirements that would have made essential information available to decision makers and the public prior to a decision being made, also led BLM to violate substantive provisions of law intended to protect wilderness and ecological values on Steens Mountain: under the Steens Act, FLPMA, and the Wilderness Act. And nothing BLM or the Board did on remand or in the CRP fixed these serious flaws.

///        ///        ///

///        ///        ///

**A.  Steens Act (Issues 2 and 3)**

In its opening brief, ONDA explained how Interior violated the Steens Act's prohibitions against (1) authorizing use of motorized vehicles off of roads and (2) establishing new roads or trails for motorized or mechanized use, by designating routes that do not actually exist—*i.e.*, that are "obscure"—on the ground. ONDA MSJ at 34–38. BLM's contention that it is entitled to deference to its reasonable "interpretations" of these provisions is unpersuasive.

BLM argues that the Board's 2014 decision is entitled to *Chevron* deference. BLM MSJ at 27. Interior is wrong that *this* decision of the Board is due deference under the two-step analysis described in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). Although this Court held that the Board's 2009 decision was due *Chevron* deference, *McDaniel*, 2011 WL 1654265, at *10–12,[6] none of the hallmarks that might warrant application of *Chevron* pertain to the Board's *sua sponte* decision to reinstate Obscure Routes. The Board's failure to disclose its intension to revisit this settled, non-remanded issue until it issued its order deprived ONDA of any of the procedural formality—the right to file evidence or briefing regarding Obscure Routes, and the right to request a hearing on that issue—that might warrant heightened deference. Because the Board did not exercise its authority in compliance with its own regulations meant to protect the rights of parties to a formal process, *Chevron* does not apply to the Board's decision to reinstate Obscure Routes. Instead, following *Mead*, the Court should consider the Board's informal, *sua sponte*, interpretation of the Steens Act only if it is

---

[6] Note, however, that the Court only applied *Chevron* to Issue 1 involving the meaning of the word "comprehensive" in 16 U.S.C. § 460nnn-22(a). *See McDaniel*, 2011 WL 1654265, at *11 (stating the issue as "whether the TMP addresses roads, trails, and travel access in *sufficient detail* to satisfy the Steens Act").

"persuasive." *Mead*, 533 U.S. at 235 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Which it is not.[7]

The Steens Act's prohibition against off-road driving is clear: "The use of motorized or mechanized vehicles on Federal lands included in the [CMPA] (A) is prohibited off road; and (B) is limited to such roads and trails as may be designated for their use as part of the management plan." 16 U.S.C. § 460nnn-22(b)(1). So is the Act's prohibition on new construction: "No new road or trail for motorized or mechanized vehicles may be constructed on Federal lands in the [CMPA] unless the Secretary determines that the road or trail is necessary for public safety or protection of the environment." *Id*. § 460nnn-22(d)(1).

The Board states that because "the statute meant *clearly* to allow BLM to designate roads and trails as open to motorized travel," then "the prohibition against motorized off-road travel logically *can only mean* that motorized travel *that does not occur on either a road or a trail* is prohibited." RAR 22307 (emphases added). That is, section 112(b)(1) prohibits *cross-country* driving. Where the Board errs is in its conclusion that this "clear" statutory language allows driving on routes "that exist only as a matter of record." RAR 22296. Authorizing driving and mechanical maintenance on a route that "exists" on paper but not on the ground is the antithesis of the Act's ban on cross-country driving and its ban on establishing new motorized routes. This is amplified by section 112(c) (dealing with road closures), which specifically references "existing" roads. 16 U.S.C. § 460nnn-22(c). That Congress intended to limit motorized travel to routes that actually existed on the ground at the time the Act passed—for which BLM has never

---

[7] Even if *Chevron* applied, the analysis would end at step one because congressional intent is unambiguous with regard to the Steens Act's bans on cross-country driving and establishing new roads. *See Chevron*, 467 U.S. at 843. If congressional intent is clear—as is the case here—"that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id*. at 842–43.

offered any evidence—is clear too from the legislative history's reference to "important protections" that "will keep Steens Mountain [*i.e.*, the mountain itself, not "records" about the mountain in a file cabinet] in its *current*, relatively undeveloped condition." RAR 22028 (emphasis added).

BLM and the Board repeat their contention that the Steens Act allows driving on "trails," not just "roads." BLM MSJ at 28–31; RAR 22296. Whether BLM classifies an Obscure Route (or any other of its route categories) as a "road" or a "trail" matters not.[8] What matters is that Obscure Routes are, by definition, "hard to locate on-the-ground" (AR 9964) and *every* ground-based photograph that exists in the administrative record demonstrates that driving or mechanical maintenance on these routes will involve cross-country travel that crushes vegetation and establishes new roads. *See* 6th Miller Decl. ¶¶ 7–14 (summarizing evidence in the administrative record). BLM has had many opportunities to provide photographic evidence that any of the Obscure Routes actually exists on the ground—and has failed to do so. Under the arbitrary and capricious standard of review, this Court cannot "defer to a void." *ONDA v. BLM*, 625 F.3d at 1121.

Finally, BLM argues it was lawful to establish 9.4 miles of obscure or nonexistent ATV Routes because these were existing routes simply left open and because ONDA's photos show that the routes are "clear on the ground." BLM MSJ at 31. For these routes to be drivable, they will have to be mechanically reconstructed. *See* AR 592–93; AR 13110. Otherwise, even motorists on an ATV (let alone a full-sized vehicle, which, although "not recommended," are not prohibited, AR 9965) will have to drive around large rocks and eroded gullies—*i.e.*, drive cross-country to circumnavigate the "landslides and natural erosion" that the Board said have "almost

---

[8] A "trail" is just a narrower version of a road. SAR 5052.

entirely . . . obliterated" them. AR 9965; AR 57. BLM offers no ground-based photographs of its own to refute this. Accordingly, the ATV Routes are unlawful under the Steens Act.

In short, the Board's "as a matter of record" theory is inconsistent with the plain language of the Steens Act. Even if there were some ambiguity to that language, the Board's interpretation is unreasonable and unpersuasive given Congress's reference to "existing" roads and its intent to keep Steens Mountain in its relatively undeveloped state. The Board's decision is doubly unreasonable and unpersuasive with regard to the Obscure Routes, given the Board's failure to evaluate any evidence of whether each of those routes exists on the ground, as the Board had insisted was necessary just five years earlier. *See* AR 55. Because these interpretive gymnastics are unpersuasive, BLM's failure to point to any rational connection between facts found and choices made renders its decisions arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the Steens Act, 16 U.S.C. §§ 460nnn-22(b)(1)(A), -22(d)(1).

## B. Federal Land Policy and Management Act (Issues 4 and 10)

### 1. *Wilderness Study Area Non-Impairment.*

ONDA demonstrated that BLM unlawfully designated (1) Historical Routes, (2) user-created "pioneered" routes, and (3) Obscure Routes, within WSAs in violation of FLPMA's non-impairment requirement. 43 U.S.C. § 1782(c); *see also* AR 60–63 (Board agreeing as to Obscure Routes in 2009). BLM repeats its long-time complaint—still incorrect—that ONDA changed its position and somehow "concedes" this issue. BLM MSJ at 34. In the administrative appeal BLM cites, ONDA reiterated the same position it has always advanced: that it would "support such historic uses" in WSAs *only* for individual routes where BLM produces "proof" that such uses actually existed on October 21, 1976. AR 255; *see also* AR 12931–32 (same position in 2007 comment letter), AR 10172 (Sierra Club also asking BLM to produce such evidence). "Without

hard documentation," wrote ONDA, "BLM must abide by its Wilderness EIS, including map boundaries and ways identified during that inventory." AR 255. That is nothing more or less than what FLPMA and BLM's binding interpretation of the non-impairment requirement command. *See* RAR 21983–84 (BLM's WSA handbook explaining that where wilderness characteristics have "improved" since 1976, FLPMA forbids "actions that would cause the regression of the WSA to its 1976 . . . condition").[9]

The *only* contemporaneous evidence in the record of what routes existed in WSAs on Steens Mountain in the late-1970s—*i.e.*, the "manner and degree" of any such motorized use in the WSAs—is BLM's Oregon Wilderness EIS, SAR 34–908, which was based on BLM inventory work conducted between 1978 and 1981. SAR 51. Now, aside from self-serving statements in the EA, BLM points only to a non-specific note from a rancher and a largely illegible map, both created decades later during the TMP process, that purport to "document" claimed "historic" routes. BLM MSJ at 36–37 (citing AR 10285, 13476). To the extent these are inconsistent with (1) BLM's own contemporaneous data not showing those routes as existing in 1976, (2) present-day ONDA data showing the routes (still) do not exist, and (3) BLM's definition of Historical Routes in the EA as "hard to locate" or "not found," BLM's decision to authorize any such routes is a textbook case of a failure to make a rational connection between facts found and choices made. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

BLM complains that Historical Routes may become "overgrown" with "vegetation . . . between occasional trips." BLM MSJ at 34–35. That is too simplistic. As Dr. Miller notes with some irony, if "ONDA were simply challenging routes that contained vegetation, we would be

---

[9] The handbook is enforceable because it is incorporated into the governing land use plan, the CMPA RMP (at AR 10455). *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 660 (9th Cir. 2009).

contesting every route within the CMPA except the Steens Mountain Loop Road!" RAR 21856 (¶ 6). This case is not about whether routes cease to exist when as BLM described to the Board a bit of grass grows in them like an overgrown "garden path" (*see* RAR 2045, 2058). It is about whether BLM can lawfully establish routes that have *actually* become overgrown and are, as BLM states in its EA, *actually* "hard to locate" or "not found" on the ground—or, as evidenced by their absence in BLM's Wilderness EIS, *never existed* in the first place.

Next, BLM argues it was not arbitrary to designate pioneered routes in WSAs based on deciding those routes "were in existence – at least as a matter of record" when FLPMA was enacted. BLM MSJ at 37. Here, both parties used the Bridge Creek WSA as an example. *See* RAR 21901–02; RAR 2088. ONDA walked the Board through each of the 11 Historical Routes BLM designated in this WSA. BLM inventoried only nine of them: five did not exist at the time BLM designated the WSA (and therefore cannot be established in the TMP), one was significantly extended in length by BLM in the TMP (and therefore the extended portion must be stricken), and only three existed at the time the WSA was established (and therefore *are* lawful). RAR 21802–03, 21852. BLM conceded that it never inventoried the other two routes that it nevertheless designated in the TMP; these, too, must be stricken because they do not appear on BLM's 1989 baseline (Oregon Wilderness EIS) map for the Bridge Creek WSA. *See* RAR 21803–04.

Through this example, ONDA established that BLM's "blanket" method for establishing routes within protected WSAs was arbitrary because opening obscure routes to motorized use in WSAs violates FLPMA's non-impairment requirement. 43 U.S.C. § 1782(c). On remand, the Board blithely adopted BLM's explanation that its Wilderness EIS inventory "did not disclose" all the routes that existed on October 21, 1976. RAR 22319. BLM never said that in the Oregon

Wilderness EIS. This Court must not defer to that kind of evidentiary "void." *ONDA v. BLM*, 625 F.3d at 1121.

Finally, ONDA explained why establishing Obscure Routes in WSAs violates FLPMA's non-impairment requirement: allowing vehicles to drive where no route currently exists will crush vegetation and create new driving routes cross-country, resulting in impermissible "regression" of wilderness condition. RAR 21984 ("cross-country vehicle use off boundary roads or existing primitive routes is surface disturbing because the tracks created by the vehicle leave depressions or ruts, compact the soils, and trample or compress vegetation"). This was the correct understanding of the law the Board applied in 2009 before "abandoning" it in 2014 in favor of the unprecedented "as a matter of record" theory. RAR 22316. The Board points out that motorized use associated with livestock grazing is "grandfathered" under FLPMA and therefore an exception to the non-impairment requirement and "regression" analysis. Yet, the Board also recognizes (correctly) that "grandfathered uses" are *only* allowed to continue "in the same manner and degree" on "routes . . . in existence on October 21, 1976." RAR 22314. If the route did not exist, there is nothing to grandfather in.

Again, this Court cannot defer to a void. Absent ground-based or contemporaneous (Oregon Wilderness EIS) evidence that any of the designated Obscure Routes existed on the ground in WSAs in 1976, the Board's and BLM's decisions to reinstate the routes in WSAs had no basis in fact, and therefore violated FLPMA's WSA non-impairment requirement. 43 U.S.C. § 1782(c).

### 2. *Minimization Criteria.*

BLM does not dispute that its regulations require the agency to "minimize" impacts on soils, vegetation, wildlife, air, water, and cultural resources. 43 C.F.R. § 8342.1(a)–(c). Nor does

BLM dispute (in fact, it fails to address) any of the six cases ONDA cited that establish that the agency must apply the criteria, at the route-specific level, when designating routes on the public lands. *See* BLM MSJ at 39–42. Rather than arguing that it satisfied this mandatory minimization requirement, BLM offers a series of technical and flawed excuses for why it should not have to minimize impacts in these sensitive ecosystems.

BLM first complains this issue was never exhausted before the IBLA as to the TMP. BLM MSJ at 39–40. That is wrong. As this Court has explained, the Ninth Circuit interprets "issue exhaustion" broadly; an agency need only be provided with sufficient notice to understand and address the concern. *Or. Natural Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1151, 1158 (D. Or. 2011) (citing *Nat'l Parks & Conservation Ass'n v. BLM*, 606 F.3d 1058, 1065 (9th Cir. 2010)). Here, BLM had sufficient notice of the public's concern that the agency should evaluate the motorized routes it was considering designating and ensure that it was minimizing damage to resources. ONDA made clear its concern that BLM's designation of specified routes that ONDA had inventoried would break up roadless areas important for their sagebrush habitat and wilderness values. *See, e.g.*, AR 10116 (ONDA comment letter asking BLM to "close routes that will enhance wilderness values and restore wilderness characteristics; close routes that maximize opportunities for non-motorized recreation, including backcountry hunting and fishing; close routes that might adversely affect wildlife values, including big-game habitat; and close routes that are causing soil erosion or otherwise might lead to spread of invasive weeds.").[10] Moreover,

---

[10] ONDA was not required to use "magic words" or "precise legal formulations." *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 965–66 (9th Cir. 2002). Even if magic words were required, an issue is exhausted so long as "some participant" in the NEPA process raised it. *City of Sausalito v. O'Neill*, 211 F. Supp. 2d 1175, 1198 n.3 (N.D. Cal. 2002). Here, the American Hiking Society cited 43 C.F.R. § 8342.1 in its January 19, 2007 comment letter asking BLM to apply the criteria in its route designations. AR 10105.

because BLM "bears the primary responsibility" to follow FLPMA and its own regulations and to comply with NEPA, this issue should have been "so obvious" that there was no need for a commentator to tell BLM that it had to apply its own minimization criteria. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004). The Court should reject BLM's exhaustion argument.

BLM next contends that the regulation does not apply to "the CRP's decision to leave open these routes." BLM MSJ at 41. Here the agency makes two arguments: first, that the regulation only applies to "areas," not individual routes; and second, that it does not apply to the CRP because that plan only "consider[ed] whether to alter the status" of routes already designated under the TMP. BLM MSJ at 41. Both arguments are wrong.

The executive orders and agency regulations make clear that the criteria apply *both* to designations of areas available for cross-country travel *and* to designations of specific routes. Exec. Order 11644, § 3(a) (referencing "specific areas *and* trails") (emphasis added); 43 C.F.R. § 8342.1 ("[a]reas and trails"). In its travel planning manual, BLM acknowledges that it must pay "[p]articular attention . . . to documentation of how the [minimization criteria] were considered" in making "area designation decisions" *and* "in making individual road, primitive road, and trail designation decisions." BLM Manual 1626 – Travel and Transportation Management, at 1-15, *available at* https://www.blm.gov/media/blm-policy/manuals (last visited Sept. 22, 2017). And the courts have made clear that "[t]he analysis of the minimization criteria must take place at the route specific level, not in some general sense." *S. Utah Wilderness Alliance v. Burke*, 981 F. Supp. 2d 1099, 1105 (D. Utah 2013); *see also WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 932 (9th Cir. 2015) (agency must apply the criteria "with the objective of minimizing . . . the effects of each particularized area and trail designation").

BLM's second argument—that the minimization criteria do not apply because the CRP merely considered whether to alter routes designations "already made" in the TMP—is an exercise in semantics. The word "designate" means "to indicate and set apart for a specific purpose" or "to distinguish as to class." Merriam-Webster Dictionary (2017), *available at* https://www.merriam-webster.com/ (last visited Sept. 29, 2017). As common sense would dictate, the Executive Order and regulation make clear that BLM must "designate" areas and trails as *either* (1) *open* or (2) *closed* to motorized use. ONDA already has established that the entire Steens Mountain motorized route network was "in play"—*i.e.*, subject to change, in the CRP. *See* ONDA Resp. to Harney County's Motion for Summ. J. (Dkt # 308), at 3–4.

It would only have arguably been reasonable for BLM to not prepare route-specific minimization analyses for the CRP if the agency had in fact already done so for the TMP that the CRP was expressly amending. But ONDA already established—and BLM does not dispute—that the agency never applied the minimization criteria to any of the routes it designated in the TMP EA (AR 9950–10029). Nor does BLM dispute that, although it did finally prepare some RAFs during the CRP process for the 36 miles of reinstated Obscure Routes (CRP 2715–892), none of those bare-bones forms address any of the minimization criteria. *See* ONDA MSJ at 42. Thus, because the regulation applies to BLM's route designations in the TMP-CRP, and because BLM can point to nothing in the record where it complied with the regulation on a route-specific basis, the agency's decisions to designate motorized routes on Steens Mountain are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with FLPMA, 43 U.S.C. § 1732(b); 43 C.F.R. § 8342.1(a)–(c).

///      ///      ///

///      ///      ///

C.  Wilderness Act (Issue 5)

ONDA explained how BLM violated the Wilderness Act's non-impairment requirement, 16 U.S.C. § 1133(b), by establishing 21 Historical Routes, totaling 14.8 miles in length, within the Steens Mountain Wilderness Area. ONDA MSJ at 43–45. BLM's defenses are unconvincing.

First, BLM repeats its frivolous contention, unsupported by evidence in the record, that ONDA "flip-flop[s]" its position on Historical Routes. BLM MSJ at 45. ONDA has explained to BLM at least six times now[11] why that is wrong: stating quite clearly that ONDA would "support such historic uses" *only* where BLM has (as it must) "proof" that such uses actually existed on October 21, 1976.

Next, BLM complains that ONDA should not be allowed to contest more than "five specific routes" that BLM claims were the only Historical Routes "remanded by this Court and briefed to IBLA." BLM MSJ at 45. Again BLM misrepresents the record. It was *BLM* that decided to only address Historical Routes 4, 141, 142, 143, and 144 on remand, telling the Board there was "specific record evidence" for those five routes. RAR 2090; *see also* RAR 21804 (ONDA's reply brief to the Board noting that BLM "only addresses the five numbered routes (4, 141, 142, 143, and 144)"). Moreover, as ONDA has explained, ONDA MSJ 43–44, although BLM designated 21 Historical Routes in the Wilderness Area (*see* SAR 5146), the agency only inventoried and assigned numbers to eight of them: the five routes listed above, plus routes 7B, 135, and 157. BLM's inventory suggests that routes 7B, 135, and 157 either do not exist or had been closed at some point, *see* ONDA MSJ at 44, and the agency fails to address them in its

---

[11] AR 12931–32 (May 21, 2007 comment letter setting out this position); AR 255 (reiterating same position in Jan. 4, 2008 appeal to Board); Miller Decl. (Dkt # 56, July 20, 2010) ¶¶ 11, 15 (setting out same position); ONDA Sept. 17, 2010 Reply/Resp. on Cross-Motions for Summary Judgment (Dkt # 75) at 11–12, 14 (same); RAR 21899–900 (May 31, 2013 remand brief to Board); RAR 21804–06 (Aug. 2, 2013 remand reply brief to Board).

brief. *See* BLM MSJ at 44–48. Thus, BLM's designation, and the Board's approval, of Historical

Routes 7B, 135, and 157 violates the Wilderness Act non-impairment requirement.

BLM repeats its "specific record evidence" claim (BLM MSJ at 46–48) for Historical

Routes 4, 141, 142, 143, and 144. But the "evidence" is: (1) a sentence in the EA generally

describing that Historical Routes "follow old closed routes" in the Wilderness Area (AR 9946);

(2) a few BLM maps *dated 2007 and 2011* showing the routes (SAR 5146; AR 802; RAR 2642–

43); (3) Mr. Sherbourne's and another BLM specialist's notes documenting that individuals

holding BLM-issued grazing permits had "requested" designation of some Wilderness routes in

order to haul water to livestock by truck instead of by horseback (AR 10289, 10296, 13439); and

(4) a scrawled note from an unknown person, not even mentioning Steens Mountain and simply

stating that the "[Civilian Conservation Corps] built the fences and built roads and developed

water in the late 1930's [sic] and early 1940's [sic]." AR 10286. None of this "evidence" shows

that Historical Routes 4, 141, 142, 143, and 144 existed on either October 21, 1976 or on October

30, 2000. Thus, designation of these five routes violations the Wilderness Act non-impairment

requirement.

As it did before the Board, BLM fails to address *at all* the other 13 Historical Routes. *See*

BLM MSJ at 46–48 (addressing only routes 4, 141, 142, 143, 144); *see also* ONDA MSJ at 45

(explaining that BLM provided Board with no evidence for the 13 unnumbered routes).[12] Thus,

all we know about these 13 routes is BLM's description of them as "currently hard to locate

and/or were not identified during the WSA inventory process"—*i.e.*, that they are obscure on the

landscape. AR 9964. If BLM allows anyone to search for these nonexistent routes, that will crush

---

[12] BLM shows these 13 Historical Routes in the Wilderness Area in purple on its travel plan
map, but without identifying numbers like the others. SAR 5146.

vegetation and create new routes, by definition impairing Wilderness character in violation of 16 U.S.C. § 1133(b).

BLM next complains that the "grandfathered" date for routes in the Wilderness Area should be the date the Steens Act was passed, October 30, 2000, rather than FLPMA's operative date of October 21, 1976. BLM MSJ at 46. In truth, this is a moot point since the agency can point to no evidence that any of these routs existed on *either* October 30, 2000 or October 21, 1976. Even so, ONDA explained why the FLPMA date applies: before it was designated as Wilderness by the Steens Act, the Steens Mountain Wilderness Area consisted of two Wilderness Study Areas, Home Creek and Blitzen River. Thus, any route not originally identified by BLM during its initial FLPMA wilderness inventory could not, under FLPMA and the Steens Act, have been lawfully established when the Wilderness Area was created. *See* ONDA MSJ at 44.

Finally, BLM's waiver argument here (BLM MSJ at 46) misunderstands its own wilderness inventory chronology. FLPMA, passed in 1976, required BLM to inventory the public lands for wilderness character and then make recommendations to the Secretary of the Interior, who in turn then made recommendations to the president regarding which areas had wilderness character—*i.e.*, were recognized as WSAs. The "grandfathered" date for ensuring WSA non-impairment was October 21, 1976, the date FLPMA was passed, but BLM only completed the lengthy process of inventorying the lands and issuing its Wilderness EIS report in 1989. *See ONDA*, 625 F.3d at 1097–98 (overview of interplay between Wilderness Act and FLPMA); *see also* SAR 1670 (BLM's overview of that 15-year process).

Accordingly, because BLM found that the Historical Routes are "hard to locate" or "not identified during the WSA inventory process," and points to no convincing evidence in the administrative record that any of the 21 Historical Routes at issue existed, on any operative date,

Interior's decisions to designate and approve these routes are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the Wilderness Act, 16 U.S.C. § 1133(b).

## **CONCLUSION**

For these reasons, the Court should grant summary judgment in ONDA's favor, deny BLM's cross-motion for summary judgment, and direct the parties to confer on or brief the issue of relief following the Court's ruling on the merits of ONDA's claims.

DATED this 29th day of September, 2017.    Respectfully submitted,

s/ Peter M. Lacy

_____

Peter M. Lacy
Oregon Natural Desert Association

Of Attorneys for Plaintiff